1   Scott Edward Cole, Esq. (S.B. #160744)
2   Matthew R. Bainer, Esq. (S.B. #220972)
    Carrie S. Lin, Esq. (S.B. #241849)
    **SCOTT COLE & ASSOCIATES, APC**
3   1970 Broadway, Ninth Floor
    Oakland, California 94612
4   Telephone: (510) 891-9800
    Facsimile: (510) 891-7030
5   web:   www.scalaw.com

6   Attorneys for Representative Plaintiff
    and the Plaintiff Class

7

8                  **UNITED STATES DISTRICT COURT**

9        **NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION**

10

11   ROBERT RUNNINGS, individually, and )   **Case No.: C-07-4012 SC**
     on behalf of all others similarly situated, )
12                                            )   **CLASS ACTION**
                          Plaintiffs,         )
13   vs.                                      )   **REQUEST FOR JUDICIAL NOTICE IN**
                                              )   **OPPOSITION TO DEFENDANT DOLLAR**
14   DOLLAR TREE STORES, INC.                 )   **TREE'S MOTION FOR SUMMARY**
                                              )   **JUDGMENT AGAINST ROBERT**
15                        Defendant.          )   **RUNNINGS**
                                              )
16                                            )   Date:        March 21, 2008
                                              )   Time:        10:00 a.m.
17                                            )   Judge:       Hon. Samuel Conti
                                              )   Courtroom:   1, 17th Floor
18                                            )
                                              )
19   MIGUEL A. CRUZ and JOHN D.               )   **Case No.: C-07-02050 SC** (*Consolidated Action*)
     HANSEN, individually, and on behalf      )
20   of all others similarly situated,        )   **CLASS ACTION**
                                              )
21                        Plaintiffs,         )
     vs.                                      )
22                                            )
     DOLLAR TREE STORES, INC.                 )
23                                            )
                          Defendant.          )
24                                            )

25

26        Plaintiff Robert Runnings hereby requests that the Court take judicial notice of the

27   following document pursuant to Federal Rule of Evidence 201, enabling the Court to take

28   judicial notice of documents filed in other courts.

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE WACHOVIA TOWER
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL: (510) 891-9800

1   **Exhibit A:**     Declaration of Miles E. Locker in Support of Plaintiffs' Motion for Class

2   Certification, *Areas v. Pac Pizza*, CIVMSC 05-01715 (Superior Court of California, County of

3   Contra Costa).

4

5   Dated: February 29, 2008.

6                                        Respectfully Submitted:

                                         **SCOTT COLE & ASSOCIATES, APC**

7

8                             By:     /s/Carrie S. Lin

9                                     Carrie S. Lin, Esq.
                                      Attorneys for Representative Plaintiff
10                                    Robert Runnings and the Plaintiff Class

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE WACHOVIA TOWER
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL: (510) 891-9800

# EXHIBIT A

1  ANTICOUNI & ASSOCIATES
   A Professional Corporation
2  Bruce N. Anticouni (#050022)
   Maureen C. O'Hara (#155031)
3  23 East De la Guerra Street
   Santa Barbara, CA  93101
4  Telephone: (805) 962-0467
   Facsimile: (805) 962-7501
5
6  Attorneys for Plaintiffs
7
8            SUPERIOR COURT IN THE STATE OF CALIFORNIA
9               FOR THE COUNTY OF CONTRA COSTA
10
11  MARICELA AREAS, an individual;      )   Case No.  CIVMSC05-01715
    DIANE ARROUES, an individual;       )
12  for themselves, and on behalf of all )   [Assigned to the Hon. David B. Flinn for all
    others similarly situated,          )   purposes]
13                                      )
                                        )
14            Plaintiffs,               )   CLASS ACTION
                                        )
15     vs.                              )
                                        )   DECLARATION OF MILES E. LOCKER
16  PAC PIZZA, LLC., a Delaware         )   IN SUPPORT OF PLAINTIFFS'
    limited liability company, doing business )  MOTION FOR CLASS CERTIFICATION
17  as PIZZA HUT; and DOES 1 through    )
    53, inclusive,                      )   DATE:      June 20, 2997
18                                      )   TIME:      8:30 a.m.
                                        )   PLACE:     Dept. 6/Room 301
19            Defendants.               )
20  _____)
21       I, MILES E. LOCKER, declare as follows:
22       1.    I am an attorney licensed to practice law in the Sate of California and have been
23  retained as an expert witness for the plaintiffs in the above-captioned case.  I know the following
24  facts of my own personal knowledge, and if called as a witness, could testify thereto under oath.
25       2.    I am a graduate of Boalt Hall School of Law, and I have practiced exclusively in the
26  area of labor and employment law since 1984.  I was employed as an attorney with the Division of
27  Labor Standards Enforcement ("DLSE", also known as the Office of the State Labor Commissioner)
28  of the Department of Industrial Relations of the State of California for sixteen years, from March

1

1    1990 through February 2006. For the first eight years at DLSE, I served as a staff attorney in the San

2    Francisco (headquarters) office, responsible for representing individual wage claimants in superior

3    court proceedings on de novo employer appeals from Labor Commissioner orders, decisions or

4    awards in which the DLSE had awarded unpaid wages and/or penalties to employees. During this

5    time, I represented wage claimants in over 400 de novo proceedings. I was also responsible for the

6    prosecution of several civil actions filed against employers, with the Labor Commissioner as the

7    named plaintiff, pursuant to Labor Code §98.3, seeking class-wide relief in the form of wages or

8    penalties due to large groups of employees who were the victims of systemic unlawful wage and

9    hour practices.

10        3.    In May 1998 I was appointed to the position of chief counsel for the DLSE. I served

11    as chief counsel until October 2001, supervising the DLSE Legal Section, advising the Labor

12    Commissioner on legal issues, overseeing all DLSE litigation, and assisting in the development of

13    DLSE enforcement policies. I was also responsible for issuing DLSE opinion letters, setting forth

14    the agency's interpretations of Labor Code provisions and wage and hour regulations. Additionally,

15    I was responsible for conducting training sessions and educational seminars for DLSE enforcement

16    staff (attorneys, deputy labor commissioners, hearing officers, and labor standards investigators), and

17    for various employer and employee organizations throughout the State. In the period following the

18    enactment of AB 60 (the comprehensive state overtime law, which took effect on January 1, 2000),

19    I was responsible for providing advice to the Industrial Welfare Commission ("IWC") as it held

20    public hearings leading to the adoption of the post AB-60 IWC wage orders, and I testified at various

21    IWC hearings on DLSE enforcement policies in regards to various issues that the IWC was

22    addressing in the wage orders.

23        4.    From October 2001 to February 2006, I served as a senior staff attorney (Industrial

24    Relations Counsel IV) for DLSE, with lead attorney responsibilities in the areas of appellate

25    litigation, civil litigation, anti-retaliation enforcement, and public education. During this period of

26    time, I was assigned to handle DLSE's most complex or novel litigation. I drafted many sections

27    of the DLSE Interpretations and Enforcement Policies Manual that was issued in 2002, and along

28    with three other DLSE attorneys, was responsible for the overall editing of the Manual. I remained

1  responsible for the issuance of opinion letters until November 2003, when the new Administration
2  sharply curtailed the practice of issuing such letters. During the period from 1998 to 2003, I drafted
3  approximately 40 opinion letters that were issued by the DLSE, covering a wide range of topics,
4  including the DLSE's interpretation of exemptions from overtime under the IWC orders.

5      5.    Over the past ten years, I have spoken at over 30 professional seminars on various
6  topics in the field of wage and hour law, including seminars held by the American Bar Association,
7  the Labor and Employment Law Section of the State Bar of California, the Bar Association of San
8  Francisco, the Sacramento County Bar Association, the Orange County Bar Association, the Sonoma
9  County Bar Association, the Santa Barbara County Bar Association, the Interstate Labor Standards
10  Association, the National Labor Relations Board, the National Lawyers Guild, the AFL-CIO Lawyers
11  Coordinating Committee, and the California Employment Lawyers Association. I have also spoken
12  about wage and hour law on dozens of occasions at seminars held by various employee and employer
13  organizations. Also, since 1991 I have guest lectured every semester at Bay Area law schools,
14  including Boalt Hall, Hastings, and Golden Gate, on substantive wage and hour law, and on DLSE
15  enforcement policies and practices. Finally, throughout my employment at DLSE, I drafted briefs
16  that were filed and/or argued in over 15 appellate and supreme court level cases, both in state and
17  federal courts.

18      6.    I have been retained by plaintiffs' counsel in the above-captioned matter to provide
19  an expert opinion on various issues that have arisen in this case, including: (1) the proper method
20  for analyzing whether work performed by an employee is exempt or non-exempt for purposes of
21  overtime compensation under California law, with a particular focus on the DLSE's enforcement
22  policies as to the characterization of work as exempt or non-exempt, and (2) the methods whereby
23  wage and hour enforcement cases are adjudicated or prosecuted by the DLSE, and how that
24  enforcement system relates to issues concerning class certification in wage and hour class actions.

25      7.    I have reviewed the following pleadings and evidence in order to form an
26  understanding as to the particular issues in this case: the Second Amended Complaint, the
27  declarations of Diane Arroues, Joaquin Reyes Garcia, Shaloo Sarni, Vu Nguyen, Michael Walker,
28  Paramjit Johal, Virgil Forrester, Kraig Morgan, Debra Jones, Amani Halloun, Amal Halloun, Gabriel

3

1  Padilla, Raymond Oiyemhonlan, Vivian Burton, and Karl Wong, and the depositions of Christina

2  Stephen, Jeff Rowe, Brian Thompson, Maricela Areas, Lisa Short, Debbie Garcia, Denise Johnson,

3  and Ronald Fehling.

4         8.     In determining exempt or non-exempt status, DLSE follows controlling law on this

5  subject, starting with the presumption that all employees are entitled to overtime compensation. It

6  is the employer that bears the burden of proving exempt status. Exemptions, including the

7  "executive exemption" at issue herein., are construed narrowly against the employer, and are limited

8  to those employees who fall plainly and unmistakably within their terms. By statute, in order to

9  qualify for the executive exemption (and the administrative and professional exemptions), the

10  employee must be paid a specified minimum monthly salary, and must be "primarily engaged in the

11  duties that meet the test of the exemption," where the employee "customarily and regularly exercises

12  discretion and independent judgment in performing these duties." (Labor Code §515(a).) The term

13  "primarily" is defined as "more than one-half of the employee's work time" (Labor Code §515(e).)

14  The IWC, in its Statement as to the Basis for Wage Order 5-2001 (the controlling wage order in this

15  case) and the various other wage orders that were adopted following the enactment of AB 60,

16  explained:

17         Thus, the Legislature has codified the longstanding IWC regulatory requirement that

18         an employee must spend more than 50% of his or her work time engaged in exempt

19         activity in order to be exempt from receiving overtime pay. The IWC notes that this

20         California "quantitative test" continues to be different and more protective of

21         employees than the federal "qualitative" or "primary duty" test. Unlike the California

22         standard, federal law allows an employee that is found to have the "primary duty" of

23         an administrator, executive or professional to be exempt from overtime pay even

24         though the employee spends most of his or her work time doing nonexempt work.

