1   MAUREEN E. McCLAIN (State Bar No. 062050)
    Email: mcclain@kmm.com
2   ALEX HERNAEZ (State Bar No. 201441)
    Email: hernaez@kmm.com
3   KAUFF McCLAIN & McGUIRE LLP
    One Post Street, Suite 2600
4   San Francisco, California 94104
    Telephone:   (415) 421-3111
5   Facsimile:   (415) 421-0938
    Attorneys for Defendant
6   DOLLAR TREE STORES, INC.

7   BETH HIRSCH BERMAN (VA Bar No. 28091)
    Email: bberman@williamsmullen.com
8   WILLIAMS MULLEN
    Dominion Tower, Suite 1700
9   999 Waterside Drive
    Norfolk, VA 23510
10  Telephone:   (757) 629-0604
    Facsimile:   (757) 629-0660
11
    *Pro Hac Vice* Attorneys For Defendant
12  DOLLAR TREE STORES, INC.

13                    UNITED STATES DISTRICT COURT

14                  NORTHERN DISTRICT OF CALIFORNIA

15

16  MIGUEL A. CRUZ, and JOHN D. HANSEN,          CASE NO.  C 07 2050 SC
    individually and on behalf of all others     CASE NO. C 07 04012 SC
    similarly situated,
17                                               **SUPPLEMENTAL DECLARATION**
                  Plaintiffs,                    **OF BETH HIRSCH BERMAN IN**
18                                               **SUPPORT OF DOLLAR TREE**
    v.                                           **STORES, INC.'S REPLY ON**
19                                               **SUMMARY JUDGMENT AS TO**
    DOLLAR TREE STORES, INC.,                    **ROBERT RUNNINGS**
20
                  Defendant.                     **DATE:**    March 21, 2008
21                                               **TIME:**    10:00 a.m.
                                                 **DEPT:**    Ctrm. 1, 17th Floor
22                                               **JUDGE:**  Hon. Samuel Conti
23  _____
                                                 **COMPLAINTS FILED:**    April 11, 2007
24  ROBERT RUNNINGS individually, and on                                  July 6, 2007
    behalf of all others similarly situated,
                                                 **TRIAL DATES:**    No dates set.
25                Plaintiff,
26  v.
27  DOLLAR TREE STORES, INC.,
28                Defendant.

KAUFF McCLAIN &
McGUIRE LLP
ONE POST STREET
SUITE 2600
SAN FRANCISCO, CA 94104
TELEPHONE (415) 421-3111

SUPPLEMENTAL DECLARATION OF BETH HIRSCH BERMAN IN SUPPORT OF DOLLAR       CASE NO. C 07 2050 SC
TREE STORES, INC.'S REPLY ON SUMMARY JUDGMENT AS TO ROBERT RUNNINGS       CASE NO. C 07 04012 SC

1    I, Beth Hirsch Berman, declare as follows:

2        1.    I am over the age of eighteen and have personal knowledge of the facts

3    set forth below.  If called upon as a witness, I could testify competently thereto.

4        2.    I am a shareholder in the law firm of Williams Mullen, P.C., pro hac vice

5    counsel for Dollar Tree Stores, Inc. in the above captioned matter.

6

7        3.    On December 12, 2007, I attended the deposition of Robert Runnings.

8    Attached hereto as Exhibit A is a true and correct copy of the relevant portions of the

9    transcript of that deposition.

10       4.    On November 13, 2007, I attended the deposition of Richard Tellstrom.

11   Attached hereto as Exhibit B is a true and correct copy of the relevant portions of the

12   transcript of that deposition.

13

14

15   I declare under penalty of perjury that the foregoing is true and correct.

16   Executed in Norfolk, Virginia this _13_ day of March, 2008.

17                                              _Beth Hirsch Berman_

18                                              BETH HIRSCH BERMAN

19

20

21   1254475v1

22

23

24

25

26

27

28

KAUFF, McCLAIN
& McGUIRE LLP
ONE POST STREET
SUITE 2600
SAN FRANCISCO, CA  94104
TELEPHONE (415) 421-3111

-2-

C:\Documents and

# EXHIBIT A

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MIGUEL A. CRUZ, and JOHN D.      )
HANSEN, individually, and on     )
behalf of all others similarly   )        **COPY**
situated,                        )
                                 )
              Plaintiffs,        )
                                 )
vs.                              ) Case No: C07 02050 SC
                                 )
                                 )
DOLLAR TREE STORES, INC.,        )
                                 )
              Defendant.         )
_____)
                                 )
ROBERT RUNNINGS, individually,   )
and on behalf of all others      )
similarly situated,              )
                                 )
              Plaintiff,         )
                                 )Case No: C 07 04012 SC
vs.                              )
                                 )
DOLLAR TREE STORES, INC.,        )
                                 )
              Defendant.         )
_____)