25         Under California law, one must look to the actual tasks performed by an employee

26         in order to determine whether the employee is exempt. (A copy of the IWC's

27         Statement as to the Basis is attached hereto as Exhibit A.)

28  The DLSE has always interpreted the primarily "engaged in" test as a test that focuses on that actual

1    work activity performed by the employee. It does not matter what the employee is thinking about

2    while he or she is engaged in some work activity; it is the activity that controls, not the employee's

3    thought processes. Likewise, the employee's "most important" responsibility or "primary" duty is

4    irrelevant; what matters is whether the employee is spending more or not more than 50% of his or

5    her time actually performing exempt tasks.

6        9.    The IWC, in its wage orders, expressly adopted certain federal regulations (as then

7    in effect on June 30, 2000) for the purpose of determining the exempt or non-exempt status of

8    various work activities. Federal regulations that were not expressly adopted cannot be used, and are

9    not used by DLSE, in construing the exempt or non-exempt nature of work activities, as the federal

10   regulations that were not adopted by the IWC are inconsistent with the state's "primarily engaged

11   in" standard. For example, Section 1(A)(1)(e) of IWC Order 5-2001 provides that the "activities

12   constituting exempt and non-exempt work shall be construed in the same manner as such terms are

13   construed in the following regulations under the Fair Labor Standards Act effective as of the date

14   of this order: 29 CFR Sections 541..102, 541.104-111, and 541.115-116.." Under these regulations,

15   there are certain activities that constitute core exempt executive tasks, including "interviewing,

16   selecting and training employees; setting and adjusting their rates of pay and hours of work; directing

17   their work; maintaining their production or sales records for use in supervision or control; appraising

18   their productivity and efficiency for the purpose of recommending promotions or other changes in

19   their status; handling their complaints and grievances and disciplining them when necessary;

20   planning the work; determining the techniques to be used or merchandise to be bought, stocked and

21   sold; controlling the flow and distribution of materials or merchandise and supplies; and providing

22   for the safety of the men and the property." (29 CFR §541.1002(b).) All work other than described

23   exempt work and activities that are "closely and directly related to" such exempt work, are defined

24   as non-exempt work. Such non-exempt work "is easily identifiable where, as in the usual case, it

25   consists of work of the same nature as that performed by the non-exempt subordinates of the

26   'executive.'" (29 CFR §541.111.) The regulations distinguish between the exempt "bona fide

27   executive" and the non-exempt "working supervisor" who regularly performs production work or

28   other work which is unrelated or only remotely related to his supervisory activities, as follows:

5

1   "Clearly, the work of the same nature as that performed by the employees' subordinates must be

2   counted as nonexempt work" (29 CFR §541.115), so if the purported "executive" spends 50% or

3   more of his or her work time performing the same production work as that performed by his or her

4   subordinates, the exemption will not apply.

5       10.      Between those core "exempt" and "non-exempt" tasks, there are certain tasks that

6   may be characterized as work that is "directly and closely related" to exempt work, and when

7   properly characterized as such, this "directly and closely related" work also counts as exempt work.

8   However, in my experience at the DLSE, I have observed that employers routinely mischaracterize

9   non-exempt work performed by working supervisors as work that is "directly and closely related"

10  to exempt work.  The controlling regulations caution; "The supervision of employees and the

11  management of a department include a great many directly and closely related tasks **which are**

12  **different from the work performed by subordinates** and are commonly performed by supervisors

13  because they are helpful in supervising the employees or contribute to the smooth functioning of the

14  department for which they are responsible." (29 CFR §541.108(a), emphasis added.) Thus, as a

15  prerequisite for characterizing a task as exempt as "directly and closed related," the task in question

16  must be one that is not routinely performed by subordinate non-exempt hourly paid employees. As

17  this regulation notes, when a task that is arguably "directly and closely related" to exempt work is

18  customarily assigned to non-exempt employees, that same task, when performed by the manager, is

19  non-exempt, and the amount of time the manager spends in such work "must be offset against the

20  statutory tolerance for nonexempt work." (29 CFR §541.108(c).)

21      11.      Based on my review of the defendant's "RGM Time Management Worksheet," it is

22  my opinion that these worksheets are utterly useless in determining the amounts or percentages of

23  time that defendant's restaurant general managers (RGMs) spent in performing exempt and non-

24  exempt tasks.  First, there is no explanation on these worksheets as to exactly what constitutes

25  exempt and non-exempt work under California law. Also, the declarations and depositions that I

26  reviewed make clear that the RGMs received no training whatsoever from the defendant on exactly

27  what constitutes exempt and non-exempt work.  Testimony from defendant's own witnesses

28  demonstrate that they were operating under the erroneous belief that almost all of their time was

6

1    exempt, even while they were making pizzas, taking customer orders, ringing up sales, or cleaning

2    the restaurant, because they were "always responsible for the restaurant's well-being" or "always

3    thinking about managing." But under California law, responsibilities and thinking are irrelevant, and

4    time gets placed on the exempt or non-exempt side of the ledger based on the task the employee is

5    actually performing. Turning to the Time Management Worksheets, various tasks that are actually

6    non-exempt were improperly counted as exempt, including "weekly inventory count" (performing

7    an inventory, i.e., physically counting supplies and merchandise, is a core non-exempt task, and

8    moreover, testimony from the RGMs show that non-exempt hourly paid employees routinely

9    performed this task), "cash control/deposit prep/and banking" (testimony from the RGMs establish

10   that non-exempt hourly paid employees routinely performed this task), "validate receiving orders

11   and transfers" (same), "nightly critical reviews" (same), and "handling customer complaints"

12   (testimony from the RGMs establish that all employees at each restaurant were expected to "handle

13   customer complaints"). Other categories listed as exempt on the Time Management Worksheet are

14   concepts or general responsibilities, rather than specific work tasks that one would perform or

15   "engage in." Under California law, such concepts (like "safety assurance of restaurant") do not

16   count as exempt work.   Another example of a meaningless category that defendant improperly

17   counts as exempt time is "vendors and repairs." It is impossible to discern what that even means,

18   let alone what tasks it is intended to subsume. The Worksheets double or triple or quadruple count

19   some of the same arguably exempt activities: there are separate entries for "hours spent training

20   crew," "hours spent training shift leaders and assistant managers," "coaching employee

21   performance," and "ops checklist" including "teaching, coaching and follow-up," The Worksheet

22   has separate line items for 28 different purported managerial tasks and one line for all non-exempt

23   tasks, which are listed as "crew duties, i.e., dough prep, making pizzas, taking orders and cleaning

24   restaurant." I am quite certain that any fair survey of non-exempt tasks would result in quite a bit

25   more than four tasks. Defendant failed to list many obvious non-exempt tasks, as, for example,

26   washing dishes, bussing tables, ringing up sales on a cash register, making deliveries, moving food

27   and other supplies to or from the refrigerator, freezer, stockroom, cooking or dining areas, and

28   preparing sauces and toppings, to name just a few.   It is quite obvious that the defendant's intent

7

1   in grossly understating the types of non-exempt tasks, and devoting just one line (out of 29 lines of

2   tasks) to what it considered to be non-exempt work was to ensure that the Worksheet results would

3   not reflect the reality of how the RGMs actually spent their time.  These Worksheets have no

4   evidentiary value whatsoever, except to show the extent to which defendant was willing to go to

5   create an illusion of compliance with California overtime requirements.  It is noteworthy, I believe,

6   that the defendant never came up with a legitimate "task list" of exempt and non-exempt tasks, and

7   never conducted any sort of survey to determine the percentages of time that the RGMs were

8   performing exempt and non-exempt work, and instead, relies on these thoroughly flawed Worksheets

9   in its defense.

10      12.     Defendants in overtime cases will typically argue that even though the evidence

11   shows that working supervisors did not spend more than 50% of their time performing exempt tasks,

12   they should still be considered exempt because the employer expected them to spend the majority

13   of their time performing exempt work. This defense is rooted in certain language in the IWC orders

14   that permits courts, to some extent,  to look beyond the actual percentages of time spent performing

15   exempt and non-exempt work. However, the IWC orders provide that "the        **work actually**

16   **performed** by the employee during the course of the workweek must,  **first and foremost**, be

17   examined, and the amount of time the employee spends on such work, together with the employer's

18   **realistic expectations** and the **realistic requirements** of the job, shall be considered" in determining

19   whether the employee is primarily engaged in duties which meet the test of the exemption.   (IWC

20   Order 5-2001, §1(A)(1)(e), emphasis added.)   Under this test, an employer cannot "make an

21   employee exempt from overtime laws solely by fashioning an idealized job description that has little

22   basis in reality."  (IWC Statement as to the Basis for the Wage Orders, p. 4-5.)  In reviewing the

23   declarations and depositions of the RGMs, it is impossible to conclude that defendant could have

24   had any realistic expectation that its RGMs would spend over 50% of their work time performing

25   tasks that are exempt under California law. Once we get past defendant's mischaracterization of

26   non-exempt work as exempt, it is evident that the vast majority of every RGM's time was spent

27   performing either core non-exempt work or work that cannot be characterized as "directly and

28   closely related" to exempt work because it was work that was routinely performed by subordinate

8

1   non-exempt, hourly employees; i.e., none of the RGMs spent more than 50% of their time

2   performing core exempt work or work that can be characterized as exempt work because it is

3   "directly and closely related" to core exempt work.

4          13.    Turning to the issue of the appropriateness of class certification, defendants often

5   assert that class certification is not appropriate because having the overtime and meal/rest period

6   claims heard by DLSE through its wage adjudication procedures would provide a superior method

7   for resolving the claims.    This assertion is without merit, as it is based on a fundamental

8   misunderstanding of the nature of the DLSE wage adjudication process, set out at Labor Code §§98-

9   98.2. It is my opinion that the DLSE wage adjudication process would be a markedly inferior

10  alternative. My opinion is based on the following considerations:

11          a.    I am informed there are approximately 200 RGMs and former RGMs in the

12  class. DLSE wage adjudication conferences and hearings, under Labor Code §98 (so-called "Berman

13  hearings"), are designed only for the adjudication of individual claims, not claims brought by a group

14  of employees. These hearings are never held on a class-wide basis, and DLSE hearing officers and

15  wage adjudication unit deputies have no training whatsoever in handling class-wide claims. Also,

16  DLSE hearings are based on the location of the individual employee's employment. Separate pre-

17  hearing conferences and hearings would have to be held before different DLSE hearing officers in

18  different DLSE offices throughout the State. There would be a tremendous duplication of effort and

19  a substantial risk of inconsistent determinations on the exact same issues of fact and law.