DEPOSITION OF ROBERT LEWIS RUNNINGS

VOLUME I, pages 1 to 383


1

00062

1    Q   Do you agree that the individuals who

2 are best able to comment upon your actual work at

3 Dollar Tree are your assistant store managers?

4    MR. COLE: Objection. Calls for speculation.

5 BY MS. MCCLAIN:

6    Q   Are they in a position, as far as you

7 can observe, to have observed what you were

8 doing?

9    MR. COLE: Objection. Calls for speculation.

10     If you can answer, go ahead.

11    THE WITNESS: Yes.

12 BY MS. MCCLAIN:

13    Q   Aside from your assistant store

14 managers, are there other people that you believe

15 are in a position to observe what you do at work

16 and when you work?

17    MR. COLE: Same objection and compound.

18     Go ahead, if you can.

19    THE WITNESS: Customers. Customers come in

20 all the time and comment, you know, Oh, you're

21 sure busy today. So I guess customers. Yeah.

22 BY MS. MCCLAIN:

23    Q   Anyone else?

24    A   Rick.

25    **Q   How often do you see Mr. Tellstrom in**

1 **person?**

2 **A   It varies.  It varies week to week.**

3 **Q   In 2007, can you give me an estimate of**

4 **the highest amount of times he's been in your**

5 **store per week and the lowest amount?**

6 **A   The lowest would be not seeing him at**

7 **all; the highest would probably be four times a**

8 **week.**

9 **Q   There have been weeks, then, in 2007**

10 **when you haven't personally seen Mr. Tellstrom?**

11 A   Yes.

12 Q   Is that a rarity?  Does it happen often?

13 A   It happens fairly often.

14 Q   If Mr. Tellstrom visits you four times

15 per week, to your observation, is there a

16 particular reason for that?

17 A   No.  We are his home store, so he stops

18 in to do paperwork.  Stuff like that.

19 Q   Does he have an office at the Willits

20 store?

21 A   He shares my office.

22 Q   Are there times when he comes to the

23 store and just does his work without interacting

24 with you?

25 A   No.

1        Q     He always talks to you?

2        A     Yes.

3        Q     Are those conversations occasionally

4   quite brief?

5        A     Yes.

6        Q     Can you estimate for me, let's say last

7   week, how many hours you spent talking to

8   Mr. Tellstrom?

9        A     Like, maybe a couple of hours.

10       Q     Would that include conversations by

11  telephone as well as in-person conversations?

12       A     Yes.

13       Q     Is that generally reflective of the

14  amount of time you would communicate with

15  Mr. Tellstrom per week?

16       A     No.

17       Q     Is it too high or too low?

18       A     Last week was more than normal.

19       Q     What would your estimate be with contact

20  with the district manager in a normal week?

21       A     I would say probably an hour.  Most of

22  it by phone.

23       Q     Is it correct that you are the highest

24  management person generally at 2939?

25       A     Yes.

64

1    **Q    Are you the highest management person**

2 **there 90 percent of the time?**

3    **A    Aside from when Rick or his supervisors**

4 **are there, yes.**

5    Q    In those normal weeks when you are

6 communicating with a district manager about an

7 hour of the time during the week, what kinds of

8 topics are you and the district manager

9 communicating about; can you give me some

10 examples?

11    A    It's usually just him telling me what he

12 wants to see get done over the course of the

13 week.

14    Q    Such as?

15    A    Whether or not the schedule has been

16 wrote yet, whether or not certain displays have

17 been built, how certain employees may be doing.

18    Q    Do you hire for store 2939?

19    A    Yes.

20    Q    How many employees do you think you've

21 hired since November of 2004?