20          b.    This is a case in which plaintiffs seek relief under Business & Professions

21  Code §17200. DLSE is not authorized to enforce B&P Code §17200, and DLSE hearing officers

22  are not authorized to award any relief under Section 17200. Thus, of course, DLSE hearing officers

23  and wage adjudication deputies have no training whatsoever on relief that is available under Section

24  17200. DLSE hearing officers cannot issue injunctive or declaratory relief under Labor Code §98,

25  and have never done so.  Without injunctive relief, there will be nothing to prevent defendant from

26  continuing to violate wage and hour law requirements. DLSE hearing officers cannot apply the four

27  year statute of limitations to claims brought under Section 17200, so plaintiffs would be limited in

28  DLSE hearings to a three year limitations period for overtime claims.

9

1        c.     Discovery is very limited at the administrative level. Depositions and

2 interrogatories are not permitted. This would deprive the plaintiffs of the discovery rights they enjoy

3 under the Civil Discovery Act, and to the extent that the employer is usually the party with more

4 extensive relevant documentation, it creates an advantage for the employer.

5        d.     Plaintiffs will not be entitled to attorneys' fees for work performed by their

6 attorneys in connection with DLSE wage adjudication hearings in view of the claims that are

7 presented herein. There are only two sorts of claims under the Labor Code for which DLSE can

8 award attorneys fees to claimants in DLSE proceedings – for claims for unreimbursed business

9 expenses under Labor Code §2802 and for certain claims filed by garment workers under Labor

10 Code §2673.1. In contrast, Labor Code §1194 (which provides for an award of attorneys' fees

11 incurred by employees in a successful action to recover unpaid overtime) and Labor Code §218.5

12 (which provides for an award of attorneys fees in any action for the nonpayment of wages) would

13 provide plaintiffs with an award of attorneys fees incurred in this action. The fact that attorneys fees

14 are not generally available to wage claimants in DLSE proceedings serves to discourage attorneys

15 from representing claimants in such proceedings, and is certainly a factor that explains why wage

16 claimants (although they have the right to be represented by counsel) are typically not represented

17 by counsel at DLSE hearings. Moreover, the fact that DLSE does not conduct class-wide hearings

18 means that the attorneys fees that would be incurred by any individual claimant will be exorbitant

19 relative to the value of his or her isolated claim, making it still more unlikely that these claimants

20 would choose to obtain counsel in proceedings before the DLSE. This would create an unlevel

21 playing field that would benefit a defendant that undoubtedly has the resources to obtain legal

22 representation at each separate DLSE hearing, and harm the wage claimants..

23        e.     DLSE hearings would not foster economy of judicial resources, as every

24 decision issued by the DLSE hearing officers would be subject to appeal to the superior court under

25 a standard of de novo review pursuant to Labor Code §98.2. De novo review means just that; it is

26 not a review of the record of the DLSE hearing, but rather, a complete "do-over," i.e., a brand new

27 evidentiary trial for each one of these cases. Instead of one class action pending in one superior

28 court, we will be faced with the spectacle of potentially 200 separate de novo trials pending in courts

1  throughout the State, squandering judicial resources and again, creating a substantial risk of
2  inconsistent judgments.

3      14.    In my experience, employers often seek to defeat class certification on the ground that
4  the DLSE believes that overtime or meal/rest period claims must be resolved on an individualized,
5  case-by-case basis, and that class-wide litigation is simply inappropriate because of the "fact
6  intensive" nature of the relevant inquiry. The essence of this common employer argument is that the
7  question of whether an employee is exempt from overtime compensation and meal/rest period
8  requirements is a "fact intensive" inquiry dependent on the facts regarding each individual employee
9  and that, therefore, cases which allege that entire groups of workers have been illegally denied
10  overtime pay or required meal and rest periods cannot move forward on a class basis. This argument
11  is both fundamentally misleading and quite disingenuous.

12      15.    The DLSE enforces wage and hour law in three different ways. First, through the
13  adjudication of individual wage claims under Labor Code §§98-98.2, through the Berman hearing
14  process described above. But DLSE also enforces minimum wage, overtime pay, meal/rest period
15  requirements, and various other minimum labor standards through the issuance of citations and
16  through the prosecution of civil actions. It issues citations and prosecutes civil actions through its
17  investigatory arm, the Bureau of Field Enforcement ("BOFE") and its prosecutorial arm, the DLSE
18  Legal Unit. BOFE and the DLSE Legal Unit operate in tandem to conduct class-wide investigations
19  and litigation, in cases where unlawful employer practices result in class-wide violations of wage
20  and hour law. For example, under Labor Code §558, BOFE can and does issue citations to
21  employers who fail to pay overtime to groups of employees who are improperly classified as exempt.
22  These citations are issued for specified civil penalties plus the amount of unpaid overtime wages
23  owed to the affected employees. Employers have the right to appeal the citation through an
24  administrative hearing, and the right to seek review of the hearing officer's decision by filing a
25  petition for administrative mandate. Instead of issuing a citation, BOFE can refer a class-wide case
26  to the DLSE Legal Unit for the filing of a civil action pursuant to Labor Code §§98.3 and/or 1193.6.
27  Under Labor Code §98.3, "the Labor Commissioner may prosecute actions for the collection of
28  wages and other moneys payable to employees or to the state arising out of an employment

11

DECLARATION OF MILES E. LOCKER RE CLASS CERTIFICATION

1   relationship or order of the Industrial Welfare Commission." Under Labor Code §1193.6, the DLSE
2   "may, with or without the consent of the employee or employees affected, commence and prosecute
3   a civil action to recover unpaid minimum wages or unpaid overtime compensation, including interest
4   thereon, owing to any employee under this chapter or orders of the [Industrial Welfare] commission."
5   It is the employer's choice to improperly treat all employees in a job classification as categorically
6   exempt from overtime or meal period requirements, and if it does, it risks being cited or prosecuted
7   by the DLSE on a class-wide basis. The DLSE routinely prosecutes such cases on a class-wide basis,
8   on behalf of a large group of employees, notwithstanding the fact that the employer must produce
9   factual evidence to establish the exempt status as to any employee (as all employees are presumed
10  to be non-exempt), and notwithstanding the fact that such cases are often "fact intensive." To give
11  just one example of a case that I was personally involved with as a DLSE attorney, in 2002 the DLSE
12  filed a lawsuit pursuant to Labor Code §98.3 against Brinker Restaurants, seeking meal period
13  premium wages for a group of approximately 30,000 current and former employees. This case
14  resulted in a $10,000,000 settlement, with the proceeds distributed among these workers. The fact
15  that some small number of these employees may have received their meal periods on some isolated
16  occasions did not make this class-wide litigation any less appropriate.

17        16.     An opinion letter issued by DLSE on January 12, 1998, on the topic of "similarly
18  situated workers," explains the DLSE's view on the appropriateness of class-wide litigation. The
19  question presented in this letter is whether the DLSE has an enforcement policy in situations where
20  its investigation reveals that an employer erroneously placed a group of similarly situated employees
21  in an exempt classification. The letter acknowledged that "most opinion letters this agency sends
22  contain language to the effect that each exempt situation must be determined on an individual basis
23  and make clear that the Division does not offer blanket opinions finding a group of employees
24  exempt or non-exempt." But this unwillingness to provide such "blanket opinions" in response to
25  alleged facts that have not been investigated by the DLSE was contrasted to the DLSE's willingness
26  to prosecute cases on a class-wide basis: "This not to say, however, that in a situation where the
27  evidence shows that a large group of employees is being misclassified that the Division would not
28  bring an action on behalf of all of the employees who are similarly situated without specifically

1   investigating the status of each individual employee. Investigation of the status of each employee

2   would be neither prudent nor necessary and the limited resources of the Division would not allow

3   for such a waste of time and effort." While noting that the DLSE is not mandated investigate every

4   claim or to bring an action to enforce every violation it finds, the letter explains that after exercising

5   its prosecutorial discretion, in appropriate cases the DLSE "would bring an action in the name of all

6   of the employees in the classification," and leave it to the employer to raise and prove the affirmative

7   defense that any of the employees are exempt. To insist upon each employee proving non-exempt

8   status when the preliminary facts already indicate that the employees are not exempt (and in view

9   of the presumption of non-exempt status) would improperly shift the burden of proof from the

10  employer to the employees. (A copy of this Opinion Letter is attached hereto as Exhibit B.)

11          17.     If employers wish to avoid either class-wide DLSE enforcement actions or class

12  action law suits, they would be best advised to individually analyze the work performed by their

13  employees and not categorically treat a class of employees as exempt because they all have the same

14  unrealistic job description. By treating all of its RGMs as exempt – until February 20, 2007, when

15  it reclassified all of its RGMs to now hourly, non-exempt employees, and by still failing to pay

16  overtime compensation to all of its RGMs for overtime work performed prior to February 20, 2007,

17  without making any effort to really determine whether any or all of them were spending most of their

18  work time prior to February 20, 2007 engaged in exempt or non-exempt work, defendant established

19  and has maintained a common treatment of all these employees that makes class-wide litigation

20  appropriate. Defendant admits that despite the recent reclassification, there has been no change

21  whatsoever in the single job description for all RGMs, no change in their job duties (which do not

22  vary in any manner from RGM to RGM regardless of restaurant size or sales volume), and no

23  change in defendant's expectations of how RGMs are to perform their jobs. By treating these RGMs

24  in a uniform manner, both prior to and after the February 20, 2007 reclassification, defendant has

25  created, by its own uniform compensation practices, common issues of fact and law as to the entire

26  class of RGMs.

27          18.     In my experience, employers seeking to defeat class certification will argue that those

28  DLSE opinion letters that refuse to issue "blanket determinations" as to whether employees in a

13

1  particular job classification are exempt or non-exempt proves that certification is inappropriate
2  because determinations are fact intensive and can only be made on a case by case basis. This
3  argument conflates the DLSE's role as an educator of the public on wage and hour law issues (which
4  is accomplished in part through the issuance of opinion letters) with its prosecutorial role as a law
5  enforcement agency (accomplished in part by filing class-wide lawsuits). Historically, the DLSE
6  issues opinion letters to employers or other members of the public in response to the unsubstantiated
7  "facts" that are set out in the request for an opinion letter. These "facts" are often colored by self-
8  interest, and the DLSE has no real ability to investigate any of these "facts." These letters are
9  intended to provide general guidance as to how the DLSE would enforce the law in the
10  circumstances presented by the requestor, and may be considered and given some degree of
11  deference by courts deciding similar issues, though they are not binding on anyone. The DLSE's
12  reluctance to issue "blanket" exempt/non-exempt determinations in opinion letters must be
13  understood to flow from the inherent limitations of relying upon "facts" that were not developed by
14  any sort of independent investigation. For this reason, the DLSE's policy of issuing no blanket
15  exempt/non-exempt determinations in an opinion letter is of no relevance to the question of whether
16  a wage and hour case ought to be certified as a class action (as it is of no relevance to the question
17  of whether the DLSE can proceed on a class-wide basis in a lawsuit filed against an employer for
18  illegally misclassifying an entire group of similarly situated employees). To suggest otherwise would
19  allow the inherent limits of advisory opinion letters to control whether regulators or aggrieved
20  workers may file a civil action on a class basis. Such a result would be plainly absurd.