22    A    I don't know.

23    Q    More than 30?

24    A    Yes.

25    Q    More than 50?

1    A   I think so, yes.

2    Q   Did he ever come to the store and meet

3 with the person, to your observation?

4    A   None that I remember, no.

5    Q   So you would call, you would say, I have

6 this candidate, here is their background, I would

7 like to hire them and Mr. Cossolotto would

8 approve?

9    A   Yes.

10   Q   Did he ever say, no, I don't think

11 that's a good candidate?

12   A   Not that I recall.

13   Q   Has that procedure changed under

14 Mr. Tellstrom?

15   A   Yes.

16   Q   What has been the change?

17   **A   I asked Rick to take a hand in hiring**

18 **assistant managers for me.**

19   **Q   Why did you do that?**

20   **A   Because I don't feel hiring is my strong**

21 **point.**

22   Q   Why do you feel that?

23   A   I don't believe I'm a good interviewer.

24 So I asked Rick to step in and start hiring my

25 assistants.

1   hang up in front to show the customers.  And then

2   it goes down, sometimes it's two or three pages,

3   sometimes it's only two pages, giving you various

4   tasks throughout the week.

5       Q    Do you usually hang the sign for the

6   item of the week?

7       A    When it's printable, yes.

8       Q    Sometimes you can't print it, so you

9   don't hang it; is that right?

10      A    Correct.

11      Q    Do you build new displays every week?

12      A    Yes.

13      **Q    Approximately, how many end caps do you**

14  **have at 2939?**

15      **A    Approximately, I believe it's right**

16  **around 80.**

17      **Q    So you have a lot of end caps because**

18  **you're a racetrack store, correct?**

19      **A    I don't know.**

20      **Q    You haven't compared the number of end**

21  **caps that other stores have?**

22      **A    No.**

23      **Q    And Dollar Tree gives you some suggested**

24  **pictures for end caps, correct?**

25      **A    Yes.**

1  **Q   Do they give you suggested pictures for**

2 **all 80 end caps?**

3  **A   No.**

4  **Q   Approximately, how many do you have to**

5 **develop yourself without any suggestions?**

6  **A   I would approximate 75 percent.**

7  **Q   Do you change your end caps regularly?**

8  **A   Yes.**

9  Q   Can you give me an example of an end cap

10 you've just done?

11  A   Me personally or in the store?

12  Q   Yeah.  Or you developed and asked

13 someone else to do, but one that you designed.

14  A   No.

15  Q   You don't have a favorite end cap in

16 mind?

17  A   No.

18  Q   Do you have front windows?

19  A   Yes.

20  Q   Do you normally have a front window

21 display?

22  A   No.

23  Q   Why not?

24  A   We have shopping carts in our front

25 window.

00110

1 It gives you lots of information about how your

2 store is doing, correct?

3     A    It shows the whole district.  Yeah.

4     Q    So you can look at how your store is

5 doing in a variety of categories and you can look

6 at how it's doing against the district as well,

7 correct?

8     A    Yes.

9     Q    Do you do that when you get it?

10     A    Yeah.

11     Q    And does that give you any information

12 that you use in running the store?

13     A    Not really.  No.

14     Q    Does your playbook have a tab for

15 S-P-E-H?

16     A    Yes.

17     Q    Do you regularly track your SPEH during

18 any given week?

19     A    Not in the playbook, no.

20     Q    Do you do it in any other fashion?

21     **A    We have a separate clipboard where we**

22 **keep track of SPEH.**

23     **Q    Is that a form that you developed?**

24     **A    That's a corporate form.**

25     **Q    How do you use that form during the**

1  <u>week?</u>

2  <u>**A**  **At the end of the night, the closing**</u>

3  <u>manager fills it out and computes the SPEH and</u>

4  <u>writes it on there.</u>

5  <u>**Q**  **Do you review that every morning?**</u>

6  <u>**A**  **Yes.**</u>

7  <u>**Q**  **Why do you look at it in the morning?**</u>

8  <u>**A**  **To see what the previous day's sales**</u>

9  <u>are, order, and to see what the SPEH is sitting</u>

10  <u>at.  And to check the void percentage for the</u>

11  <u>cashiers.</u>

12  <u>**Q**  **Is that something that you normally do**</u>

13  <u>in the office?</u>

14  <u>**A**  **Yes.**</u>

15  <u>**Q**  **So that would be part of your typical**</u>

16  <u>office routine every morning; is that right?</u>

17  <u>**A**  **Yes.**</u>

18  Q   Do you have an order scorecard in your

19  playbook?