21       19.    By treating all of the RGMs identically without performing any meaningful individual
22  analysis of whether they meet the test of the executive exemption, defendant by its own uniform,
23  across-the-board wage and hour practices created this class. For defendant to now argue that class
24  certification is inappropriate because any determination of exempt or non-exempt status must be
25  made on the basis of an employee by employee analysis is the height of hypocrisy, as it did not
26  perform any such individualized analysis when it adopted the uniform policy of classifying all of the
27  RGMs as exempt. In any event, it is the defendant that must carry the burden of affirmatively
28  disproving non-exempt status, and there is nothing that would prevent defendant from raising this

14

1   defense as to any and all of the members of the class in the context of a class action,

2      I declare under penalty of perjury under the laws of the State of California that the foregoing

3   is true and correct.

4      Executed this _19th_ day of April 2007, at San Francisco, California.

5

6                  _____

7                    Miles E. Locker, Declarant

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

15

## STATEMENT AS TO THE BASIS

**TAKE NOTICE** Pursuant to the "Eight-Hour-Day Restoration and Workplace Flexibility Act," Stats. 1999, ch. 134 (commonly referred to as "AB 60"), the Legislature reaffirmed the State's commitment to the eight-hour workday standard and daily overtime, and authorized workers to adopt regularly scheduled alternative work days and weeks according to statutory and regulatory provisions. The Industrial Welfare Commission of the State of California ("IWC"), in accordance with the authority vested in it by the California Constitution, Article 14, Section 1, as well as Labor Code §§ 500-558, and 1171-1204, held public meetings and investigative hearings during which it received public comment regarding the implementation of AB 60 and, on March 1, 2000, the IWC's Interim Wage Order - 2000 became effective. The IWC subsequently has held additional public meetings and public hearings pursuant to Labor Code §517(a) to further review all of its Wage Orders for purposes of complying with AB 60. The IWC has considered all correspondence, verbal presentations, and other written materials submitted prior to the adoption of amended wage orders. The IWC submits the following statement as to the basis for the various amendments made to sections 1, 2, 3, 4, 7, 9,11, 12, 17, and 20[1] of Wage Orders 1 through 15, and to the Interim Wage Order - 2000. The Statements as to the Basis for the remaining parts of the IWC's wage orders are contained in prior printings of those orders. These remaining parts have not been changed, and there is no need for an explanation because the IWC is continuing in effect regulations that have previously become a part of the standard working conditions of employees in this State.

## 1. APPLICABILITY OF ORDER

Amendments to this section apply to Wage Orders 1 through 13, 15, and the Interim Wage Order. Generally, the section now provides, in part, that employees employed in administrative, executive, and professional capacities are exempt from Sections 3 through 12 of these wage orders. According to the provisions of Labor Code § 515, the criteria that must be satisfied in order to obtain an exemption from overtime pay requirements based on the fact that an individual is an administrative, executive, or professional employee, are that the particular employee must be primarily engaged in duties which meet the test for the exemption, and earn a monthly salary of no less than two times the state minimum wage for full time employment. Labor Code § 515(e) defines "primarily" as "more than one-half of an employee's work time," and § 515(c) defines "full-time employment" as 40 hours per week.

---

[1]Please note that not all amendments apply to all of the wage orders, and that the sections of the Interim Wage Order are slightly different from the other wage orders. Please refer to the detailed Statement below.

EXHIBIT "A"

Thus the Legislature has codified the longstanding IWC regulatory requirement that an employee must spend more than 50% of his or her work time engaged in exempt activity in order to be exempt from receiving overtime pay. The IWC notes that this California "quantitative test" continues to be different from and more protective of employees than, the federal "qualitative" or "primary duty" test. Unlike the California standard, federal law allows an employee that is found to have the "primary duty" of an administrator, executive, or professional to be exempt from overtime pay even though that employee spends most of his or her work time doing nonexempt work. Under California law, one must look to the actual tasks performed by an employee in order to determine whether that employee is exempt. In addition, the statutory threshold for monthly employee remuneration has substantially increased from the amounts set forth in prior IWC wage orders, and that remuneration must be received in the form of a salary.

In addition to the above requirements, Labor Code § 515(f) codified the IWC's existing treatment of registered nurses employed to engage in the practice of nursing. They are not to be considered exempt professional employees, and will not be considered exempt under Labor Code § 515(a) unless they individually meet the criteria established for executive or administrative employees. Similarly, Labor Code § 1186 (enacted by Senate Bill 651, Stats. 1999, ch. 190), provides that pharmacists employed to engage in the practice of pharmacy no longer qualify as exempt professional employees and must individually meet the criteria established for executive or administrative employees in order to be considered exempt under Labor Code § 515(a).

In accordance with the mandate of Labor Code § 515(a) and the expedited process for the promulgation of regulations authorized by § 517, the IWC conducted a review in order to determine the administrative, executive, and professional duties that meet the test of the exemption. The IWC held public meetings and hearings, and received verbal and written public comment in the form of testimony, correspondence, and legal argument regarding various proposals for exempt duties. The bulk of the information came from employers and employees involved in retail, restaurant, and fast food service businesses, as well as representatives of these groups. The IWC also received substantial comment from the legal community. The chief concern of all of these groups related to the distinction between executive managerial employees and nonexempt employees. Employees stated that it was common to have the title of a manager and not be paid overtime, yet perform many of the same tasks as other nonexempt employees during most of the workday. Many employers asked for specific action by the IWC, including the classification of work in settings, such as retail stores, where managers may spend a significant amount of time on the retail floor in the course of managing the operation and directing and supervising the staff. They argued that an employee should not lose his or her exempt manager status merely because he or she sometimes may have to chip in and perform nonexempt work. Attorneys representing employers argued that California should move toward the federal regulatory standards. Other attorneys representing employees reminded the IWC that use of federal regulations might conflict with California's more protective statutory requirement that, in order to be exempt, employees must be "primarily

engaged" in exempt work. The IWC determined that the way to harmonize these various and competing concerns was to focus on identifying the federal regulations that could be used to describe managerial duties within the meaning of California law. The purpose of identifying and referring to such regulations is to more clearly delineate managerial duties that meet the test of the exemption and to promote consistent enforcement practices.

The IWC also received testimony and correspondence from registered nurses regarding the loss of their exempt status as professional employees. The IWC received similar testimony and correspondence from pharmacists and pharmacy representatives. Some testimony reflected the desire to reinstate the professional exemption, while other testimony based on safety and accuracy considerations did not. In addition, advocates seeking an exemption for pharmacists urged that, if the professional exemption could no longer be used, the definition for the administrative exemption should be expanded to include the coverage of pharmacists. Arguments included greater flexibility, professional degrees, and their managerial and advisory duties. Testimony submitted against the allowance of an exemption cited strenuous working conditions, potential jeopardy to the quality of patient care, and the interest of minimizing medical errors. The IWC does not have the power to repeal Labor Code § 515(f) or 1186, which explicitly require that registered nurses and pharmacists individually meet the administrative or executive criteria in order to qualify for an exemption. Accordingly, the IWC chose not to address regulations relating to registered nurses and pharmacists.

Advanced practice nurses, which is an umbrella term that includes nurse practitioners, clinical nurse specialists, certified registered nurse anesthetists, and certified nurse-midwives, submitted testimony advocating the continuation of their exempt status as professional employees. They noted, among other things, that they are not employed to engage in the practice of nursing, and they have advanced degrees in specialized areas, and/or special certification by the State of California. They further noted their 24-hour responsibility for patients, independent management duties, and the need for continuity of patient care as justification for status as exempt professionals. Health care organizations and health care employees both submitted comments and correspondence urging an exemption for advanced practice nurses. On the other hand, labor organizations representing advanced practice nurses testified that they should be treated no differently than other nurses. The IWC also received information regarding pending legislation (Senate Bill 88) that would provide exempt professional status to three types of advanced practice nurses. This legislation was enacted and signed by Governor Davis in September 2000. Accordingly, Sections 3-12 the IWC Wage Orders 1-13 and 15, and Sections 4 and 5 of the Interim Wage Order do not apply to certified nurse midwives, certified nurse practitioners, and certified nurse anesthetists, within the meaning of Articles 2.5, 7, and 8, of Business and Professions Code, Division 2, Chapter 6, who otherwise satisfy the requirements for the professional, executive or administrative exemption. (See Stats. 2000, ch. 492, amending Labor Code § 515.)

After digesting all the information received in its review, the IWC chose to adopt regulations for Wage Orders 1 - 13, and 15 that substantially conform to current guidelines in the enforcement of IWC orders, whereby certain Fair Labor Standards Act regulations (Title 29 C.F.R. Part 541) have been used, or where they have been adapted to eliminate provisions that are inconsistent with the more protective provisions of California law. The IWC intends the regulations in these wage orders to provide clarity regarding the federal regulations that can be used describe the duties that meet the test of the exemption under California law, as well as to promote uniformity of enforcement. The IWC deems only those federal regulations specifically cited in its wage orders, and in effect at the time of promulgation of these wage orders, to apply in defining exempt duties under California law.