20  A   Yes.

21  MS. MCCLAIN:  May I have this marked next in

22  order, please?

23      (Exhibit 8 was marked for identification.)

24  BY MS. MCCLAIN:

25  Q   Is this in the format of an order

00128

1  those two weeks?

2  A   Yes.

3  Q   How does that happen?

4  A   I don't know.

5  **Q   Do you know that there are times when**

6  **you place a very big order and times when you**

7  **place quite a small order?**

8  **A   Yes.**

9  **Q   And why is that?**

10  **A   Sometimes the store may look a little**

11  **low, and I'll actually go in and order**

12  **something.  Rick may have ordered something for**

13  **me.  I don't know.**

14  **Q   How do you decide that the store looks**

15  **low?**

16  **A   Just by the presentation overall.**

17  **Q   So you walk around and look at it and**

18  **think you need more merchandise; is that right?**

19  **A   Yes.**

20  Q   Do you do that on a regular basis, walk

21  your store?

22  A   I try to.

23  Q   For what purposes do you do that?

24  A   To see what sections I need to stock.

25  Q   And once you decide which sections you

**Runnings, Robert 12-17-07.dep**          **Page 128**

1 underlying circumstances were; is that right?

2   A   No.

3   Q   Did you agree?

4   A   Yes.

5   Q   Did Ms. Segmiller engage in another

6 transaction void, to your knowledge?

7   A   No.

8   MS. MCCLAIN:  May I have this marked as next

9 in order, please?

10   (Exhibit 27 was marked for identification.)

11 BY MS. MCCLAIN:

12   Q   Is this corrective action in your

13 handwriting, Mr. Runnings?

14   A   Yes.

15   Q   Is that your signature?

16   A   Yes.

17   Q   Your signature appears on top of the

18 line saying, "Signature of supervisor completing

19 this form," correct?

20   A   Yes.

21   Q   Were you Ms. Burton's supervisor at the

22 time you completed this form?

23   A   Yes.

24   **Q   Are you the supervisor of all employees**

25 **who work in your store?**

1   A   Yes.

2   Q   How did you know the information that

3 appears in details on Exhibit 27?

4   A   From the cashiers statistics report.

5   Q   This is an example of something you told

6 us about earlier, I think, and that is, that you

7 review the cashiers statistics report on a weekly

8 basis as well as a daily basis, correct?

9   A   Yes.

10   Q   The conclusions you reached in this

11 particular case had to do with accumulation of

12 information that was on the weekly report; is

13 that right?

14   A   It would appear that I ran a two-week

15 report.

16   Q   Does that say February 1 to the 16th?

17   A   Yes.

18   Q   My correction.  I was reading it to the

19 6th.  So this was looking at the statistics on a

20 two-week basis?

21   A   Yes.

22   Q   Do you do that from time to time?

23   A   Yes.

24   Q   You told us about daily and weekly.  Are

25 there other periods that you also examine?

1    **A   Yes.**

2    **Q   What are those other periods?**

3    **A   I try to look at it on a once-a-month**

4 **basis as well.**

5    **Q   What information do you have on a**

6 **once-a-month basis that you don't have on a**

7 **weekly basis?**

8    **A   It just covers the entire 30 days**

9 **instead of a weekly period.  It combines all four**

10 **weeks.**

11   **Q   So it gives you a broader view of what**

12 **is occurring?**

13   **A   Yes.**

14   **Q   Is it correct that that broader view may**

15 **give you the ability to spot trends that you**

16 **might not see on a daily or a weekly basis?**

17   **A   Yes.**

18   Q   When you say in Exhibit 27, "Lauri

19 represents 26 percent of total voids," that's a

20 comparison of Lauri's voids to the ones done by

21 the remaining cashiers; is that right?

22   A   I believe so.

23   Q   You thought that was a overly high

24 percentage; is that right?

25   A   Yes.

00227

1    Q    Do you have any responsibilities as a

2    store manager to enforce that policy?

3    A    Yes.

4    Q    What are your responsibilities?

5    A    I'm responsible for making sure

6    everybody gets paid correctly.