Executive Exemption.  The IWC derived the duties which meet the test for the executive exemption from language in the federal regulation 29 C.F.R. § 541.1(a)-(d), with one important exception.  The reference in 29 C.F.R. § 541.1(a) to the phrase "primary duty" is omitted because, as discussed above, that phrase refers to a federal test that provides less protection to employees.  Instead section A(1) generally refers to managerial duties and responsibilities, while section A(5) sets forth California's "primarily engaged" requirement.  Section A(5) also refers to the federal regulations, 29 C.F.R. §§ 541.102, 541.104-541.111, 541.115-541.116, that may be used to describe exempt duties under California law.  Included in these regulations are two which describe work and occasional tasks that are "directly and closely related" to exempt work.  (29 C.F.R. §§ 541.108 and 541.110.)  For example, time spent by a manager using a computer to prepare a management report should be classified as exempt time where use of the computer is a means for carrying out the exempt task.  The IWC recognizes that 29 C.F.R. § 541.110 also refers to "occasional tasks" that are not "directly and closely related."  The IWC does not intend for such tasks to be included in the calculation of exempt work.  In addition, the last sentence of section A(5) comes from the California Supreme Court's decision in Ramirez v. Yosemite Water Co. (1999) 20 Cal.4th 785, 801-802.  Although that case involved the exemption for outside salespersons, the determination of whether an employee is an outside salesperson is also quantitative: the employee must regularly spend more than half of his or her working time engaged in sales activities outside the workplace.  In remanding the case back to the Court of Appeal, the California Supreme Court offered the following advice:

"Having recognized California's distinctive quantitative approach to determining which employees are outside salespersons, we must then address an issue implicitly raised by the parties that caused some confusion in the trial court and the Court of Appeal: Is the number of hours worked in sales-related activities to be determined by the number of hours that the employer, according to its job description or its estimate, claims the employee should be working in sales, or should it be determined by the actual average hours the employee spent on sales activity? The logic inherent in the IWC's quantitative definition of outside salesperson dictates that neither alternative would be wholly satisfactory. On the one hand, if hours worked on sales were determined through an employer's job

description, then the employer could make an employee exempt from overtime laws solely by fashioning an idealized job description that had little basis in reality. On the other hand, an employee who is supposed to be engaged in sales activities during most of his working hours and falls below the 50 percent mark due to his own substandard performance should not thereby be able to evade a valid exemption. A trial court, in determining whether the employee is an outside salesperson, must steer clear of these two pitfalls by inquiring into the realistic requirements of the job. In so doing, the court should consider, first and foremost, how the employee actually spends his or her time. But the trial court should also consider whether the employee's practice diverges from the employer's realistic expectations, whether there was any concrete expression of employer displeasure over an employee's substandard performance, and whether these expressions were themselves realistic given the actual overall requirements of the job."

The IWC, in summarizing the above language in its wage orders, intends to provide some guidance in the enforcement of its regulations. The IWC does not intend to modify or limit the California Supreme Court's statements or its decision.

Administrative Exemption. The IWC similarly derived the duties that meet the test for the administrative exemption from language in the federal regulation 29 C.F.R. § 541.2(a)-(c), with the exception of the "primary duty" phrase. Section B(1)(b), which restates 29 C.F.R. § 541.2(a)(2), refers to school administration, but is not intended to establish a different test with regard to school administration, or to affect the professional exemption as it relates to teachers, or to otherwise change existing law. Section B(4) sets forth the California "primarily engaged" requirement. That section also sets forth the federal regulations, 29 C.F.R. §§ 541.201-541.205, 541.207-541.208, 541.210, and 541.215, that may be used to describe exempt duties under State law. These regulations include types of administrative employees, categories of administrative work, and a description of what is meant by the phrase "discretion and independent judgment." The last sentence of section B(4) again summarizes the California Supreme Court's decision in Ramirez v. Yosemite Water Co. (1999) 20 Cal.4th at 801-802, quoted above. In summarizing that language, the IWC intends to provide some guidance in the enforcement of its regulations, and does not intend to modify or limit the California Supreme Court's statements or its decision.

Professional Exemption. The IWC developed the duties that meet the test for the professional exemption from the list of recognized professions contained in prior wage orders as well as from language in the federal regulations 29 C.F.R. § 541.3(a)(1), (2), and (4), and 541.3(b). The recognized professions are law, medicine, dentistry, optometry, architecture, engineering, accounting, and teaching. Although registered nurses and pharmacists were previously included in the list of recognized professionals, as discussed above, they can no longer be considered to be exempt as professionals. (Labor Code §§ 515(f) and 1186.) Teaching continues to require a certificate from the Commission for Teacher Preparation and

Licensing, or teaching in an accredited college or university, to be eligible for the professional exemption.

Employees subject to Wage Orders 1, 4, 5, 9, and 10 have had the "learned or artistic" aspect of the professional exemption available to them since 1993. The IWC found no reason to limit this aspect of the exemption to those five wage orders. The IWC therefore decided to include the "learned and artistic" provisions uniformly throughout all the wage orders. Section C(4) sets forth the federal regulations, 29 C.F.R. §§ 541.207, 541.301(a)-(d), 541.302, 541.306, 541.307, 541.308, and 541.310, that may be used to describe exempt duties under State law.

The new regulations in this section of the IWC's wage orders regarding the administrative, executive, and professional exemption are consistent with existing law and enforcement practices.

Recent legislative enactments provide exemptions from some or all of the provisions of the IWC's wage orders. In addition to an exemption for certain advanced practice nurses, SB 88, Stats. 2000, ch. 492, creates an exemption for certain employees in computer software fields. Sections 3-12 of IWC Wage Orders 1-13 and 15, and Sections 4 and 5 of the Interim Wage Order will not apply to employees in computer software fields who 1) earn forty-one dollars ($41.00) or more per hour, 2) are primarily engaged in work that is intellectual or creative and requires the exercise of discretion and independent judgment, and 3) are highly skilled and proficient in the theoretical and practical application of highly specialized information to computer systems analysis, programming, and software engineering within the meaning of added Labor Code § 515.5. In addition, effective January 1, 2001, the IWC's orders will not apply to any individual participating in a National Service Program, such as AmeriCorps, AmeriCorps NCCC, and Senior Corps, that carry out services with the assistance of grants from the Corporation for National and Community Service within the meaning of Title 42, United States Code, Section 12571. (See Stats. 2000, ch. 365, amending Labor Code § 1171.)

This section further provides that outside salespersons are exempt from the provisions of the IWC's wage orders. Pursuant to the requirements of Labor Code § 517(d), the IWC conducted a review of the wages, hours, and working conditions of outside salespersons and received testimony and correspondence on these matters. Some witnesses urged the IWC adopt a more expansive definition of an outside salesperson. Others asked the IWC to define more clearly those activities that are not "sales related." After considering proposals by both employers and employees, the IWC determined that it would not change its longstanding definition of "outside salesperson." (See Ramirez v. Yosemite Water Co., 20 Cal.4th 785.) However, the IWC notes that this exception is to be construed narrowly, as a determination that an employee is an outside salesperson deprives that employee of the protections of the wage orders and many other provisions of the Labor Code.

The provisions of Wage Order 10 now apply to all employees employed by an employer operating a business at a horse racing facility, including stable employees. Stable employees include, but are not limited to grooms, hotwalkers,

exercise workers, and any other employees engaged in the raising, feeding, or management of racehorses, employed by a trainer at a racetrack or other non farm training facility. Employees in the commercial fishing industry are now covered by wage orders 10 and 14.

The IWC received no compelling evidence, and concluded there was no reason at this time, to warrant making any other changes in the provisions of this section.

## 2. DEFINITIONS

Amendments to this section apply to Wage Orders 1 through 13, and 15. The IWC received testimony from employee and employer groups requesting clarification regarding what a workday and a workweek included. There was also confusion regarding the definition of an alternative workweek. The IWC adopted the following language into the Interim Wage Order - 2000: 1) "Workday" and "day" mean any consecutive 24-hour period beginning at the same time each calendar day; 2) "Workweek" and "week" mean any seven (7) consecutive days, starting with the same calendar day each week. "Workweek" is a fixed and regularly recurring period of 168 hours, seven (7) consecutive 24-hour periods; 3) An "Alternative workweek schedule" means any regularly scheduled workweek requiring an employee to work more than eight (8) hours in a 24-hour period. This language will now replace the language in Wage Orders 1 through 13 and 15. The definitions provided in this section for "workday" and "day," "workweek" and "week," and "alternative workweek schedule" are identical to the definitions provided in Labor Code §500.

The IWC determined that an additional definition for a work "shift" should be added to its wage orders. "Shift " means designated hours of work by an employee, with a designated beginning and quitting time.

As discussed below in Section 3, Hours and Days of Work, the IWC also determined that the health care industry should retain the option to adopt alternative workweek schedules with work days of more than 10 but not exceeding 12 hours. The IWC has therefore included definitions in Wage Orders 4 and 5 for the terms "health care industry," "employees in the health care industry" and "health care emergency." These three terms are discussed more fully in Section 3.

The IWC received no compelling evidence, and concluded there was no authority at this time, to warrant making any other change in the provisions of this section other than those required by AB 60.

3. HOURS AND DAYS OF WORK
DAILY OVERTIME - GENERAL PROVISIONS[2]

This portion of Section 3 states the daily overtime provisions mandated by AB 60 and applies to Wage Orders 1 through 13, unless otherwise indicated. This section clarifies that premium pay for the "seventh day of work in any one workweek" refers to the seventh consecutive day of work in a workweek. The IWC received testimony regarding the general provisions of overtime as mandated by AB 60. Both employers and employees testified that they were confused regarding the meaning of the "seventh day of work" in the calculation of premium pay. The time-and-a-half provision in Labor Code §510(a) refers to "seventh day of a workweek," but the double time provision refers to "seventh day of a workweek." This slight difference creates the confusion as to whether AB 60 requires double time pay for any work performed in excess of eight hours on the seventh day of the workweek, even if the employee has not worked on all seven days of that workweek. The IWC found that the purpose of the seventh day premium is to provide extra compensation to workers who are denied the opportunity to have a day off during the workweek. Following a literal interpretation of the double time provision would illogically reward someone who may only be scheduled to work one day, and that day fortuitously happens to be the seventh day of the employer's workweek. To clarify this matter, the IWC inserted the term "consecutive" to specify that an employee must work on all seven days in a designated workweek to receive overtime compensation for the seventh day of work in a workweek.

In determining overtime compensation for nonexempt full-time salaried employees, this section also restates Labor Code § 515 (d), which clarifies that the rate of 1/40th of the employee's weekly salary should be used in the computation.

ALTERNATIVE WORKWEEKS SCHEDULES[3]

This portion of section 3 provides the general guidelines for Wage Orders 1 through 13 for the adoption of employer proposed alternative workweek schedules provided by Labor Code § 511. Section 511 has specific provisions for adopting alternative workweek schedules and sets the standards for determining the overtime compensation for employees who adopt such schedules.

Generally, Wage Orders 1 through 13 provide that an employer does not violate the daily overtime provisions by properly instituting an alternative workweek schedule of up to ten (10) hours per day within a forty (40) hour workweek. Instead, once employees have properly adopted an alternative workweek schedule, an employer must pay one and one-half (1½) times the employees' regular rate of pay for all work performed in any workday beyond that alternative workweek of up to twelve (12) hours a day or beyond forty (40) hours per week, and double the employees' regular

---

[2] See Section 4 of the Interim Wage Order

[3] See Sections 5-8 of the Interim Wage Order.

rate of pay for all work performed in excess of twelve (12) hours per day and any work in excess of eight (8) hours on those days worked beyond the adopted alternative workweek schedule. Wage Orders 4 and 5 also provide for alternative workweek schedules of up to twelve (12) hours in a workday within a forty (40) hour workweek for employees in the health care industry. In addition, the IWC has provided for special exemptions from daily overtime for organized camp counselors and employees in the ski and commercial fishing industries. These matters are discussed in more detail below.