7    Q    How do you implement that

8    responsibility?

9    A    By supervising their punching in and

10    out, taking lunches, all that.

11    Q    How do you supervise that, by visibly

12    seeing that they take their lunches and breaks?

13    A    Both.  By seeing it and checking the

14    time clocks.

15    Q    Do you make it a point to tell hourly

16    employees in your store that they must take their

17    lunch periods and breaks?

18    A    Yes.

19    Q    Do you do that regularly?

20    A    Yes.

21    Q    Do you tell your assistant store

22    managers that they must enforce that policy as

23    well?

24    A    Yes.

25    Q    And in your view, do your store

00244

1   mean that you may leave a note as to where it

2   should be staged or where it should actually be

3   on the floor or both?

4   A   Where it should be stocked.

5   Q   You generally develop an employee

6   schedule every week?

7   A   Yes.

8   Q   Do you do that on Mondays?

9   A   I try to.

10   Q   Is that part of your office hours on

11   Monday?

12   A   Sometimes.

13   Q   When it's not, when do you do it?

14   A   Usually Sunday.  It can happen anytime

15   between Sunday and Wednesday.

16   Q   How do you go about doing the

17   scheduling, can you tell me what your process is?

18   A   You go into the Compass system, and it

19   usually generates a cashiers' schedule for you.

20   You make any adjustments necessary and then you

21   schedule your freight and crew and your

22   management staff yourself.

23   Q   When you say you make any adjustments

24   necessary to the cashiers' schedule, can you give

25   me some examples?

00245

1    A   Yeah.  Sometimes it'll only schedule two

2   cashiers for an entire day, which leaves multiple

3   vacant shifts.  So you have to go in and add

4   shifts.

5        One of the ongoing problems I've had is

6   it won't schedule me a cashier until 8:30 in the

7   morning, even though I open at 8:00.  So you have

8   to account for all that when you change

9   everything.

10    Q   So you add a cashier coming in before

11   eight o'clock; is that right?

12    A   Yes.

13    Q   You modify, then, the cashier scheduling

14   that you get?

15    A   Yes.

16    Q   Once you have the schedule prepared, do

17   you post it?

18    A   Yes.

19    Q   From that time forward, are there

20   changes in the schedule?

21    A   Sometimes, yes.

22    Q   What would cause a change?

23    A   Somebody calling in sick.

24    Q   Whose responsibility is it to change the

25   schedule?

1    A    It's usually just written on the hand --

2  on the printed out copy.  And it's whichever

3  manager gets the call.

4    Q    Do you get consulted from time to time

5  about those issues, so and so is not coming in,

6  what do I do?

7    A    Yeah.

8    Q    Is that an example of a call you might

9  get at home?

10   A    Yes.

11   Q    Do you ultimately approve switches in

12  the schedule?

13   A    No.

14   Q    You allow your assistant managers to do

15  that?

16   A    Yes.

17   Q    Do you try to get some sense of what

18  your employees' needs are for any given week

19  before you do the scheduling?

20   A    Yes.

21   Q    That is, if somebody has a doctor's

22  appointment or whatever?

23   A    Yes.

24   Q    How do you do that?

25   A    We keep a stack of index cards in the

246

1    office, and they are allowed to write down days

2    off that they need, and then leave them on my

3    desk for me.

4        Q    Do you actually communicate to the

5    employees as to whether that's all right or not

6    or do they get that communication when they see

7    the schedule?

8        A    That's typically the case, when they see

9    the schedule.

10       Q    So you get these index cards, you work

11   that into your scheduling, and hopefully

12   accommodate as many of those requests as you can?

13       A    Yes.

14       Q    If you can't accommodate a request, do

15   you talk to the employee about it?

16       A    I can only recall one time that it did

17   not happen.

18       Q    Generally, you're able to do that?

19       A    Yes.

20       Q    What was the situation on the one

21   occasion when it didn't happen?

22       A    An employee asked for Halloween off, one

23   of the assistant managers, and I told her no.

24   Because she was the only member of management

25   that didn't have children.

247

1    Q    You try?

2    A    I try to.  Yes.

3    Q    And when you say, "ideally," why isn't

4 that successful sometimes?