The IWC notes that Wage Order 1-89, which was reinstated by AB 60, provided for an alternative workweek "of not more than ten (10) hours per day within a workweek of not less than forty (40) hours," as opposed to the language adopted by the IWC that provides for an alternative workweek of not more than ten (10) hours per day within a "within a forty (40) hour workweek," as specified in AB 60. To resolve this conflict, and in the interest of uniformity and greater flexibility in crafting alternative workweek schedules, the IWC adopted the latter language to insert into Wage Orders 1 through 13. Thus, Wage Order 1 now contains language identical to the other wage orders.

The IWC further clarified that hours considered in the calculation of daily overtime pay are not counted in the determination of 40-hour workweek overtime compensation. Basically, there is no "pyramiding" of separate forms of overtime pay for the same hours worked. Once an hour worked is paid at the applicable daily overtime rate, that same hour cannot be used in the computation of forty hours for the purposes of weekly overtime pay.

After receiving testimony and correspondence from employees who sought predictability in work schedules, and employers who sought flexibility in work schedules, the IWC concluded that an employer proposal for an alternative workweek schedule must designate the number of days in the workweek and number of hours in the work shift. The employer does not need to specify the actual days to be worked within that workweek prior to the alternative workweek election. The phrase "regularly scheduled," as set forth in Labor Code § 511(a), means that the employer must schedule the actual work days and the starting and ending time of the shift in advance, providing the employees with reasonable notice of any changes, wherein said changes, if occasional, shall not result in a loss of the overtime exemption. However, in no event does Labor Code § 511(a) authorize an employer to create a system of "on-call" employment in which the days and hours of work are subject to continual changes, depriving employees of a predictable work schedule. Moreover, in Wage Orders 1, 2, 3, 6, 7, 8, 11, 12, and 13, the IWC retained the pre-AB-60 requirement that alternative workweek schedules provide for two (2) consecutive days off for employees.

The IWC received several inquiries concerning flexibility for employees switching alternative-workweek options after an election is held. The IWC concluded that upon the approval of the employer, an employee may move from one menu option to another. Additionally, the "menu of options" provision provided in Labor Code § 511(a) provides that an employer may propose "a menu of work schedule options,

from which each employee in the unit would be entitled to choose. "Such choice may be subject to reasonable nondiscriminatory conditions, such as a seniority-based system or a system based on random selection for selection of limited alternative schedules, provided that any limitation imposed upon an employee's ability to choose an alternative schedule is approved as part of the 2/3 vote of the work unit. If the employer's business needs preclude allowing its employees to freely choose among work schedule options, the employer should not propose a menu of work schedule options. Instead, the employer may be able to propose more than one alternative workweek schedule by dividing the workforce into separate work units, and proposing a different alternative workweek schedule for each unit. This method would inform each employee of exactly which schedule would be adopted by the election. In order to provide flexibility in accommodating the personal needs of employees, the IWC further clarified that employers may grant employee requests t switch same-length shifts on an occasional basis.

Based on some of the testimony the IWC received regarding alternative workweek schedules, a question arose as to whether an employer who adopted an alternative workweek arrangement of no greater than ten (10) hours per day could lawfully require employees to work beyond those scheduled hours on a recurring basis with the payment of appropriate overtime compensation. Labor Code §511(a) provides that employees may elect to establish a "regularly scheduled alternative workweek" that authorizes work by the affected employees for no longer than 10 hours within a 40-hour workweek. However, Labor Code § 511(b) provides that an employee working beyond the hours established by the alternative workweek agreement shall be entitled to overtime compensation. The IWC believes that, reading these two provisions of the Labor Code together, an employer who requires an employee to work beyond the number of hours established by the alternative workweek agreement, even if such overtime hours are worked on a recurring basis, does not violate the law if the appropriate overtime compensation is paid.

However, the IWC added a section to its wage orders out of its continued concern that employers could establish alternative workweek agreements and then consistently deviate from the regular schedule approved by the employees without paying overtime compensation for work performed beyond eight hours in a day. Such conduct effectively deprives employees of the right established by Labor Code §511(a) to a "regularly scheduled" alternative workweek and could lead to abuses. To prevent any such abuses, the IWC wage orders now provide that, if an employer sends workers home early on a work day that they are scheduled to work beyond eight hours without the payment of overtime pursuant to an alternative workweek agreement, the employer is required to pay overtime compensation in accordance with the provisions of the Labor Code §511(a) for all hours worked in excess of eight (8) hours on that workday.

The IWC has received questions regarding how part-time employees working in employee units that have adopted alternative workweeks should be paid overtime. It is the IWC's continued intention that a part-time employee be paid overtime in the same manner as other employees in the work unit. Thus if the employee work unit has adopted an alternative work week schedule of four ten-hour days, a part-time

employee working two ten-hour days would not be paid overtime after eight hours; rather, overtime would be paid after working the ten-hour daily shift.

This section echoes Labor Code §511(c), which prohibits employers from reducing an employee's regular rate of hourly pay as the result of the adoption, repeal, or nullification of an alternative workweek schedule. Labor Code §511(c) only applies to reductions in the regular rate of pay that are instituted after January 1, 2000, the effective date of AB 60.

This section also reflects the requirements of Labor Code § 511(d) regarding the required reasonable accommodation of employees who are unable to work alternative workweek schedules that are established through election, the permissible accommodation of employees hired after the election who are unable to work the alternative workweek schedules established through election, and the required exploration of "any available reasonable alternative means" of accommodation of the religious belief of an affected employee that conflicts with the alternative workweek schedule established through election. In addition, this section states the requirements for the employer reporting of alternative workweek election results mandated by Labor Code §511(e), as well as the provisions in Labor Code §554 concerning the accumulation of days of rest. The requirement of one day's rest in seven is mandated by Labor Code §§ 551 and 552.

Notwithstanding the general provisions in its wage orders regarding alternative workweeks, Wage Orders 4 and 5 allow employees in the "health care industry" to adopt employer proposed alternative workweeks of up to twelve (12) hours in a workday within a forty (40) hour workweek. Labor Code § 511(g) and the Interim Wage Order 2000 previously authorized such alternative workweeks if they were adopted according to the election and other requirements contained in those measures. In addition, the Interim Wage Order provides that such alternative workweeks are valid only until the effective date of wage orders promulgated pursuant Labor Code §517. In the meantime, the IWC conducted a review of the health care industry, as required by Labor Code § 517(b), to determine inter alia whether the allowance of twelve hour workdays should continue to be an option for employees, and what employees should be considered a part of the health care industry.

The IWC received testimony and correspondence from numerous employees, employers, and representatives of the health care industry regarding alternative workweeks. Citing personal preference, commuter traffic, mental and physical well-being, family care, and continuity of patient care issues, the vast majority of testimony from health care employees urged the retention of the 12-hour workday. Advocates of 12-hour workdays also noted that 8-hour shifts were impractical for hospital and home health care services, and that their industry should be afforded greater flexibility.

The IWC received additional testimony and correspondence from employees who work eight (8) hour shifts and prefer doing so. These employees also emphasized the need for flexibility in work scheduling, so that eight (8) shifts would not be

eliminated, and so that employees would not be forced to work longer or shorter hours than desired.

The IWC also received testimony concerning patient safety considerations in support of the elimination of 12-hour workdays. These witnesses advised that the last four hours of 12-hour shifts can be exhausting and that exhaustion can result in a greater inclination toward making mistakes.

Based on all the information it received, the IWC determined that the health care industry should retain the option to adopt alternative workweek schedules with work days of more than 10 but not exceeding 12 hours. The IWC further determined that it will retain through its wage orders the provisions of former Labor Code § 1182.9, that employers engaged in the operation of a licensed hospital, or in providing personnel for the operation of a licensed hospital, may propose regularly scheduled alternative workweeks that include no more than three (3) twelve (12)-hour workdays within a 40-hour workweek, and that, if such an alternative workweek is adopted, an employer must make a reasonable effort to find another work assignment for any employee who participated in the vote which authorized the schedule and is unable to work the 12-hour shift. However, an employer is not being required to offer a different work assignment to an employee if such a work assignment is not available or if the employee was hired after the adoption of the twelve (12) hour, three (3) day alternative workweek schedule.

The main question remaining was how the health care industry would be defined. Following several public meetings and hearings, employer and employee representatives decided to work together and attempt to resolve several issues regarding the health care industry and to draft proposed language for consideration by the IWC. Prior to the public hearing on June 30, 2000, these two groups were able to negotiate compromises agreeable to both sides and to propose such language to the IWC. The proposed language, which the IWC adopted, defines the "health care industry" as hospitals, skilled nursing facilities, intermediate care and residential care facilities, convalescent care institutions, home health agencies, clinics operating twenty-four (24) hours per day, and clinics performing surgery, urgent care, radiology, anesthesiology, pathology, neurology, or dialysis. The IWC received testimony and correspondence that in intermediate care and residential care facilities other regulatory agencies use the term "resident" to describe persons receiving medical care in those facilities. The IWC concluded that the term "patient" includes "residents" of those facilities as defined by Health & Safety Code §§ 1250(c), (d), (e), (g), and (h), and 1569.2(k).

The proposal also included language defining the employees that are a part of the health care industry. The IWC adopted this proposal with one amendment regarding animal health care. Employees in the health care industry are now defined as those employees who provide patient care, or work in a clinical or medical department, including pharmacists dispensing prescriptions in any practice setting, or work primarily or regularly as members of a patient care delivery team, or are licensed veterinarians, registered veterinary technicians, and unregistered animal health

assistants and technicians providing patient care in animal hospital settings or facilities equivalent to those described above for people.

The regulations make clear that the phrase "employees in the healthcare industry" does not include those persons primarily engaged in providing meals, performing maintenance or cleaning services, doing business office or other clerical work, or undertakings involving any combination of such duties. Therefore, any alternative workweek schedule that is adopted by employees primarily engaged in these duties, and that provides for workdays in excess of 10 hours, is now null and void.

The IWC intends the definition of employees in the health care industry to encompass pharmacists who dispense prescriptions in all practice settings, including community retail pharmacists. The IWC also intends to include within the definition of the health care industry all employees who primarily or regularly provide hospice care as members of a patient care delivery team.

The IWC further notes that the requirement that an employee work primarily or regularly as a member of a patient care delivery team means that the employee must spend more than one-half of his or her work time engaged in such work. In Wage Orders 4-89 and 5-89, as amended in 1993, the IWC had a different definition of the term "primarily" for employees in the health care industry. According to those orders, "the term 'primarily' as used in section 1, Applicability, means (1) more than one-half the employee's work time as a rule of thumb or, (2) if the employee does not spend more than 50 percent of the employee's time performing exempt duties, where other pertinent factors support the conclusion that management, managerial, and/or administrative duties represent the employee's primary duty." This definition no longer exists. Again, the IWC emphasized that, consistent with Labor Code §515(e), "primarily" means one-half the employee's work time.