5    A    We have so few hours sometimes that we

6 have to stretch the cashiers so thin that we

7 can't take into regards how busy we are.  It's

8 just a matter of having somebody in the store so

9 that the store can remain open.

10    Q    How many cash registers do you have

11 operating in any given time in your store?

12    A    I'm not following that.

13    Q    How many cash registers do you have open

14 at any given time?

15    A    With customers in line?  Usually at

16 least one.  So just depends on the business.

17    **Q    Did you hire additional employees for**

18 **the holiday season?**

19    **A    Yes.**

20    **Q    How many did you hire?**

21    **A    I don't know.**

22    **Q    Whose decision was it as to how many to**

23 **hire?**

24    **A    I was pretty much given free rein.**

25    **Q    Is that generally the case that you set**

1  the number of employees that you have working on

2  a part-time basis?

3    A   Yes.

4    Q   Do you agree that it's good to have as

5  many employees as possible working on a part-time

6  basis?

7    A   No.

8    Q   What don't you agree with, about that?

9    A   Well, the more employees you have, then

10  the less hours the employees get on an individual

11  basis.  So I don't think it's fair to hire

12  somebody and give them four hours a week.

13    Q   So you try to reach a balance between

14  having enough additional people if there are

15  emergencies and giving employees sufficient

16  hours?

17    A   Yes.

18    Q   Do all of your part-time employees

19  generally work four and a half hours?

20    A   Yes.

21    Q   When you go to hire an hourly associate,

22  do you check with anyone?

23    A   No.

24    Q   Have there been hourly associates who

25  have been promoted to the assistant manager level

00259

1 Dollar Tree mean anything to you?

2    A    No.

3    Q    Would you agree that there has been

4 increasing emphasis since you started at Dollar

5 Tree on the need for store managers to perform

6 management responsibilities, the majority of

7 their time?

8    A    That that's the expectation?

9    Q    Yes.

10    A    Yes.

11    Q    And would you agree that there's been

12 consistent emphasis on that expectation?  Has it

13 increased or has it been the same throughout the

14 time you've been there?

15    A    It's definitely changed.

16    Q    In what way?

17    A    There's -- there's much more emphasis

18 now on the fact that we are not supposed to be

19 out on the floor stocking all the time.

20    Q    How do you gain knowledge of that

21 emphasis?

22    A    Just from the e-mails and from Rick.

23 Mainly from Rick, I would say.

24    Q    What does Mr. Tellstrom convey to you

25 when he sends you those e-mails?  What does he

1 say?

2   A   It's usually in person.

3   Q   What does he say in person?

4   A   Or on the phone.  Excuse me.

5       Just complaining that I'm out on the

6 sales floor all the time.

7   Q   Rick is complaining that you're on the

8 sales floor all the time?

9   A   Correct.

10   Q   What is he saying that you should be

11 doing?

12   A   He says that I should be in the office

13 doing paperwork or, you know, other stuff.

14   Q   How does Mr. Tellstrom know when you're

15 on the sales floor, do you know?

16   A   Usually when he arrives at the store,

17 I'm stocking.

18   Q   So he arrives at the store, he sees

19 you're stocking, and he says, you're not supposed

20 to be doing this?

21   A   Yes.

22   Q   And that has been his consistent refrain

23 throughout the time that he's been district

24 manager?

25   A   No.

# EXHIBIT B

1            UNITED STATES DISTRICT COURT

2           NORTHERN DISTRICT OF CALIFORNIA

3

4

5

6  KASSONDRA BAAS and KELLY       )
   LOFQUIST, individually         )
   and on behalf of all           )
7  others similarly situated,     )    No. C 07-03108 JSW (ENE)
                                  )
8            Plaintiffs,           )
                                  )
9        vs.                       )
                                  )
10 DOLLAR TREE STORES, INC.,       )
                                  )
11           Defendants.           )
   _____   )

12

13

14          DEPOSITION OF RICHARD A. TELLSTROM

15              Held at the Offices of

16            Verbatim Reporting Service

17       141 Stony Circle, Santa Rosa, California

18        Tuesday, November 13, 2007, 9:45 a.m.

19

20

21

22

23

24

25

# Verbatim

00104

1 night crew, he gets the freight out. There's some

2 opportunities for him to -- to -- floor stacks being

3 cleaner and neater. I mean, there's opportunities.