With regard to animal health care, the IWC received testimony from veterinarians and the California Veterinary Medical Association which represents approximately 4,500 licensed veterinarians and registered veterinary technicians who own and/or work in some 2,200 hospitals, clinics and independent practices throughout the State. The Association advised the IWC that approximately 50% of the animal care facilities are 24-hour hospitals that provide medical, dental, and surgical care, as well as emergency and critical care for patients. The IWC determined that licensed veterinarians, registered veterinary technicians and unregistered assistants had the same work-related issues and personal concerns regarding alternative workweek schedules as employees providing health care services to humans, and that such employees, who provide patient care within the meaning of Business and Professions Code §§ 4825-4857 in facilities similar to those described above for the treatment of humans, should be included in the health care industry.

The negotiated proposed language that the IWC adopted also includes a few protections for employees working 12-hour shifts. Employees cannot be required to work more than 12 hours in a 24-hour period unless there is a "health care emergency," as that phrase is defined in the regulation, and even though all reasonable steps have been taken to provide otherwise, the continued overtime is

necessary to provide the required staffing. However, an employee may be required to work up to thirteen (13) hours within a 24-hour period if the employee that is supposed to relieve the first employee does not show up for his or her shift on time and does not notify the employer two hours in advance that he or she will not appear for duty as scheduled. Also, no employee can be required to work more than sixteen (16) hours in a 24-hour period unless by a voluntary mutual agreement of the employee and employer, and no employee can work more than 24 consecutive hours until that employee receives 8 consecutive off-duty hours. Finally, the adopted language provides that, if, during the last quarter of 1999, an employer implemented a reduced pay rate for employees choosing to work 12 hour shifts, and desires to reimplement a flexible work arrangement that includes twelve (12) hour shifts at straight time for the same work unit, the employer must pay a base rate to each affected employee in the work unit that is no less than that employee's base rate in 1999 immediately prior to the date of the rate reduction.

The IWC retained the provisions in Wage Order 5 relating to the following method of calculating overtime compensation. An employer engaged in the operation of a hospital or other institution primarily engaged in the care of the sick, aged, or mentally ill or defective in residence may, pursuant to an agreement or understanding arrived at before the performance of work, establish a work period of fourteen (14) consecutive days in lieu of a workweek of seven (7) consecutive days if, for any work in excess of eighty (80) hours in such fourteen (14) day period, the employee receives compensation at a rate of not less than one and one-half (1½) times the employee's regular rate of pay.

ELECTION PROCEDURES

Labor Code 517(a) directed the IWC to adopt regulations before July 1, 2000 regarding "the conduct of employee workweek elections, procedures for employees to petition for and obtain elections to repeal alternative workweek schedules, procedures for implementation of those schedules, conditions under which an adopted alternative workweek schedule can be repealed by the employer, employee disclosures, designations of work, and the processing of workweek election petitions." In accordance with this mandate, this section also lays out the election procedures for the adoption and repeal of alternative workweek schedules. Labor Code § 511(e) requires employers to report the results of any election to the Division of Labor Statistics and Research.

Based on testimony it received during public meetings and hearings, as well as its consideration of proposals of election procedures that were submitted, the IWC determined its wage orders should have more extensive procedures and safeguards than included in the Interim Wage Order - 2000. The language adopted reiterates the two-thirds (b) vote before the performance of work and secret ballot election requirements found in Labor Code § 511(a), and also provides a definition for "affected employees in the work unit." This definition is derived from preexisting language found in Wage Orders 4, 5, 9, and 10.

However, the adopted language also sets up employee disclosure guidelines and mandates that an employer must provide disclosure in a non-English language if at least five (5) percent of the affected employees primarily speak that non-English language. Written disclosure and at least one meeting must be held at least fourteen (14) days prior to the secret ballot vote. This 14-day notice provision was previously applicable only to the health care industry. Failure to abide by these employee disclosure requirements will render the election null and void.

In addition, Wage Order election procedures now require employers to hold elections at the work site of the affected employees, specify that employers must bear any election costs, and authorizes the Labor Commissioner to investigate employee complaints. Following an investigation, an employer may be required to select a neutral third party to conduct the election. In order to provide additional protection for employees, the IWC added language that prohibits employers from intimidating or coercing employees to vote either in support of or in opposition to a proposed alternative workweek. Also, employees cannot be discharged or discriminated against for expressing opinions about elections or for voting to adopt or repeal an alternative workweek agreement.

The procedures further provide for the revocation of an alternative workweek schedule. The one-third (1/3) petition threshold and two-thirds (b) vote required to reverse an alternative workweek agreement reflects language adopted in the Interim Wage Order – 2000. While Wage Orders 1, 9, 10 and non-health care industry employees in Wage Orders 4 and 5 already followed these requirements, Wage Orders 2, 3, 6, 7, 8, 11, 12, 13, and Wage Orders 4 and 5 in the coverage of health care industry employees instead required a majority of employees to petition for an election. In the interest of establishing a universal provision applicable to all wage orders, the IWC decided to defer to the one-third (1/3) standard.

Following the repeal of an alternative workweek schedule, the employer faces a sixty (60) day compliance deadline, but the Division of Labor Standards Enforcement (DLSE) may grant an extension upon showing of undue hardship. This provision merely restates preexisting language from Wage Orders 1 through 13.

The requirements that an election to repeal an alternative workweek agreement must be held within thirty (30) days of an employee petition and on the affected employees' work site fall under the IWC's Labor Code § 517 authority. The prerequisite twelve (12) month lapse after the adoption of an alternative workweek schedule before an election to repeal can be held reflects preexisting language found in Wage Orders 1 through 13.

The adopted language clarifies that the report on election results is a public document, and further specifies the content required for each report. The language also provides for a thirty (30) day grace period before employees are required to work any new alternative workweek schedules adopted through election.

OTHER PROVISIONS[4]

---

[4]  See Sections 6-8 of the Interim Wage Order.

Minors: This section reflects the current penalties for violation of child labor laws. Violators are now subject to civil penalties from $500 to $10,000 as well as to criminal penalties. These increased penalties, initially set forth in the Interim Wage Order - 2000, will now be reflected in all the IWC's wage orders.

Make up Time: This section implements the make up time provisions mandated by Labor Code §513. The statute provides that an employer must approve the written request of an employee on each occasion the employee would like to perform make up time in the same workweek. In the interest of employer and employee convenience, the IWC decided to allow any employee who knows in advance that he or she will be requesting make up over a succession of weeks to request make up work time for up to four weeks in advance.

Collective Bargaining Agreements: This section updates the criteria for the collective bargaining agreement exemption in accordance with Labor Code § 514. Except as provided in subsections referring to overtime for minors 16 and 17 years of age, the availability of a place to eat for workers on night shift, and limits on work over 72 hours, employees working under valid collective bargaining agreements are exempt from the AB 60 overtime provisions if the agreement provides for the wages, hours of work, and working conditions of the employees, premium wage rates are designated for all overtime hours worked, and their regular hourly rate of pay is at least thirty (30) percent more than the state minimum wage.

This provision replaces the previous requirement that employees under collective bargaining agreements must earn at least one-dollar ($1) an hour more than the state minimum wage to qualify for the exemption. Premium wage rates are any rates higher than the regular hourly wage rate. The IWC also adopted language that requires the application of "one day's rest in seven" for employees working under a collective bargaining agreement unless the agreement explicitly states otherwise.

The California Labor Federation submitted testimony that Labor Code §514 was intended to permit the parties to a collective bargaining agreement to define what constitutes "overtime hours" and to determine the rate of premium pay to be paid for all overtime hours worked. The Commission agrees that § 514 permits the parties to a collective bargaining agreement to establish alternative workweek agreements through the collective bargaining process provided certain conditions are met. Thus, so long as the collective bargaining agreement establishes regular and overtime hours within the work week, establishes premium pay for all such hours worked, and the regular rate of pay is more than (30) percent above the minimum wage, then the exemption established by Labor Code § 514 is applicable.

Personal Attendants: Wage Order 5 previously included an exemption from Section 3, Hours and Days of Work, for personal attendants, adult employees or minors who are permitted to work as adults who have direct responsibility for children under eighteen (18) years of age receiving twenty-four (24) hour care, organized camp counselors, and resident managers of homes for the aged having less than eight (8) beds as long as such employees were not employed more than 54 hours nor more than six (6) days in any workweek, except under certain emergency conditions. The

IWC learned, however, that, except for organized camp counselors, the provisions of this exemption violate the requirements of the federal Fair Labor Standards Act. In order to comply with federal law, the IWC reduced the weekly overtime provisions to 40 hours for personal attendants, adult employees or minors who are permitted to work as adults who have direct responsibility for children under eighteen (18) years of age receiving twenty-four (24) hour care, and resident managers of homes for the aged having less than eight (8) beds. It is the IWC's intention is that these employees may work more than eight (8) hours in a day as long as their weekly hours do not exceed 40 and, consistent with prior enforcement practices, any such employees who work more than 40 hours in a workweek must receive overtime pay for any day during that workweek in which they worked more than eight (8) hours. The IWC notes, however, that personal attendants who are also "employees in the health care industry," who also work in facilities within the meaning of the term "health care industry," may elect to work pursuant to an alternative workweek schedule adopted pursuant to the provisions applicable to such employees.

Ski Industry Employees (See Wage Order 10): Pursuant to Labor Code § 517(b), The IWC conducted a review of the wages, hours, and working conditions of employees working at establishments that offer Alpine and Nordic skiing and related recreational activities to the public. The IWC received testimony and written submissions from employees who overwhelmingly disapproved the special exemption from overtime set forth in former Labor Code § 1182.2 whereby employees could be required to work up to 56 hours in a workweek without the payment of overtime. Employees stated that their income is just above the minimum wage, that they have often worked ten (10) to fourteen (14) hours at straight time without breaks or meal periods, and at their income it is difficult to pay rent or otherwise make ends meet. They asked that they receive the same protections as other employees under AB 60. In addition, labor representatives testified that ski facilities in neighboring Nevada are required to pay overtime to employees after eight (8) hours without any apparent financial hardship.

Employers testified that they are a very small industry of 38 facilities, with a low profit margin that is very dependent upon the vagaries of the weather and a primarily seasonal workforce. Employers further stated that, unlike other industries that are dependent on the weather, ski facilities must be cleared for safe public use every day they are open. They also noted that, the under the federal Fair Labor Standards Act, the ski industry is exempt from having to pay weekly overtime after forty (40) hours, and that, if they are required to comply with all the requirements of AB 60, their profit margin will be eliminated. As a compromise, they requested that the IWC issue regulations requiring overtime to be paid after forty-eight (48) hours in a workweek year-round.

The IWC concluded that it would be inconsistent with the health, safety, and welfare of employees to continue the former statutory exemption from daily overtime in a regulation. Instead, Wage Order 10 will now provide that an employer engaged in the operation of a ski establishment as defined in that order will not be in violation of overtime provisions by instituting a regularly scheduled alternative workweek of 48 hours or less during any month of the year when Alpine or Nordic skiing activities are actually being conducted. However, overtime must be paid at the rate of 1 ½

times the regular rate of pay for all hours worked in excess of ten (10) hours in a day or 48 hours in a workweek.