4 But, yeah, he is running the night crew.

5 Q. When you say "opportunities," you mean

6 opportunities to improve?

7   A. Correct.

8   Q. With regard to all the managerial functions

9 we talked about, the ordering and the supervision

10 and the analysis of sales, all of the various tasks

11 we've talked about, I don't mean to list them all,

12 were those responsibilities that Mr. Cruz had?

13   A. Sure.

14   Q. Are those responsibilities that Mr. Runnings

15 had and continues to have?

16   A. Yes.

17   **Q. How do you evaluate Mr. Runnings with respect**

18 **to his supervision of employees? Is he good at it?**

19 **Is he bad at it? Do you have an evaluation?**

20 **A. Rob -- Rob -- Rob wants to do good. He just**

21 **doesn't know how to hold people accountable and**

22 **get -- get the expectations that the company needs**

23 **through his leadership.**

24   **Q. Have you worked with Mr. Runnings on that?**

25 **A. Yeah. Lately, yeah. You bet.**

00105

1    Q.  What have you done?

2    A.  Tried to, you know, teach and coach, and, you

3    know, set the bar a little higher than what kind of

4    standards he's got.  You know, what the company's

5    directive is.  That's been no different than store

6    manager-wise.  Nothing that's not obtainable through

7    his leadership.

8    Q.  Have you talked with Mr. Runnings about

9    delegation, or does he do a good job at that?

10   A.  No.  He's terrible at it.

11   Q.  Why do you say that?

12   A.  Give you an example.  Couple weeks ago I was

13   in there, and he was unloading the truck, and I

14   asked him what's he unloading the truck for, and he

15   says, "Well, I can do it faster."

16       And I said, "Why don't you schedule some

17   cashiers in so you can do other things?"  And he

18   proceeded to, you know, think that that was the best

19   way to unload the truck is for him to get it done

20   himself.

21       Another example is over the last couple

22   weeks, I went in and noticed on his schedule trying

23   to get frozen food to one person so I can go in

24   there and pull that person and say, you know, "How

25   come you're empty?"  He thinks that he can do a

1 **better, faster job than anybody on frozen instead of**

2 **teaching and training somebody to put one person for**

3 **four hours on Monday and Thursday.  We'll see if he**

4 **did it this week, but he seems to think that he can**

5 **do everything faster himself instead of teaching and**

6 **making his whole team make him better.**

7      MS. MCCLAIN:  Would you read back the answer

8 on unloading the trucks, please, Ms. Reporter.

9      (The record was read.)

10 BY MS. MCCLAIN:

11   Q. Is cashiers right as opposed to stockers, or

12 do you use those terms interchangeably?

13   A. Either way.  He's used both, actually.  He's

14 used -- if it's early in the morning, his stockers

15 will unload it.  He doesn't want to use his stocking

16 hours to unload a truck because then you're working

17 overnight.  The truck -- the truck comes from 5:00

18 in the morning till 2:00, 3:00 in the afternoon.

19 So --

20 Q. So when you referred to cashiers, you

21 referred to scheduling extra cashiers to unload the

22 truck?

23   A. Correct.

24   Q. Mr. Runnings was resistant to that?

25 A. He's just used to unloading the truck; so he

1  shift. And I told Rob, "Well, you need to break it

2  down and say 'What did you do? You only checked

3  eight people, in a seven-and-a-half-hour shift, in

4  an hour. What did you do the rest of the time?'"

5  You know, break it down into small segments and see

6  what's going on.

7    Q. This was advice you gave to Mr. Runnings with

8  respect to knowing what his people were doing?

9    A. Exactly.

10  **Q. When you say run the business, what business**

11  **are you referring to?**

12    **A. Dollar Tree. It's his unit. It's under his**

13  **guidance and leadership as far as sales, the shrink,**

14  **the profitability, the bonus structure, or the bonus**

15  **that he gets. It's all up to him.**

16      MS. MCCLAIN: Let me have this marked as next

17  in order, please.

18      (Whereupon, the document referred to

19      was marked Defendants' Exhibit 9 for

20      identification by the Reporter, a

21      copy of which is attached hereto.)

22  BY MS. MCCLAIN:

23    Q. Was there a customer service Best Practice

24  program in February of 2007?

25  A. I don't remember the date. But it's rolled