Commercial Fishing Employees (See Wage Orders 10 and 14): The IWC received testimony from persons employed in the commercial passenger fishing industry that, due to the uncertain length of the work day as well as long established customs in the industry, which is highly dependent on the availability of fish, it would be inappropriate to impose a requirement that employees receive overtime pay. In addition, commercial passenger fishing boats are subject to minimum manning requirements regulated by the United States Coast Guard, Title 46, Code of Federal Regulation, Part 15, which limit the number of hours that crew members may work while at sea. There is also an exemption from overtime requirements for commercial fishing vessels under the Fair Labor Standards Act. Therefore, the IWC concluded that it would continue the exemption from Section 3, Hours and Days of Work, formerly set forth in the Labor Code § 1182.3, for employees of commercial passenger fishing boats when they perform duties as licensed crew members. Such an exemption would not apply to other employees in the industry, such as clerical or maintenance personnel, who do not perform duties as licensed crew members on fishing boats.

The IWC received no compelling evidence to warrant making any other changes in the provisions of Section 3, Hours and Days of Work.

## 4. MINIMUM WAGES

While there are no changes to present minimum wage levels, the IWC currently is conducting its minimum wage review. A new minimum wage may become effective January 1, 2001. If there is a new minimum wage, it will, in turn, affect the level of meal and lodging credits.

Commercial Fishing: Under former Labor Code § 1182.3 employees in this industry were exempt from the minimum wage. The IWC conducted a review of this industry pursuant to Labor Code § 517(b), and received testimony from representatives of the commercial passenger fishing industry that the custom in the industry was to pay crew members on the basis of "one-half day," "three-quarter day," "full day," or "overnight" trips. These employers wished to continue this custom consistent with their present obligation to pay the minimum wage for all hours worked. The provisions of Section 4 (E) would allow employers to record pay of crew members in accordance with a formula based on the length of the trip. However, if the trip exceeds the defined hours of the formula, the additional hours would have to be recorded as additional hours worked and compensated accordingly. In practice, this alternative record keeping system may result in employees being paid more than the actual hours worked, but can never result in them being paid less than the actual hours worked. It is, therefore, primarily established as a convenience for employers. It is noted that regulations of the United States Coast Guard establish minimum crew standards which are intended to insure that, when boats are at sea for protracted periods, they receive adequate rest periods.

9. UNIFORMS AND EQUIPMENT

The IWC retained its longstanding policy of requiring employers to provide uniforms, tools and equipment necessary for the performance of a job. Subsection (B) permits an exception to the general rule by allowing an employee who earns more than twice the State minimum wage to be required to provide hand tools and equipment where such tools and equipment are customarily required in a trade or craft. This exception is quite narrow and is limited to hand (as opposed to power) tools and personal equipment, such as tool belts or tool boxes, that are needed by the employee to secure those hand tools. Moreover, such hand tools and equipment must be customarily required in a recognized trade or craft.

11. MEAL PERIODS[5]

Wage Orders 1, 2, 3, 6, 7, 8, 9, 10, 11, 13 and 15 continue the preexisting requirement of a meal period for an employee working for a period of more than five (5) hours, and provide for a second meal period in accordance with Labor Code §512(a).

Senate Bill 88, Stats. 2000, chapter 492, added subsection (b) to Labor Code § 512, which provides that, notwithstanding subsection (a), the IWC may adopt a working condition order that allows a meal period to begin after six hours of work if it determines that the order is consistent with the health and welfare of the affected employees. The IWC made such a determination with regard to Wage Order 12 and continued the existing language providing for a first meal for an employee working for a period of more than six (6) hours, and for a second meal period in accordance with Labor Code §512.

Consistent with the health, safety, and welfare of employees in the health care industry, the IWC determined that Wage Orders 4 and 5 should have somewhat different language regarding meal periods. The IWC received correspondence from members of the health care industry requesting the right to waive a meal period if an employee works more than a 12-hour shift. The IWC notes that Labor Code § 512 explicitly states that, whenever an employee works for more than twelve hours in a day, the second meal period cannot be waived. However, Labor Code § 516 authorizes the IWC to adopt or amend the orders with respect to break periods, meal periods, and days of rest for all California workers consistent with the health and welfare of those workers.

---

[5] See Section 9 of the Interim Wage Order.

The IWC received several comments concerning the potential prohibition of on-duty meal periods.  Under the current IWC wage orders, an "on-duty meal period" is permitted only when (1) the nature of the work prevents the employee from being relieved of all duty, and (2) the employee and employer have entered into a written agreement permitting an on-duty meal period. An employee must be paid for the entire on-duty meal period since it is considered time worked.

Any employee who works more than six hours in a workday must receive a 30-minute meal period.  If an employee works more than five hours but less than six hours in a day, the meal period may be waived by the mutual consent of the employer and employee.

Notwithstanding other provisions regarding meal periods, the IWC adopted proposed language prepared for its consideration by employee and employer representatives of the health care industry.  This language provides that employees in the health care industry covered by Wage Orders 4 and 5 who work shifts in excess of eight (8) hours in a workday may voluntarily waive their right to one of their two meal periods, provided that the waiver is in writing and voluntarily signed by the employer and employee.  The employee may revoke the waiver at any time by providing the employer with at least one (1) day's written notice of the revocation. However, while the waiver is in effect, the employee must be paid for all working time, including an on-the-job meal period.

During its review of its wage orders and of various industries pursuant to the provisions of AB 60, the IWC heard testimony and received correspondence regarding the lack of employer compliance with the meal and rest period requirements of its wage orders.   The IWC therefore added a provision to this section that requires an employer to pay an employee one additional hour of pay at the employee's regular rate of pay for each work day that a meal period is not provided.  An employer shall not count the additional hour of pay as "hours worked" for purposes of calculating overtime pay.

The IWC received no compelling evidence, and concluded there was no authority at this time, to warrant making any other change in the provisions of this section other than those required by AB 60.

20

## 12. REST PERIODS

As discussed above in Section 11, Meal Periods, the IWC heard testimony and received correspondence regarding the lack of employer compliance with the meal and rest period requirements of its wage orders.   The IWC therefore added a provision to this section that requires an employer to pay an employee one additional hour of pay at the employee's regular rate of pay for each work day that a rest period is not provided.   An employer shall not count the additional hour of pay as "hours worked" for purposes of calculating overtime pay.

Commercial Fishing Employees: The IWC added the last paragraph of Section 12 to insure that crew members on commercial passenger fishing boats are at sea for periods of twenty-four (24) hours or longer receive no less than eight (8) hours off-duty within each twenty-four (24) hour period to permit the employee to sleep. This rest period is in addition to the meal and rest periods otherwise required under Section 12.

## 17. EXEMPTIONS

This section previously allowed the Division of Labor Standards Enforcement, after an investigation and finding that enforcement would not materially affect the welfare or comfort of employees and would work an undue hardship on the employer, to exempt the employer and employees from the requirements of certain sections of the IWC's wage orders.  After considering the testimony and correspondence it received with regard to meal periods, and in light of the mandatory provisions of Labor Code § 512, the IWC decided to remove Section 11, Meal Periods, from the list of sections that can be exempt from enforcement.

## 20. PENALTIES [6]

This section sets forth the provisions of Labor Code § 558, which specifies penalties for initial and subsequent violations. In accordance with that section, the IWC voted to extend the penalties provisions to Wage Order 14. The IWC received inquiries as to whether "willfulness" is a required element for the issuance of a civil penalty. There were also concerns over the assessment of penalties against an employer's payroll clerk, payroll supervisor, or a payroll processing service for failure to issue checks reflecting the required overtime compensation. AB 60 fails to address these issues, but the IWC noted that there is no intent to penalize individuals that are merely carrying out policies formulated by an employer.

---

[6] See Section 10 of the Interim Wage Order.

PETE WILSON, Governor

STATE OF CALIFORNIA
DEPARTMENT OF INDUSTRIAL RELATIONS
DIVISION OF LABOR STANDARDS ENFORCEMENT
LEGAL SECTION
Fremont Street, Suite 3220
, Francisco, CA 94106
(415) 975-2060

H. THOMAS CADELL, JR., Chief Counsel



January 12, 1998


Re:  Similarly Situated Employees


        This is intended to respond to your letter of December 29,
1997, wherein you ask what the Division enforcement policy would be
in a situation where our investigation reveals that an employer has
erroneously placed a group of similarly situated employees in an
exempt classification.

        Most of the opinion letters this agency sends contain language
to the effect that each exemption situation must be determined on
an individual basis and make clear that the Division does not offer
blanket opinions finding a group of employees exempt or non-exempt.

        This is not to say, however, that in a situation where the
evidence shows that a large group of employees is being mis-
classified that the Division would not bring an action on behalf of
all of the employees who are similarly situated without
specifically investigating the status of each individual employee.
Investigation of the status of each employee would be neither
prudent nor necessary and the limited resources of the Division
would not allow for such a waste of time and effort.

        As with the view of the federal courts regarding the
application of exemptions to the Fair Labor Standards Act, it must
be remembered that it is the employer who must prove that the
exemption is applicable as an affirmative defense[1].

---

[1] See A. H. Phillips, Inc. v. Walling, 324 U.S. 490, 493, 65 S.Ct. 807, 808,
89 L.Ed. 1095 (1945); Arnold v. Ben Kanowsky, Inc., 361 U.S. 388, 392, 80 S.Ct.
453, 456, 4 L.Ed.2d 393 (1960); Walling v. General Industries Co., 330 U.S. 545,
547--548, 67 S.Ct. 883, 884, 91 L.Ed. 1088 (1947); Mitchell v. Kentucky Finance
Co., 359 U.S. 290, 295, 79 S.Ct. 756, 759, 3 L.Ed.2d 815 (1959).

EXHIBIT  B

1998.01.12

January 12, 1998
Page 2

The Division is not mandated to investigate every claim that is filed nor is it mandated to bring an action to enforce every violation it finds; however, assuming that the Division agreed that a particular action were appropriate and the investigation reveals that a substantial number of the employees allege that they are subject to work rules or practices which clearly make them non-exempt, the Division would bring an action in the name of all of the employees in the classification. Of course, the action by the Division, while it would inure to the benefit of the affected employees, would be in the nature of a law enforcement effort designed to insure that the employer did not gain an unfair competitive advantage over other businesses as a result of the misclassification.

The affirmative defense that these are exempt employees may be raised by the employer regarding any of the employees, but this would be a defense which the employer would have the burden of proving.

I hope this adequately addresses the questions you raised in your letter of December 29th. If I may be of further assistance, please feel free to call.

Yours truly,

H. THOMAS CADELL, JR.
Chief Counsel

1998.01.12