1

**LITTLER MENDELSON  L.L.P.**
MAUREEN MCCLAIN (Bar No. 062050)

2
650 California Street, 20th Floor
San Francisco, CA 94108-2693

3
Telephone:  (415) 433-1940
Facsimile:  (415) 399-8490

4

Attorneys for Defendant

5
Dollar Tree Stores, Inc.

6

7

8                        **UNITED STATES DISTRICT COURT**

9                       **NORTHERN DIVISION OF CALIFORNIA**

10

11  | MIGUEL A. CRUZ, and JOHN D. | Case Nos.:  07-2050 SC
    | HANSEN,, individually and on behalf of |                07-4012 SC

12  | others similarly situated,

13  |                Plaintiffs,

14  |         vs.

15

16  | DOLLAR TREE STORES, INC., | **DECLARATION OF**
    |                          | **ROBERT CRANDALL, MBA**

17  |                Defendant.

18

19  | ROBERT RUNNINGS, individually and
    | on behalf of others similarly situated,

20
    |                Plaintiffs,

21
    |         vs.

22

23  | DOLLAR TREE STORES, INC.,

24  |                Defendant.

25

26

27

28

**DECLARATION OF ROB CRANDALL**

I, ROBERT CRANDALL, declare:

1.      I am making this declaration based of my own, first-hand knowledge (except as to matters declared on information and belief, of which I have been informed and do believe) and, if called upon to do so, could and would competently testify to the following.

## SECTION 1 - ASSIGNMENT

2.      I was retained by counsel for defendant Dollar Tree Stores ("Dollar Tree") to review the available data for the purpose of assessing whether the data indicates that there is wide variation in experiences across the Dollar Tree Store Managers ("SMs") who make up the present class. I have also been asked to review the available data, declarations, and deposition testimony and comment upon whether the data collected to date supports the hypothesis that common training, policies, practices, and procedures has led to uniformity in how SMs allocate their work time between managerial and non-managerial duties.  In addition, I have been asked to discuss the business model to address the questions of whether the operating model would be expected to lead to variability in managerial activities, and whether the nature of the operating model led to the expectation that class members uniformly spent less than 50% of their time performing managerial duties.  I have been asked to comment upon statistical issues that arise when one seeks to use representative testimony if the circumstances demonstrate that there is wide variability in experiences across class members and that a portion of the class meets the test for the exemption and a portion does not.   More specifically, 1) How does wide variability in the percentage of time allocated to managerial duties impact the ability to utilize random sampling approaches and statistical techniques to predict whether a given individual non-testifying class member is above or below the 50% line; 2)   How does wide variability in the percentage of time allocated to managerial duties impact the ability to utilize information derived from a random sample of class members to make extrapolations regarding the class wide average managerial time and the

proportion of class members who spent more than 50% of their time performing managerial duties;  3) Whether the data and information available indicate that SMs spend uniform or variable amounts of time performing managerial duties;  4)  Whether the data and information indicate that SMs uniformly spend more or less than 50% of their time on managerial duties;

3.    What follows is organized into several sections.  Section II presents my qualifications; Section III presents an introduction and summary of opinions; Section IV presents analysis of the variation in responses to the Certification of Duties forms completed by class members, Section V presents a validation analysis of the Certification of Duties forms, Section VI discusses statistical issues that arise when there is variation in experiences across class members, Section VII provides an detailed synopsis of a formal survey study conducted by Resolution Economics in 2002-2003 regarding how SMs allocated their time across various in-store tasks, Section VIII discusses how to test whether systematic policies, practices, and procedures govern SM behavior and how operational factors would be expected to result in variability in how SMs allocate their time among the various tasks they perform, and Section IX presents conclusions.

## SECTION II – QUALIFICATIONS

4.    I am a Partner at Resolution Economics LLC, a firm whose activities include conducting labor studies, performing economic and statistical analyses, and providing complex data analysis in connection with litigation and non-litigation issues.   I have been retained in an expert or consulting capacity in more than 200 class-action matters alleging wage and hour violations under FLSA and other state laws.   In connection with this work, I have been involved in numerous projects where the objective was collecting and analyzing data related to the work activities of class members through the use of scientific surveys, observation studies, and other data studies. I have conducted many such studies in "big box" retail environments.   I have also been asked to perform similar studies outside of the litigation context.   In addition, I am frequently asked to

**DECLARATION OF ROBERT CRANDALL**

review and comment upon the surveys and other studies conducted by other experts.  Finally, my work has often called for analysis of survey data in the context of labor economics issues. I hold an M.B.A. from Loyola Marymount University, and a B.A. degree in History from the University of Southern California.  I have been qualified as an expert witness in both Federal and State Courts.  My resume and a list of testimony, reports, and affidavits provided over the past four years are attached to this report as Attachment A.

## SECTION III - INTRODUCTION AND SUMMARY OF OPINIONS

- **Variability in Experiences Limits the Use of Representative Testimony and Statistical Extrapolation of Findings to Non-Testifying Class Members**

5.      As noted in my assignment above, I have been asked to review the available data and information to assess whether the data indicates that there is wide variability in class member experiences.  From a statistical perspective, the question of whether there is wide variability in experiences presents the significant question in any class action matter where the trial plan calls for representative testimony from a select few to make decisions about the experiences of the remainder of the class.   For example, suppose that every manager performed tasks A, B, and C such that they all had a uniform and exactly identical experience.  If that were the case, then any single manager could be selected at random and his or her experience would be representative of the group's experience.   On the other hand, what would happen if there were four SMs and each manager had completely different experiences with little to no overlap?  If Manager 1 testified that he spent his workday completing tasks A, B, and C, his experience would not be representative of Manager 2 who, if asked, would testify that she spent her workday performing tasks X, Y, and Z.  Things get further complicated if we add Manager 3 who spent his workdays performing tasks A, Y, and Z and Manger 4 who spent her workday performing tasks X,  B, and C respectively.  Thus, SMs 3 and 4 have completely different experiences from each other; however, each has some overlap with SMs 1 and 2.  As evidenced by the example, each of the

**DECLARATION OF ROBERT CRANDALL**

SMs performed tasks that were within the universe of all tasks SMs could perform; yet, none had experiences that were the same.   Thus, if we were to select at random only one manager to testify about his or her experience, whatever information was obtained would not be relevant for the other three.   Indeed, given this example, one would have to question all four SMs individually in order to make determinations regarding what they did.

6.      The level of complexity increases if we add the concept that tasks A, B, C are classified as exempt and tasks X, Y, and Z are classified as non-exempt. If that were the case, then Manager 1, who only did the exempt tasks A, B, C would be exempt, Manager 2, who only did the non-exempt tasks X, Y, Z, would be non-exempt.  For SMs 3 and 4 there is an added layer of complexity since they performed both exempt and non-exempt tasks.   Thus, Manager 3 could be either exempt or non-exempt depending what percentage of his work-time was spent performing task A versus tasks Y and Z.  Whereas Manager 4 could be exempt or non-exempt depending on the percentage of her work-time was spent performing task X versus tasks B and C.  Again, since there is no overlap, one cannot use Manager 3's testimony as the basis for determining the experiences of Manager 4.   Nor can one use the experiences of SMs 3 and 4 as proxies for the experiences of SMs 1 and 2. Thus, to make merits determinations for all four SMs, one would have to question each manager individually in order to identify which tasks they performed, as well as, for SMs 3 and 4, who performed both exempt and non-exempt tasks, what percentage of their time was spent performing each task.

7.      The examples above present circumstances where variability in how SMs performed their job resulted in none of the four SMs' experiences being the same, which led to the need to conduct individualized inquiry into what tasks they performed and, when they performed a mix of exempt and non-exempt tasks, how much time they spent performing each tasks.  The end result of this scenario is that a portion of the group met the standard for the exemption and a portion did not.  However, one could not determine which manager's experiences met the criteria and which did not without questioning each individually.   Plaintiffs' argument appears to be that one can

**DECLARATION OF ROBERT CRANDALL**

create a random sample and make determinations and then extrapolate the results to the remainder

of the class.   However, if the circumstances in the example above were true, the need to

individually question SMs regarding their experiences would persist even if the sample size was

expanded from four to a considerably larger number.   Suppose it were the case that a portion of

the expanded sample would have experiences similar to Manager 1, a portion would have

experiences similar to Manager 2, and portions would have experiences similar to SMs 3 and 4

respectively.  Extrapolating these results to the remainder of the class would only result in an

estimate of the portion of class members whose experiences may fit the characteristics of each

manager.  However, unless one could determine which non-testifying SMs are like Manager 1,

which non-testifying SMs are like Manager 2, which non-testifying SMs are like Manager 3, and

which non-testifying SMs are like Manager 4 based on some external observable trait, statistical

analysis would not be useful for determining which individual non-testifying SMs had

experiences similar to SMs who worked in an exempt capacity and which did not.

- **Variability in Experiences Can Result in Significant Error in Class Wide Adjudications**

8.      The examples above illustrate why uniformity in experiences is important when the

exemption question is dependent on what tasks are performed and how much time is spent

performing each task.  If it were the case that all SMs had uniform experiences, then, by

definition, they would all be on the same side of the liability test.  Consequently, no

individualized inquiry would be necessary since whatever class-wide liability finding was made

would be accurate for all members of the class.  However, on the other hand, if there was wide

variability that resulted in some class members being exempt and others non-exempt, then, by

definition, whatever class-wide liability finding that is made will be wrong for a portion of the

class.  Thus, the question becomes how much error is too much? To illustrate this point, consider

the following hypothetical outcome.  Suppose that 51% of the class was on one side of the line

and 49% was on the other.  If that were the case, then whatever liability decision was made would

**DECLARATION OF ROBERT CRANDALL**

be wrong for approximately half of the class. Under these circumstances a finding in favor Dollar Tree would result in large numbers of class members with valid claims who would have been compensated had they pursued their case individually not being compensated due to the class wide finding in favor of Dollar Tree. On the other hand, if the proportions were reversed Dollar Tree would be required to compensate hundreds of class members who do not have valid claims and class members with valid claims would see their awards cut in order to pay class members who have no claim. As evidenced by the example above, the error rate for a class wide adjudication increases as the proportion of the class with valid claims gets closer to 50/50.

9.       It is important to note that plaintiffs have not yet performed an analysis of whether or not a portion of the class met the requirements for the exemption and a portion did not. Indeed, in connection with class certification, plaintiffs did not conduct a survey or implement any other systematic data collection process that would demonstrate that class members had uniform experiences. Since plaintiffs have not conducted a study, they have no basis for stating that class members had uniform experiences or that the named plaintiffs had experiences similar to the class. Plaintiffs have argued "while every manager will perform exempt functions to some degree, that degree is a question of liability, all other questions (e.g. what the defendant expected, why it expected it, and how it was communicated) are completely defendant oriented questions that really should be answered once for all members of the class."[1] In other words, plaintiffs agree that every class member performs some managerial duties for some amount of time. Plaintiffs also do not assert that class members spent similar amounts of time performing managerial duties. However, in plaintiffs view, this variability should be ignored since making this determination would lead to a merits finding of 'yes' or 'no' for that individual which is not the focus at this phase of the case. In making these assertions, plaintiffs' approach fails to consider the implications that variability in experiences has upon the usefulness of representative testimony and statistical techniques to make class-wide determinations. Further, plaintiffs have

---

[1] Plaintiffs Reply Memorandum and Points of Authority of Representative Plaintiff's Motion for Class Certification, p. 1.

**DECLARATION OF ROBERT CRANDALL**

failed to consider that understanding whether portions of the class members are on both sides of the liability test is the basic step for determining if class wide findings with an acceptable level of error.

- **Plaintiffs' Common Questions Do Not Eliminate the Need to Collect Detailed Information Regarding Class Members Actual Work Activities**

10.     Instead of examining issues that impact whether one can use a class action process to make determinations about the group's experience, plaintiffs have focused on questions like, "what the defendant expected, why it expected it, and how it was communicated" and claim that these issues should result in a common answer for all class members.[2]  The answers to plaintiffs' questions do not address the bottom line question of whether class members actually performed their job duties in a manner consistent with the requirements for the exemption.  Indeed, suppose it were the case that all three questions in plaintiffs' brief were answered.  Does the answer to those questions result in a class-wide adjudication?  The answer is no.  Since none of the questions address the basic issue whether SMs spent more than half of their time performing exempt duties, individual inquiries regarding the amount of time spent performing various tasks would still have to be collected in order to make determinations for individual testifying class members on the merits issue, and then one would need to determine whether or not the results can be extrapolated to the class without significant error.

- **The Question of Whether Class Members Performed the Tasks Listed on The Certification Forms Does Not Answer the Question of Whether Class Members Have Valid Claims**

---

[2] I imagine that Dollar Tree can answer these questions quickly.  The likely answers are: 1) Dollar Tree expected its SMs to work in an exempt capacity. 2) Dollar Tree had the results of the survey that I conducted in the 2002-2003 time period that demonstrated that a strong majority of SMs report allocating more than half of their time to exempt duties, and, 3) The company's expectations of how SMs work were communicated in the Certifications of Duties form.

7

**DECLARATION OF ROBERT CRANDALL**

11.     In avoiding the discussion on whether or not variability exists, plaintiffs have decided that the common question is whether class members performed the 17 numbered tasks listed on the payroll Certification Form as well as the five non-managerial tasks (receiving product, distributing and storing product, stocking product, and cashiering).   Given this theory, suppose we were to confirm through the testimony of a sample of randomly chosen class members that that every class member spent at least some of their time performing every task identified on the Certification of Duties Form.  Have we made any meaningful progress in making a class-wide determination? As evidenced by the discussion above, the mere fact that a manager performed a given task is irrelevant without an understanding of the how much time they spent performing the task.    Further, suppose it were the case that not all class members performed every task on the list.  What do we do with this information?  Again, that finding would not be relevant to making merits determinations on a class-wide or even individual basis since time spent performing various duties is what actually matters.

- **Plaintiffs' Proposed Trial Plan Will Likely Result In The Need to Revisit Class Certification Issues Mid-Trial**

12.     Plaintiffs' view is that one can resolve the legal issues by obtaining representative testimony from a group of randomly selected class members that can then be extrapolated to the remainder of the class.  As noted above and below, there are many significant issues that will arise if the testimony shows wide variation in experiences.  Thus, the question is whether whatever process plaintiffs propose to generate the data on SMs' work activities will produce data that demonstrates variability in SMs' work activities.  At present, the detailed data related to SMs work activities consists of the weekly Certification Form data and the 2002-2003 survey data.[3] Since both of these sources of data show patterns of wide variation in SMs' work activities and

---

[3] In connection to a prior lawsuit regarding whether Dollar Tree SMs were appropriately classified as exempt, Resolution Economics designed and conducted a survey of current and former Dollar Tree SMs. Among other things, the survey collected detailed data related to SMs estimates of how much time they spent performing various groups of exempt and non-exempt tasks and how much time they estimate that they spent in various areas of the store.

experiences, it is unlikely that whatever approach plaintiffs use to collect representative evidence on class members' work activities will demonstrate that class members had uniform and consistent experiences.  If there is variability in experiences, one would have to determine on an individual by individual basis which non-testifying manager had experiences similar to which testifying manager.

- **Plaintiffs Have Not Considered Whether Systematic Policies Practices and Procedures Govern Class Members' Behavior and Result in Uniformity of Experiences Where Class Members Spent Significantly Less Than  Half of Their Time Performing Exempt Duties**

13.     Plaintiffs typically claim that whatever systematic policies, practices, and procedures resulted in uniformity of experiences across members of the proposed class.  Generally one can test if this theory is true by examining the extent of variability in experiences across class members.  If it were the case that policies governed SMs' behavior, then one would expect very limited variability across members in terms of the time spent performing various work-related tasks and the overall percentage of time spent performing exempt versus non-exempt tasks would be similar.  The end result would be that most, if not all, of the class would be on the same side of the merits issues. Instead of a 50/50 proportion of valid and invalid claims, the proportion could be closer 100/0 or 95/5, which eliminates or significantly reduces the error associated with class wide adjudication.   The exception to this result of adjudicating with minimal error are situations where there is limited variability in experiences across class members, but the percentage of time spent performing exempt duties is very close to 50%.   For example, suppose class members' reported exempt time ranged between 47% and 53%.  Under these circumstances, it is likely that whatever class-wide finding is rendered will be wrong for significant portions of the class. Given this issue, the second prong of the uniformity question is whether the "uniform experience" results in class members' exempt time being close to the 50%.

**DECLARATION OF ROBERT CRANDALL**

14.     Suppose it were the case that data was collected that showed there is wide variability in experiences across class members.  This finding would be the opposite of what would be expected if systematic policies, practices, and procedures governed manager behavior.  Rather, this finding would be consistent with the hypothesis that variability in individualized factors such as managerial style, employee productivity, employee commitment, and store specific factors such as sales volume and customer flow influenced SMs' behavior.  If that were the case, then one cannot use "representative" testimony to make determinations about the experiences of SMs who have not provided testimony.  Such a process would likely devolve into making determinations of which non-testifying manager had experiences similar to which testifying manager.  However, this cannot be done without individualized inquiry.

- **The Available Data Demonstrates That There Is Wide Variability Across SMs in Terms of the Percentage of Work Weeks That They Reported Spending More Than 50% of Their Time Performing Managerial Duties.**

15.     In 2005, Dollar Tree began a process whereby SMs were asked to certify on a weekly basis that they spent more than half of their time performing managerial duties, or, if not, what were the operational issues that led to them being unable to allocate more than half of their time to managerial duties.  The 'Certification of Duties' forms asked SMs to record at the end of each week whether they had spent more than 50% of their time engaged in managerial tasks.  In total Certification Forms are available for 29,431 work weeks during the class period.  Analyses of the weekly forms indicate that SMs report spending more than half of their time performing managerial duties for 88% of the weeks reported.   However, if one delves underneath the aggregate statistic, there is considerable variation across SMs.  As described in detail below, there is considerable variation across SMs, across stores, across districts, and across regions in terms of the percentage of weeks SMs certified that they were performing exempt duties.  In addition, the data demonstrates that there is considerable variability in the percentage of weeks the same manager certified as exempt when they worked at different stores.   Thus, the data suggests that

10

manager-specific and store-specific factors play a role in whether a given manager certified that he or she spent more than half of their time performing managerial duties.

- **Statistical Analysis of The Certification Forms Indicates That They Provide Valid Measures of Instances Where SMs May Not Have Spent More Than 50% of Their Time Performing Managerial Duties.**

16.     Given the findings of variability in terms of the percentage of weeks certified as exempt, one question that must be addressed is whether the Certification Forms provide a valid measure of weeks where SMs did not spend more than 50% of their time performing exempt duties.   From a technical perspective, the concept of validity refers to whether the data collection instrument, in this case the Certification Form, produces accurate measures of what it intends to measure.  One methodology to assess validity is to statistically compare outcomes with other factors that should be correlated with those outcomes.  As described in detail below, there are many statistically significant relationships between a 'no' certification response and operational factors that were occurring in the store during the week in question.  Thus, in the aggregate, it appears that the Certification Forms provide valid measures.

- **Whether or Not A Given Manager Correctly Certified Their Time Would Likely Require Individualized Inquiry**

17.     The requirement for SMs to complete certifications presents an interesting question as the case proceeds forward.   In order to make a claim, most plaintiffs will be required to recant or explain the information reported on their weekly certification and provide contradictory information several months or years later regarding what happened during a particular week. Given this issue, the fundamental questions become whether or not the claims forms provide a valid measure of SMs' work activities and whether one Store Manager's claim that he or she did not accurately complete the certification should be applied to others who have not stepped forward and provided information that their Certification Forms are inaccurate.   In other words,

**DECLARATION OF ROBERT CRANDALL**

plaintiffs must claim that SMs were required to report or did report spending more than half of their time performing managerial duties, whether they did so or not and that the requirement was systematically affecting all SMs.   As discussed in detail below, the certification data demonstrates variability, not only from week to week, but also in the frequency that SMs reported exempt status over time at the individual, store, and district levels.  This finding is inconsistent with the notion that SMs systematically provided inaccurate responses when reporting how they spent their time.    Further, the validation analysis discussed below shows that there are statistically significant relationships between operational factors at a particular store during a particular week and incidents where SMs report that they spent less than half of their time performing managerial duties.   This finding is the opposite of what would be expected if SMs were simply checking a box without consideration regarding how they spent their time during a particular week.   Rather, these findings support the conclusion that the certifications provide valid measures of weeks where SMs spent less than half their time performing managerial duties. Thus, even if it were the case that individual plaintiffs recant their Certification Forms, the data does not support the theory all SMs systematically falsely certified that they spent more than half of their time performing managerial duties.   Consequently, it would be inappropriate to extrapolate the results of one or a group of class members who have recanted their weekly Certification Forms to others who have not.  Thus, individual inquiry may be necessary to determine each manager's practices for completing their certifications.

- **The Dollar Tree Business Model and Role of the Manager in the Store Would be Expected to Result in Variability in Experiences Across SMs**

18.     The Dollar Tree business model features low prices ($1 or less per item) and low margins with profits being driven through high sales volume.  Generally, hourly Associates are not asked to "sell" product.  Rather, Associates focus on receiving product, pricing merchandise, maintaining the level of stock, merchandising the store, and cashiering.  Associates' customer service duties are typically limited to helping customers find certain items in the store.   Given

**DECLARATION OF ROBERT CRANDALL**

this environment, the manager's primary role is to ensure the flow of merchandise from the receiving dock to the shelves, and then out the door.  Fundamental aspects of the manager's mission are ensuring that the store has the appropriate number of trained Associates, and that Associates work at a pace sufficient to complete their assigned tasks within budgeted hours.  As discussed in detail below, SMs in stores where employees fail to meet the budgeted time to complete tasks are likely to be required to create more efficiency in performing other tasks, add additional labor hours, or perform addition labor themselves.   Thus, individual store characteristics are likely a contributing factor in the variability in SMs' activities.

- **Analysis of Time Keeping Data Indicates That SMs Make Different Choices Regarding the Use of Overtime Hours in Their Stores**

19.     The timekeeping data also suggests that SMs exercise discretion over the use of overtime hours in their stores.   As noted below, the time-keeping data was analyzed across stores and across SMs.[4]  For each SM, the average number of overtime hours per week that they utilized was computed.   This analysis demonstrated that the average and median number of overtime hours used per week across SMs were 17.7 and 5.3 hours per week respectively with a standard deviation of 39 hours.  Indeed, 10% of the SMs averaged 1.9 overtime hours or fewer per week and 10% of the SMs averaged 36 overtime hours or more per week.   As evidenced by these findings, some SMs use relatively few overtime hours per week while others use relatively large amounts of weekly overtime to operate their stores.  A chart showing the average number of overtime hours utilized per week for 30 randomly selected SMs is shown in Exhibit 1.  As demonstrated by the chart and the statistics above, there is wide variability across SMs in the use of overtime.

20.     The finding that class members vary in their use of overtime labor hours creates several questions.  First, does a manager who uses overtime labor to complete tasks in their store spend

---

[4] The Compass data utilized in the analysis spanned 2006-2007.

**DECLARATION OF ROBERT CRANDALL**

different amounts of time performing hourly labor as compared to SMs who do not use overtime? If the answer to this question is 'yes' then differences in overtime use would be expected to drive variability across SMs in terms of the percentage of time spent performing non-managerial duties. A second question is whether SMs who did not use overtime did so because their employees were well supervised and productive, or because the manager supplied the necessary labor themselves. Again, the answer to this question has direct bearing on how much time SMs spend performing non-exempt tasks and different responses would lead to variation in the percentage of time spent performing exempt duties.

- **Differences in Employee Commitment Would Be Expected to Drive Variation in Time Spent Performing Managerial Duties**

21.     The second employee quality issue is employee turnover and/or "no-shows," which may result in labor hours being available, but not utilized if the manager is unable to find employees to work on a given day.[5] Again, there are several potential courses of action available to SMs when this occurs.   One potential option would be to ask employees who are on-shift that day to work additional hours, which in some instances will result in overtime.  A second option is to call in workers who are off that day to fill-in for the missing employee.  The third option would be for the manager to supply some additional non-managerial labor themselves.  Again, whatever decision the manager makes would influence the amount of time spent performing managerial duties.  Thus, variability in decision-making would be expected to drive variability in the percentage of work-time SMs allocated to managerial duties.

---

[5] As discussed in detail below, analysis of the certifications data indicates that there are statistically significant relationships between weeks where SMs did not certify that they spent more than half of their time on the 17 duties and labor issues in the store that week.

**DECLARATION OF ROBERT CRANDALL**

1

2  **SECTION IV – ANALYSIS OF SM 'CERTIFICATION OF DUTIES' FORMS SHOWS**

3  **WIDE VARIATION IN TERMS OF THE PERCENTAGE OF WEEKS CERTIFIED AS**

4  **EXEMPT**

5

6  • **There Is Wide Variation Across SMs In Terms of the Percentage of Work-Weeks**

7  **Certified As Exempt**

8  22.     Beginning in 2005 Dollar Tree implemented the 'Certification of Duties' form to be

9  completed by SMs on a weekly basis.[6]  Dollar Tree SMs were required to complete the form by

10  indicating whether they spent more than 50% of their time performing a combination of 17 duties

11  during the week.  SMs provided 'yes' or 'no' responses and were asked to provide an explanation

12  if they did not meet the 50% threshold.    To examine variability across SMs, the percentage of

13  work-weeks each manager reported as "exempt" was computed.  This percentage was computed

14  by counting the total number of 'yes" weeks worked for each manager and dividing that number

15  by the total number of weeks that manager worked.  SMs who had 'yes' proportions of greater

16  than 50% were considered to be correctly classified.  Again, these results show that fewer than

17  12% of SMs reported spending a majority of their weeks working in a non-exempt capacity.[7]

18  These results are summarized in Exhibit 2 – the manager-level percentages of 'yes' responses

19  range from 30% to 80%, with the majority of SMs at or above the 50% line.

20

21  23.     Additionally, the certifications data reveal considerable variability across SMs, stores, and

22  districts.  While many SMs uniformly reported that they worked in a managerial capacity during

23  all of their weeks as Dollar Tree SMs, other SMs reported that they *never* performed exempt tasks

24  ────────────

[6] The 'Certification of Duties' form data were built by combining electronic records and paper
records that were examined and then hand-coded.  Duplicate entries for the same 'manager-week'

25  were eliminated from the data as were data provided by unidentified SMs.  Further, weeks where
SMs indicated having been on vacation, on leave, or records where they indicated that they were

26  not the store manager were excluded based on the reasons provided on the form.

27  [7] SMs' who worked in a store for fewer than 10 weeks were excluded from this analysis.  This
resulted in more than 500 unique manager-store combinations over the period from 2005-2009.

28

**DECLARATION OF ROBERT CRANDALL**

more than 50% of the time.  Such wide variation in the responses from manager to manager suggests that manager-level attributes and decision making play a role.  Some, in fact, most SMs certify that they are consistently able to allocate more than half of their time across the set of managerial activities that Dollar Tree SMs are required to perform.  Other SMs are routinely unable to configure their work weeks in ways that allow them to devote a majority of their time to managerial tasks.  Each manager's percentage of 'yes' certification responses can be found in Exhibits 3A, 3B, and 3C.  As evidenced by these exhibits, there is significant variability across members of the class in terms of the percentage of weeks they certified as working in an exempt capacity.  Approximately 62% of SMs reported that 100% of their weeks were 'exempt', while approximately 2.5% SMs reported that 0% of their weeks were exempt, and 35% of SMs fell somewhere in between.

- **There is Wide Variability in the Percentage of Weeks Certified As Exempt Across Stores**

24.     Exhibits 4A, 4B, and 4C illustrate the between-store variability that is observed in the data.  These exhibits show the rates of 'yes' responses for each store.  Looking across the three charts, there is considerable fluctuation in the bars that are displayed.  Stores fluctuate from 0% to 100 'yes' responses on the forms.  It is important to note that this variation is observed even when comparing stores within the same region.  Exhibit 4C, for example, shows certification responses for all stores in Region #22.   To illustrate the variation across stores in Region #22, compare the results for the three stores are highlighted in red, stores #1535, #3194, and #1855.   As seen in the chart, Store #1535's 'yes' response rate was 99%.  In Store #3194, the 'yes' response rate was 70%, and in Store #1855 the rate of 'yes' responses was only 47%.   As evidenced by this example, whatever control that existed at the regional level did not result in uniform outcomes across all stores in the region.

**DECLARATION OF ROBERT CRANDALL**

- **SMs Who Worked At Multiple Stores Often Reported a Different Percentage of Weeks Certified as Exempt After Changing Stores**

25.    Variability in responses observed at the store-level is underscored when considering that certification responses often change when SMs change stores.  The data demonstrates that the event of a new SM taking over a store frequently coincides with a change in the frequency with which a manager reports 'yes' on his/her Certification Forms.  Exhibits 5A and 5B show SMs who worked at two different stores.  It is clear from the chart that differences between 'yes' reporting at the first store and the second store were common occurrences.

26.    Exhibit 6 shows certification responses for 11 SMs who worked at three different stores.  Consider, for example, the case of Jerry Clemens who worked as a manager in three different Dollar Tree locations.  In his first store, #1773, he provided 'yes' responses 100% of the time.  As a manager of Store #1899, he provided 'yes' responses 84% of the time.  Finally, when moving to Store #2216, he indicated 'yes' on his Certification Forms approximately 72% of the time.  As seen in the exhibit, Mr. Clemens is not alone in reporting different certification responses when changing stores.  In fact, only 4 of the 11 SMs had consistent response patterns across all three of the stores where they worked.  Other SMs' responses exhibited between-store differences of over 70%.  For example, Richard Hoyt never reported 'yes' during any of the 20 weeks he spent at Store #1215, but reported 'yes' 70% of the time during his 67 weeks at Store #1229.

27.    The reasons why SMs change their certification reporting patterns when changing work environments are illuminated by reviewing the deposition testimony provided in this case.  For example, SM Conrad Mayhew testified about his experiences in both the Tracy and Oakdale Dollar Tree stores.  In addition to noting that the Oakdale store was about half of the size and that it differed in layout, he also testified that the store had a wider variety of merchandise.[8]  While Mr. Mayhew was at the Tracy store, he reported exempt-status on the Certification Forms 100%

---

[8] Deposition of Conrad Mayhew, 38:8-40:11.

**DECLARATION OF ROBERT CRANDALL**

of the time.  However, once moving to the Oakdale store, he reported exempt status during 66% of his weeks.  Based on his testimony, it appears that the combination of different sales volume, variety of merchandise, customers, and employees influenced the amount of time he could spend performing managerial tasks.  As a result, these changes are reflected in his Certification Form responses.

- **There is Wide Variability in the Percentage of Weeks Certified As Exempt Across Districts**

28.     Exhibit 7 shows further variability in the proportion of 'yes' responses at the district-level. Across 3 districts—#261, #197, and #194—the 'Yes' response rate varied from 40% to 76% to 99%, respectively.  These districts are also highlighted in red.  The spread between the lowest district (40%) and the highest district (99%) is nearly 60 percentage points.  The wide variation across districts in percentage of weeks certified as exempt is the opposite of what would be expected if centralized controls, policies, practices and procedures governed SMs behavior.

29.     These differences observed at the district-level are not surprising in light of the deposition testimony that has been offered by several SMs.  In their testimony, SMs cited differences in the management 'styles' of the District Managers that oversaw them.  They were able to express preferences for certain District Managers and could cite examples of how their work had been hindered or helped by particular district-level supervisors.  Mr. Mayhew, for instance, describes the style of his DM 'Ray' as 'strictly by the book…set-ups done correctly 100 percent, signs put up, stockroom empty, things pulled forward, recovered 100 percent at night, store vacuumed. Restrooms cleaned two three times a day."[9]  Ray, in his opinion, was one of the best DMs he ever worked under.  John Kohl, by contrast, was 'more gray than black' and was less explicit in letting Mr. Mayhew know when things in his store were not meeting standards.

---

[9] Deposition of Conrad Mayhew, 60:5-21.

**DECLARATION OF ROBERT CRANDALL**

30.     Arnaldo Pineda also testified that his District Managers were considerably different in how they oversaw his work as an SM.  In discussing his time under Kenneth Miller, Mr. Pineda testified that 'he treat[ed] me like we were in boot camp" and he described Mr. Miller as a micromanager.[10]  One of Mr. Pineda's other District Managers, Rob White, was described in testimony as "the opposite" of Mr. Miller.  It is clear to see from the depositions of both Mr. Meyhew and Mr. Pineda how District Managers could potentially affect SMs' ability to perform their jobs.

31.     Looking to the certifications data, differences in managerial style across District Managers appear to be related to how often Dollar Tree SMs report exempt status on their Certification Forms.  When comparing SMs who worked under two different DMs during their tenure at Dollar Tree, there are observable differences in the frequency of 'yes' reporting on the forms based on the district supervisor.  For example, James Ellis worked under two DMs—Burdeshaw and Guzman—during his tenure as a store manager.  Under Burdeshaw his reported 'yes' rate on the Certification Forms was 51% while under Guzman, his rate was nearly 82%.  Similarly, Danny Herrera managed stores under two DMs, Whalen and Hawley, and his rate of reporting 'yes' on the Certification Forms was different under the two District Managers.  His rate of 'yes' reporting under Whalen was 28% and his rate under Hawley was 88%.  These two SMs are among many other examples—Exhibit 8 shows comparisons for a sample of 30 SMs who worked under more than one DM.

32.     In their papers, Plaintiffs have asserted that Dollar Tree SMs do not have the discretion to run their stores as they see fit because company-wide policies and automated inventory systems already dictate how the stores will operate.  However, if stores and districts were operating under common policies and fixed procedures that dictated manager behavior, such wide variability in 'yes' responses at the individual, store, and district level would be unexpected.  Rather, one

---

[10] Deposition of Arnaldo Pineda, 27:6-28:7.

**DECLARATION OF ROBERT CRANDALL**

1    would expect much more uniformity in SMs' weekly responses and that uniformity would trend

2    strongly in the direction of non-exempt status.  As demonstrated by the exhibits discussed above,

3    the data suggests that whatever common policies, practices, and procedures that exist did not

4    result in uniformity of experiences across SMs.

5

6    **SECTION V -   ASSESSING THE VALIDITY OF MANAGER CERTIFICATIONS**

7

8        • **Assessing the Validity of Manager's Week-To-Week 'Exempt-Status' Certification**

9          **Forms:**

10   33.     In the documents supporting their filing, plaintiffs have acknowledged that the

11   'Certification of Duties' forms were completed by SMs on a weekly basis.  However, through the

12   declarations they have submitted, plaintiffs have tried to cast doubt on the accuracy of the

13   information contained within these forms.  Plaintiffs contend that some SMs indicated exempt-

14   status uniformly, without regard for the tasks that they actually performed during the week.

15   Consider the declaration of D'Estrea Bell who states: "I always answered 'yes' to the

16   'Certification of Duties Form,' thereby indicating that I had complied with the Dollar Tree

17   mandated managerial duties and responsibilities for this week."[11]  Taking Ms. Bell's claim at face

18   value, the validity of the forms becomes an important issue to address: were SMs filling out the

19   forms in a way that failed to accurately reflect the work that they performed?  In order to answer

20   this question, an empirical study of the forms' validity is required.

21

22   34.     There are both qualitative and quantitative reasons to believe that the forms accurately

23   represent the week-to-week activities of SMs.  From a qualitative perspective, the deposition

24   testimony provided in this matter provides numerous examples of SMs testifying that they

25   understood the terms of the Certification Forms when they signed them.  Consider, for example,

26   the testimony of Charles Banks.  When asked whether he was telling Dollar Tree through his

27   _____

     [11] Declaration of D'Estrea Bell, p3.

28

1    'yes' response on the Certification Form whether he had spent more than 50% of his time

2    performing the 17 tasks presented on the form, Mr. Banks replied "Right. Yes."  He also testified

3    that he had the restriction of spending no more than 35% of his time on cashiering, stocking, and

4    receiving product in mind when he completed the forms.[12]  Marvin Reyes provided comparable

5    testimony, stating 'yes' when asked whether his believed that his signature on the Certification

6    Form indicated that he had spent 50% of more of his time on the 17 managerial tasks listed on the

7    form.[13]  It is testimony of this sort that suggests, on a prima facie level, that SMs were responding

8    to these forms honestly and to the best of their abilities.

10    35.    To validate the 'Certification of Duties Form' responses from a quantitative standpoint,

11    the week-to-week certifications data were merged with store-level and employee time clock data

12    from Dollar Tree's Compass time-keeping software.  Data from all sources were available for the

13    period between May 2006 and December 2007.  Across all Dollar Tree locations in CA, 237

14    unique stores and 10,316 unique manager work weeks were examined.  First, SMs' responses to

15    the certifications were compared to fixed store-level attributes to determine if those who indicated

16    a higher proportion of non-exempt weeks also tended to work in environments that were more

17    likely to require the use of their time in non-managerial capacities.  Next, as a further means of

18    validating the certification responses, changes in SMs' weekly reporting of exempt/non-exempt

19    status were compared to store-level attributes that varied from week to week.  Based on these

20    analyses, I conclude that the certifications have a strong tendency to reflect actual in-store

21    conditions and are likely to accurately represent the activities performed by each manager during

22    the week.

---

[12] Deposition of Charles Banks, 18:15-19:9.

[13] Deposition of Marvin Reyes, 16:4-11.

21

**DECLARATION OF ROBERT CRANDALL**

- **SMs' Propensities to Report 'Exempt' Status are Associated with Store-Level Attributes**

36.     The first set of validation analyses examines store-level characteristics that are relatively fixed over time.   The analyses compare these semi-fixed attributes to the proportion of exempt weeks that SMs reported during their tenure at a particular store.  If SMs reported their exempt/non-exempt status in a way that did not accurately reflect in-store conditions, one would not expect to see any significant relationship between their certification responses and store-level attributes.  Based on the forthcoming analyses, I conclude that there are identifiable store-level factors—namely, the number of full-time employees and the level of customer flow per associate—that vary in tandem with each SMs' propensity to report exempt status.

37.     To examine these relationships, the proportion of exempt weeks was calculated for each store manager.  A manager who consistently answered 'yes' on the Certification Form was assigned a proportion of 100%, a manager who answered 'yes' during 18 of 36 work weeks was assigned a proportion of 50%, and so on.  Each SMs' proportion of 'exempt status' weeks was compared to the observable characteristics of his/her store during the period in which he/she operated as the store manager.

38.     The first notable finding is that SMs with a higher percentage of 'full-time' employees were likely to report a higher proportion of exempt-status work weeks.[14]  For each store, the percentage of active full-time employees was calculated.  Stores with a full-time-to-part-time employee ratio in the top 25% were assigned to one group.  Those stores with a full-time-to-part-time employee ratio in the bottom 25% were assigned to a different group.  SMs of stores in the two groups were compared to see whether their reported proportions of exempt-status weeks differed.  For SMs with a larger share of full-time employees, the reported percentage of exempt-

---

[14] For purposes of this analysis, the term 'full-time' is meant to describe employees that were consistently and regularly employed for close to 40 hours per week.  In the analysis, 'full-time' employees are defined as those employees that worked 35+ hours per week for more than 80% of their active weeks.  There are 626 employees who met these criteria.

**DECLARATION OF ROBERT CRANDALL**

status weeks was nearly 9% higher (81.4% vs. 90.1%).  This finding makes intuitive sense: full-time employees are likely to be more experienced, to better understand both the short- and long-term needs of the store, and to have predictable schedules that allow SMs to plan more effectively.  This takes the burden off of SMs to make up for the lack of experience among a work force comprised of short-term and part-time hires.  As a direct result they are able to devote more time to exempt, managerial tasks, resulting in a higher reported proportion of exempt weeks.  It is interesting to note that due to employee turnover the level of experience in a particular store changes over time.  Thus, over the class period, stores would be expected to vacillate in terms of the level of employees' experience.

39.     A second analysis examines whether store sales activity and customer flow are related to the proportions of exempt/non-exempt weeks that SMs report.  For this analysis, the proper metric to study is the volume of sales per associate.  This measure serves as a proxy for how 'busy' each individual associate is in the store.  A higher volume per sales associate is likely to be related to increased levels of cashiering, stocking, cleaning, and assisting customers.  The expectation is that in stores where each non-exempt employee encounters higher sales volume per associate, SMs will be more likely to also perform non-managerial work.  Since each member of the non-exempt labor force is required to service a higher level of customer flow compared to stores with lower sales volume per associate, some SMs may have a tendency to compensate by assisting with certain non-managerial functions.

40.     This expectation is confirmed in the Dollar Tree data by identifying and analyzing stores with high customer flow per associate, or those in the top 25% in terms of sales per associate.  SMs that oversaw stores with high customer flow were much more likely to report non-exempt time.  48.3% of the SMs in high customer flow stores also had a 'high' rate of weekly non-exempt reporting.[15]  Among SMs in stores with low and average customer flow per associate, a

---

[15] SMs with 'high' rates of non-exempt reporting were defined as those SMs that reported spending more than 65% of their weeks working in a non-exempt capacity.  Due to the

**DECLARATION OF ROBERT CRANDALL**

'high' rate of weekly non-exempt reporting was less common: only 29.2%, or a difference or more than 19%.[16]

41.     Taken together, these two analyses suggest that fixed store-level attributes exhibit clear statistical relationships with SMs' responses provided on the Certification Forms.  These statistical relationships would be unexpected if the certification responses were provided either at-random or in a uniform fashion.  I turn now to examining week-to-week fluctuation in the reporting of exempt/non-exempt status and how these weekly changes are associated with changes in store conditions that vary on a weekly basis.

- **Week-to-Week Variation in SMs' Reporting of Exempt/Non-Exempt Status is Associated With Actual Changes in Weekly Store Staffing Conditions**

42.     The previous set of validation analyses examined how fixed store-level attributes were related to individual SMs' overall propensities for reporting non-exempt status.  The next set of analyses examines how week-to-week changes in store conditions affect managerial reporting of exempt/non-exempt status on a weekly basis.  A good number of SMs' provided responses on the Certification of Duties forms that exhibit fluctuation from week to week.  This variation allows for SMs' exempt/non-exempt status in a given week to be compared to the store's staffing conditions for that week.  The question for the purpose of validating the Certification Forms is

---

(continued…)

availability of store sales data, this analysis was conducted for approximately 67% of the SMs. When dealing with smaller samples, analysts commonly rely on Chi-Squared Statistics and Fisher's Exact Tests, as opposed to T-statistics from a comparison of sample means, to determine statistical significance.  The results here are significant using both the Chi-Squared and Fisher's Exact methods.

[16] It should be noted that despite the large difference observed between stores with high sales volume per associate and other stores, there remains considerable variation among stores in the 'high sales volume per associate' group.  Exhibit 9 provides a graphical representation of the percentage of 'yes' responses for SMs overseeing stores in the top 25th percentile with regard to sales volume per associate.  This chart shows that proportions of 'yes' responses on the certification forms vary considerably even within this subset of the Dollar Tree SM population.

**DECLARATION OF ROBERT CRANDALL**

whether SMs' responses on the forms can be linked to actual changes in staffing conditions. If changes in staffing conditions tend to correspond with changes in a manger's reporting of exempt/non-exempt status, it supports the notion that his/her response on the Certification Form accurately reflects the work that he/she performed in that week.

43.     In making this comparison, the first clear and noteworthy finding is that SMs were more likely to report non-exempt status in weeks where they were understaffed. To conduct this analysis, the average number of active employees for each store was calculated. Next, each week was examined to determine whether a store was 'short' more than two employees. Store-weeks were classified as 'normally/overstaffed' or 'understaffed' and Certification Form responses during normally- or overstaffed weeks were compared to responses during the understaffed weeks. The analysis shows a statistically significant increase of 6.4% in the reporting of non-exempt status during weeks when a store is understaffed. Approximately 30.4% of the weeks were reported as 'non-exempt' when stores were normally or overstaffed. However, during understaffed weeks that proportion rose to 36.8%.[17]

44.     A similar pattern is observed in the context of store hours. For each store, the typical number of employee hours was calculated. Weeks where the number of employee hours worked dropped 10% below the average were identified. Comparing weeks with typical employee hours to weeks with below-average employee-hours reveals a statistically significant difference in the percentage of reported non-exempt weeks – SMs working during weeks with below-average staff hours were 3.8% more likely to report non-exempt status.

---

[17] This analysis, by definition, focuses on SMs who had varied certification form responses from week to week. As a result, SMs with 0% and 100% 'Exempt' responses were excluded from the analysis. Since a disproportionate number of SMs reported '100% exempt', the proportion of 'non-exempt' weeks here is considerably higher than when all SMs are included. Using the full sample, the percentage of 'non-exempt' weeks is 14.8%.

**DECLARATION OF ROBERT CRANDALL**

45.     Employee turnover also appears to have a clear effect on SMs' reported exempt/non-exempt status.  During weeks where a store lost an employee, SMs were 3.6% more likely to report that 50%+ of their hours were spent performing non-exempt duties.   These results are more pronounced when assessing the effect of termination events among longer-term employees.  SMs who lost an employee with 90+ days on the job were 4.4% more likely to report non-exempt status during that week.

46.     If the certifications forms failed to accurately represent the activities of Dollar Tree SMs there would be little reason to expect store level factors to vary in tandem with a SMs' reported exempt/non-exempt status.  Observed here, however, is a clear set of relationships between both fixed and dynamic store level attributes.  Mangers who oversaw stores with fewer full-time employees and those who were faced with higher levels of customer flow were both more likely to report non-exempt status on their Certification Forms.  There is an observable concurrence between weekly in-store staffing conditions and the ways in which SMs' report spending their time on a week-to-week basis.  Further, as shown earlier, a manager's change in store location or district-level supervisor also tends to coincide with different certification reporting behavior.  Taken together, these several facts suggest that the SMs' responses on the certifications forms accurately reflect the work that they performed in a given week.  A summary of these validation analyses is shown in Exhibit 10.

47.     It should be noted that the various analyses presented here are meant only to confirm the validity of the Certification Forms that were completed by SMs.  The characteristics that have been examined—staffing conditions, customer flow, store changes, etc.—do not constitute the full range of attributes one would need to study in any given week to make a determination about whether a store manager performed a majority of his/her tasks in a managerial capacity.  As mentioned in the introduction of this report, managerial discretion in how time is allocated also

plays a crucial, if not predominate, role in making any reasonable assessment of whether a

manager spent the majority of his/her time performing exempt, managerial tasks.

## SECTION VI - STATISTICAL ISSUES THAT ARISE WHEN CLASS MEMBERS DO NOT HAVE UNIFORM EXPERIENCES

- **How does wide variability in the percentage of time allocated to managerial duties impact the ability to utilize random sampling approaches and statistical techniques to predict whether a given individual non-testifying class member is above or below the 50% line**

48.     The list of "common" issues presented by plaintiffs in this case does not address the basic

question of whether class members spend uniform or variable amounts of time performing

managerial duties.   From a statistical perspective, this is the most important question since the

high variation across SMs' practices and experiences creates several issues.  First and foremost,

high variation has several implications related to the use of representative testimony to determine

a class-wide average or "typical" experience that could be used to make merits determinations.

In situations of low variability, the class average usually is a relatively good measure the

"typical" experience of class members.  However, in higher variability situations, the class

average may not be "typical" of the experiences of most or all class members.  For example,

suppose it were the case that half the class spent 48% of their time on managerial duties and half

spent 52% of their time on managerial duties.  The class-wide average of 50% of time spent on

managerial duties would represent the "typical" experience of class members fairly accurately

since the difference between the average and each class member's true value is only 2%.  Now

suppose that half the class spent 0% and half spent 100% of their time performing managerial

duties.  Again, the class wide average would be 50%, but in this instance the average would

**DECLARATION OF ROBERT CRANDALL**

represent none of the class members' experiences.  Indeed, imputing the average to any class member would be an error of 50% from his or her true value.

49.     Wide variability in managerial time also impacts the ability to utilize representative testimony to get an accurate measure of class members' activities.   As noted above, in situations of wide variability, the class "average" experience does a poor job of representing individual class member's actual experiences.  The example above where half of the class spent 0% of their time on managerial duties and the other half spent 100% illustrates the point.  If testimony of a random sample of class members were utilized, the finder of fact would have to deduce 50% managerial time based on alternating stories of 0% and 100%.   Further, due to random variation in the order of testifiers, stopping the testimony at a particular number of people could result in the false impression that one side had more people that met the liability test.[18]

50.     High variability in managerial time also makes it more difficult to utilize statistical sampling approaches and statistical techniques to make inferences regarding the population's average experience.   The basic approach calls for selecting a random sample of class members, conducting detailed individualized inquiry regarding their work experiences, and then making inferences about the population's characteristics.   However, when making inferences, statisticians must account for sample to sample variance, which is sometimes referred to as sampling error.  Sampling error is a byproduct of observing only a sample, or portion of the population, rather than the whole population.  Since any two different random samples from the same population may have different characteristics, it is sometimes the case that variation between the two samples may result in different estimates of the population mean (average).  Statistical sampling theory accounts for this issue by providing probability-based estimates of the likely size of the sampling error.   To account for sampling error when making inferences, statisticians make plus or minus interval estimates around a sample statistic, which is known as a

---

[18] To deal with this issue one can determine if the proportion is statistically significantly above 50% by computing confidence intervals around the proportion.

**DECLARATION OF ROBERT CRANDALL**

confidence interval.  Confidence intervals estimate the likelihood that the parameter (statistic) in question fits within the specified interval, and are generally influenced by the size of the sample and the variability of the sample data.  Higher variability increases the standard deviation, which leads to wider interval estimates, while increased sample size leads to smaller interval estimates.[19]

51.     Consider again the concept of making statistical inferences about the populations "average" experience based on information obtained from a random sample of class members.  Suppose we drew a random sample of 30 class members and determined that they spent on average 53.0% of their time on managerial duties with a standard deviation of 10%, which implies that 95% of the SMs in the sample had managerial time that ranged between 35% and 70%.  Extrapolating this result back to the population would result in the conclusion that at a 95% level of confidence, the true average of the population is between 49.4% and 56.6%, a result which, unfortunately, is legally ambiguous relative to the 50% managerial time test.  Conceptually, the ambiguous result above could be avoided if there was less variation across SMs, or we had a larger sample.  For example, suppose the standard deviation were 8% instead of 10%.  If that were the case then the confidence interval range would narrow to between 50.1% and 55.9%, which would be considered statistically significantly above 50%.   Increasing the sample size has the same effect of narrowing confidence intervals.  Taking the original example and increasing the sample size from 30 to 45 would also narrow the confidence interval to between 50.1% and 55.9%.

---

[19] Confidence intervals of an average or mean value are estimated by computing the standard error of the mean (Standard deviation / square root of sample size) and then multiplying the standard error by 1.96, which equates to a 95% confidence interval.  95% confidence intervals are standard in the social sciences.

**DECLARATION OF ROBERT CRANDALL**

- **How does wide variability in the percentage of time allocated to managerial duties impact the ability to utilize information derived from a random sample of class members to make extrapolations regarding the class wide average managerial time and the proportion of class members who spent more than 50% of their time performing managerial duties**

52.     Wide variation in managerial time creates similar problems with confidence intervals if one seeks to utilize statistical techniques, such as multivariate regression, to estimate the managerial time for class members who are outside of the sample.  In this case, a statistical model (or, regression equation) would 'predict' percentage of time spent on managerial duties (the dependent variable) as a function of several known "independent" variables (such as tenure, store size, sales volume, etc.). The output of the model includes: the adjusted r-squared statistic, which measures how well the independent variables explain the variation in the dependant variable, a point estimate, which, in turn, is surrounded by a confidence interval.   Generally, models have higher adjusted r-squared statistics, and consequently, better predictive power if there are strong statistical relationships between the independent and dependent variables.  However, a pattern of wide variation across SMs is indicative that strong relationships may not exist.  Consequently, the end result of such a process may be a regression model that predicts with 95% confidence that a manager spent between 40% and 60% of his or her time performing managerial duties. Obviously, this conclusion is of little use in terms of addressing the questions at hand.

53.     Variation in managerial time could also result in significant portions of the class on both sides of the liability test.   If that were true, then it is guaranteed that whatever decision is rendered by a jury, or other finder of fact, will be wrong for at least a portion of the class.  Under these circumstances, the question becomes, how much error is too much?  For example, suppose that 70% of the class was classified properly and 30% was not.  A class wide finding for the defendant would result in those class members with valid claims receiving nothing.  Had they pursued their case individually, they would have been better off.  Now suppose that the statistics

**DECLARATION OF ROBERT CRANDALL**

were reversed to 30% classified properly and 70% misclassified.  If one were unable to determine precisely which class member fell into which liability bucket, a "rough justice" approach would be necessary.   Class members with valid claims would receive 70 cents on the dollar, while class members who did not have valid claims would receive the same amount.  In addition to robbing class member Peter (has claims) to pay class member Paul (no claim), a finding for the plaintiffs would result in the defendant paying damages to a large number of individuals who have no claim.

54.     Wide variation in managerial time that results in portions of the class on both sides of the liability test also impacts the ability to utilize representative testimony / information to derive class wide liability.   For example, suppose the trial plan called for merits to be determined based on the proportion of randomly selected class members who were determined to have spent more than 50% of their time on managerial duties.   When statisticians extrapolate a proportion from a sample to a population, a 95% confidence interval is computed.   Generally, the size (width) of the confidence interval increases as the proportion gets closer to 50% and narrows as the sample size increases.   For example, assume we selected a random sample of 30 people and determined that 60% were above the 50% managerial line.  This sample size and proportion will result in a confidence interval of plus or minus 17.5%.  Thus, one would conclude that between 40.8% and 79.2% of SMs spent more than 50% of their time on managerial duties.[20]  Again, we are left with a legally ambiguous result.   Suppose the proportion above 50% stayed at 60% of the sample, but the sample size was increased to 104 people.  The confidence interval would narrow and the resulting conclusion would be that between 50.1% and 70% of the class spent more than 50% of their time on managerial duties.  Alternatively, suppose it was the case that the proportion derived from the sample was 80/20 rather than 60/40.  Under this scenario, a sample size of 30 would yield a 95% confidence interval ranges between 64% and 96% for the proportion of the class that spent more than 50% of their time on managerial duties.   This would lead to a finding for the defendant.  Suppose that instead the proportions were reversed to 20/80.  The 95% confidence

---

[20] Continuity correction was utilized in confidence interval estimates.

**DECLARATION OF ROBERT CRANDALL**

interval for this scenario would be that between 4% and 36% of SMs spent more than 50% of their time performing managerial duties.

## SECTION VII – OVERVIEW OF FINDINGS FROM THE 2002-2003 SURVEY OF DOLLAR TREE SMS

55.     In considering the relevance of the 2002-2003 survey, the question becomes what operationally has changed and did those changes result in changes in SMs behavior, more specifically did significantly alter behavior such that SMs now had relatively uniform experiences.   It is my understanding that some new tools, such as automatic replenishing for certain products and the compass time keeping and scheduling software, have been introduced subsequent to the time period when the survey was conducted.   While these new tools may aid managers in ordering product and scheduling employees, they are unlikely to produce uniformity in the time spent performing specific tasks and exempt tasks overall.   As discussed above, the certification data demonstrates a pattern of wide variability across managers in terms of the percentages.   This finding is consistent with the 2002-2003 survey findings of wide variation in terms of what percentage of their time SMs allocated to various duties and managerial duties overall.   In other words, the data demonstrates that the variability that existed during the 2002-2003 period still exists today.

- **The Survey Captured Information Regarding How Managers Allocated Their Time Between The Various Tasks They Perform and How Frequently They Exercise Discretion and Independent Judgment in Operating Their Store**

56.     In 2002-2003, Resolution Economics conducted a survey of current and former California Dollar Tree SMs.   The survey, completed by 74 respondents, was aimed primarily at assessing SMs' allocation of their time across a variety of exempt/non-exempt tasks.   Respondents were also asked a variety of questions concerning their individual decision making authority with

**DECLARATION OF ROBERT CRANDALL**

1    regard to store operations.  The study found that Dollar Tree SMs predominately reported

2    working in managerial, exempt capacities and that each manager's allocation of time across the

3    task groups differed considerably.   Further, the observed variability in how SMs reported

4    spending their time was very high.  This finding contradicts plaintiffs' notion that Dollar Tree

5    SMs are subject to strict company-wide policies or uniform procedures.  Rather, the survey's

6    results suggest that each manager tends to allocate her/her time quite differently, thus making the

7    claims in this case unsuitable for class-wide analysis using common statistical evidence.

8

9    57.      To assess the proportions of time that SMs were devoting to exempt/non-exempt

10   activities, survey respondents were presented with three major categories of activities:

11   administrative, stock room, and sales floor.  Within each of those groupings, SMs were provided

12   with a list of more detailed sub-groups of tasks.  They were asked to assign a percentage to the

13   amount of time spent performing each (e.g. supervising employees to insure completion of

14   assigned tasks, reviewing and analyzing sales and profit center reports, disciplining and

15   terminating employees, unloading trucks and staging freight, conducting an inventory of the stock

16   room, cashiering, selling to customers, etc).  The responses were used to estimate each manager's

17   proportion of exempt time.

18

19    •    **The Survey Demonstrates that a Portion Of Respondent SMs Report Spending**

20        **More Than Half of Their Time Performing Managerial Duties and a Portion of**

21        **Respondent SMs Did Not**

22   58.      As discussed in detail below, this survey indicates that a significant majority of SMs

23   report spending more than half of their time performing managerial duties.  Further, the average

24   managerial time across all survey respondents was in excess of 50%.   More specifically, the

25   Dollar Tree SMs conducted by Resolution Economics in 2002-2003 demonstrated that

26   approximately two out of three survey respondents (67%) spent more than half of their time on

27

28

**DECLARATION OF ROBERT CRANDALL**

managerial duties.[21]  Exhibit 11 presents the percentage of time spent performing managerial

duties reported by the survey respondents.  Respondents have been grouped into intervals ranging

from 30% managerial time to 80% managerial time, as reported on the survey task list.  As seen

in the chart, the majority of Dollar Tree SMs are in the groupings that fall above the 50%

threshold.  Exhibit 12 presents similar information except that the proportion of managerial time

for each survey respondent is presented as single bar in the chart.  From manager to manager, we

again observe a pattern of wide variability in the proportion of time devoted to exempt-status

tasks.   As evidenced by these Exhibits 11 and 12, the data suggests that some SMs perform their

job in a manner consistent with the exemption and others do not.   Given that this pattern of

variability in experiences continues to present day, it is likely that many SMs will report that they

worked in a manner that met the requirements for the exemption and some will not.  Thus,

individual inquiry may be required to make determinations regarding which SMs who are not

asked to provide information had experiences similar to those who worked in an exempt manner

and which had experiences similar to those who did not.

- **Whatever Systematic Policies, Practices, and Procedures Exist Did Not Result In SMs Reporting That They Spent Uniform Amounts of Time in Various Areas of the Store**

59.     SMs not only varied in the percentage of exempt time that they reported, but they also

differed in terms of how much time they spent in various areas of their stores.  Exhibits 13, 14,

and 15 present the percentage of total time SMs' report spending in the office, sales floor, and

back room, respectively.  Very few SMs reported splitting their time in similar or equal ways

across the three areas.  It is important to note that these exhibits do not distinguish between

managerial and non-managerial tasks, rather they depict the percentage of time spent performing

all duties in a particular area of the store.  Thus, these exhibits demonstrate that there are no

systematic factors that result in SMs spending similar amounts of time in the same area of their

---

[21] The survey was conducted by mail.  All surveys were completed by respondents and signed under penalty of perjury.

**DECLARATION OF ROBERT CRANDALL**

1    stores.  Since the universe of tasks performed in each area of the store is different, (truck

2    unloading only happens in the back room, cashiering only happens on the sales floor), this finding

3    of wide variability in terms of the percentage of time SMs spend in various areas of the store

4    would be expected to drive variability in terms of the percentage of time SMs spend performing

5    various individual tasks, as well as, their overall managerial time.

6

7    • **The Survey Data Demonstrates That There Is Wide Variability Across SMs in the**

8    **Percentage of Time Allocated to Managerial Duties**

9    60.      Exhibits 11 through 15 suggest that SMs make decisions regarding what tasks they

10   themselves perform, what tasks they decide to delegate to others, and how much time they spend

11   working in various areas of the store.   Thus, it is clear that whatever common set of policies,

12   practices, and procedures exist, they do not influence SMs' behavior with regard to what duties

13   they choose to perform and where they perform them.

14

15   61.      The responses indicated that a considerable majority, nearly 67% of SMs, regularly spent

16   50% or more of their time performing exempt, managerial work (these results were shown in

17   Exhibit 11).  The average percentage of exempt time across all survey respondents was 55.6%.  If

18   one were to assume that there was non-response was random and not systematic, the 95%

19   confidence interval around that estimate ranged from 51.8% to 59.4%.[22]  Substantively, this

20   indicates that the average across all survey respondents was above 50%, even when accounting

21   for error introduced by the sampling process.  More importantly, the results also showed that

22   approximately two-thirds of SMs were above the 50% threshold (these results were displayed

23   graphically in Exhibit 12).

24

25

26   _____

[22] The argument that non-response is an issue implies that there are systematic and meaningful
27   differences across class members. I am assuming that plaintiffs believe class members did not
     have systematically different experiences.
28

**DECLARATION OF ROBERT CRANDALL**

- **The Survey Shows Wide Variation in Terms of the Percentage of Time SMs Report Allocating to Groups of Tasks**

62. In addition to showing a high level of exempt-status reporting, the study also revealed considerable variation across the various task groupings. Different SMs reported spending very different proportions of their time handling the activities in the list. For example, a handful of SMs reported spending as much as half of their time unloading trucks, staging freight, organizing and categorizing merchandise in the stock room, conducting inventory in the stock room, and cleaning the stock room. At the same time, other SMs reported virtually no time performing this set of tasks and others reported, on average, spending about 10-20% of their time engaged in these non-exempt activities. These results are shown in Exhibit 16. With regard to supervising cashiers, approving returns at the cashier, and responding to customer complaints some SMs reported spending as little as 1% of their time performing these tasks while other SMs reporting spending as much as 18% of their time engaged in these supervisory activities. Exhibit 17 shows the percentage of time reported for each manager for this set of tasks. Manager-level variation as observed in Exhibits 16 and 17 was present, to varying degrees, across each of the task categories and sub-groups.

- **The Survey Data Demonstrates Variation Across SMs in Terms the Extent They Exercise Discretion and Independent Judgment**

63. Another important finding of the survey concerned the issue of managerial discretion. SMs were presented with a series of tasks and asked whether they were allowed to exercise independent judgment in performing each activity. Responses to the survey indicated a clear sense of discretion among SMs with regard to the day-to-day operation of their stores. A majority of the respondents to the survey reported having the discretionary authority to initiate sales promotions, to develop strategies for the merchandising and marketing of products, and for the hiring, scheduling, disciplining, and termination of associates. Of twelve individual decisions listed, 90% of the surveyed SMs indicated that they had decision making authority for at least six

1    of the tasks.  An overview of SMs' survey responses are showing in Exhibit 18.

2

3    64.      The survey also found that while SMs tended to report having the discretion to perform

4    tasks relating to day-to-day store operations, they commonly differed in terms of how often they

5    utilized such discretion.  In addition to being asked *whether* they had the authority to make

6    independent judgments regarding store sales strategies, staffing, etc., respondents were asked to

7    report how often they engaged in exercising such authority.  Here, the observed variability was

8    considerable.  For example, when asked what percentage of promotional activities in the store

9    were the result of individual initiative (as opposed to company-wide promotions) responses

10   ranged from 0% to 90%.  Similarly, approximately 80% of SMs indicated that they had the

11   authority to tailor their store's merchandise to their location-specific customer base.  Though,

12   while some SMs indicated that they were almost exclusively responsible for determining the

13   merchandise that would be supplied in their store, others indicated that they rarely exercised such

14   discretion.  These results are shown in Exhibits 19 and 20, respectively.

15

16   65.      Each of these findings is in conflict with the notion that Dollar Tree SMs were subject to a

17   set of common policies or procedures that dictated the ways in which they could oversee their

18   stores.  Much the opposite, the survey results not only suggest that SMs varied considerably in

19   how they allocated their time across exempt and non-exempt tasks, but that each had considerable

20   leeway to exercise independent judgment, if they chose to do so.[23]

21

22   •    **Wide Variation in Managerial Time Allocations Limits The Usefulness of Statistical**

23        **Techniques to Use Known Attributes to Predict Whether a Given Class Member**

24        **Worked in an Exempt Capacity**

25   66.      In attempting to understand the variation observed in SMs' time allocations, the study

26   included a variety of regression analyses.  SMs' proportions of reported exempt time were

27   _____

     [23] The issue of managerial discretion was also discussed consistently in the deposition testimony
28   submitted in this case.  This deposition testimony will be addressed in detail later in this report.

**DECLARATION OF ROBERT CRANDALL**

1   modeled statistically using a variety of observable factors including annual sales of the store,

2   gross square footage of the store, manager tenure, and the total number of 'yes' responses to

3   questions concerning managerial  discretion.  The various models suggested that SMs' perception

4   of their authority to make decisions, as reported on the survey, was one of the measures most

5   strongly associated with higher reported levels of exempt-status hours.

6

7   67.     However, even taking these various factors into consideration, the statistical models were

8   able to explain only 16% of the total variation in SMs' reported proportions of exempt-status

9   time.  In other words, using these measurable factors in a multivariate analysis was a very

10  imprecise way to arrive at estimates for SMs that did not complete the survey's 'time diary'.  The

11  estimates from such a model are likely to be accompanied by very large margins of error – for

12  example, the model might establish with 95% certainty that a SMs' average fell somewhere

13  between 20% and 80%.  This would make an individual-level determination of exempt/non-

14  exempt status impossible in the absence of an extensive individualized fact gathering effort.

15  Exhibit 21 shows each manager's estimated proportion of exempt time based on the model, as

16  well as the range of uncertainty around each prediction.

17

18  **SECTION VIII – HOW TO EXAMINE WHETHER A COMMON SET OF POLICIES,**

19  **PRACTICES, PROCEDURES, TRAINING, AND SUPERVISION RESULTED IN**

20  **UNIFORMITY IN WORK ACTIVITIES**

21

22  68.     According to plaintiffs, SMs at Dollar Tree perform their duties without discretion at the

23  behest of regional or District Managers.  In their filing, plaintiffs write: "each store manager

24  remained (and remains) tightly constrained by the instructions and oversight of their respective

25  district manager."[24]  The implication here is that SMs function as SMs in name only, following

26  the lead of computer-directed inventory systems and spending "virtually all of their

27  _____

28  [24] First Amended Complaint, p7.

38

**DECLARATION OF ROBERT CRANDALL**

time…performing regular hourly employee tasks."[25]  The deposition testimony of SMs presented

in this case tends to contradict this notion.  SMs were seldom hesitant to offer testimony

describing the supervisory activities that they performed as SMs in Dollar Tree stores.  Some

SMs, in fact, testified that supervision of the store was a 'constant' facet of their job.  In his

deposition testimony, Charles Banks responded to questioning about his supervisory role in the

following way:

> Mr. Banks: Supervising?  Giving out duties.  Training.  Teaching.  Basically everything
> on this list [referencing the 17 'Certification of Duties' form tasks].
> Mr. Vandall: Okay.  So in the performance of those 17 tasks, you were constantly
> involved in supervision; is that what you mean?
> Mr. Banks: Correct.[26]

Mr. Banks' testimony is accompanied by testimony from numerous other SMs who reported that

they were also responsible for a variety of supervisory tasks.  For example, Kyle Chapman

testified that he had the authority to hire cashiers without the approval of his district manager.[27]

He later testified that his recommendation of a candidate for the Assistant Store Manager position

was followed and the candidate was hired.[28]  Diana Durston testified that it was her job to

discipline employees using formal verbal and written warnings and that she was responsible for

conducting annual performance evaluations.[29]


69.     Store Manager Bob Hodge indicated that he made decisions regarding the delegation of

the various tasks that needed to be completed in the store.  His testimony (shown below) provides

a good example of how managerial discretion can lead to variation in outcomes with regard to the

---

[25] First Amended Complaint, p5.

[26] Deposition of Charles Banks, 28:2-8.

[27] Deposition of Kyle Chapman, 80:5-15.

[28] Deposition of Kyle Chapman, 80:17-81:11.

[29] Deposition of Diana Durston, 35:18-38:8.

**DECLARATION OF ROBERT CRANDALL**

amount of time spent performing exempt/non-exempt tasks:

> Mr. Vandall: Okay.  Now if you're walking in the store and you happen to see something on the floor that a customer could slip on, what do you typically do to deal with that situation?
>
> Mr. Hodge: Depending on what it is.  If it's a piece of cardboard I might pick it up.  If it's a bigger project, I call an associate over to clean it up.
>
> Mr. Vandall: So, you make a decision about whether to delegate or do it yourself; is that correct?
>
> Mr. Hodge: A decision is made, yes.[30]

These types of decisions are likely to contribute significantly to the variation that is observed in both the survey data and the Certification Form responses.  Some SMs, for example, will routinely handle such issues by themselves without delegating to an associate – a spill or a poorly stocked shelf will be remedied by the manager.  With each decision of this sort that is made, the manager spends more of his/her time performing non-exempt duties.  Other SMs, however, will clearly understand the implications of their decision not to delegate and will choose to delegate these tasks as often as possible.  The end result is variation from manager to manager in how they report spending their time.  This variation is a by-product of managerial discretion concerning how to handle these situations as they arise.

70.     If it were true that SMs had limited discretion and inhibited decision-making authority, the expected empirical result would be near-uniformity in the way that SMs report spending their time.  SMs, across the board, would report very little time performing exempt tasks and the variability in the proportions across SMs would fluctuate only minimally.  The 'Certification of Duties' forms (and the results of the survey conducted prior to the class period) show this to be untrue.

---

[30] Deposition of Bob Hodge, 27:12-25

**DECLARATION OF ROBERT CRANDALL**

71.     To examine the question of whether systematic processes, such as corporate policies, practices, procedures, and training resulted in uniformity in work activities, one can examine the extent of variability in time allocations across SMs.  In alleging that putative class members performed their jobs with uniformity and consistency and that store operations were dictated in large part by District Managers, plaintiffs are implicitly assuming that differences across stores in terms of labor volume drivers, such as sales volume, customer flow, and product mix, employee factors, such as associates' productivity, experience and skill sets, motivation, and managerial style do not result in variability of SMs' behaviors and experiences.  Instead, under plaintiffs' theory, SMs are "forced" to behave in similar manners by whatever systematic processes and common training and supervision approaches exist.

72.     As shown in the discussion of the survey study, plaintiffs' contention that SMs lack discretionary authority is ill-founded.  SMs at Dollar Tree routinely reported that they are responsible for making decisions regarding staffing issues, promotional offers, and which items will be stocked in their stores.  Further, part of the equation that plaintiffs have not considered, is that there may be differences in employee and manager quality and managerial style that could influence what activities SMs perform in the stores.  For example, suppose the labor model allocates an expected average of 100 hours to complete task A.  Suppose Store 1's well-trained, motivated, and highly productive non-exempt employees push to complete the task in only 90 hours, or 10 hours faster than the expected time per the labor model's allocation.  In contrast, suppose it takes Store 2, which has newer, less productive non-exempt employees 110 hours to complete the same task.   The end result is that the manager of Store 1 has 10 additional non-exempt hours that can be allocated elsewhere, while the manager of Store 2 must make-up 10 non-exempt hours by either creating greater than expected efficiency in completing some other task, by exceeding his labor budget, or by providing more non-exempt labor himself.

**DECLARATION OF ROBERT CRANDALL**

73.     The paragraph above highlights the impact that a manager's leadership could have upon whether there is an excess or shortfall of non-exempt labor hours in the store.  SMs who are good motivators and are effective at training their employees are more likely to have more productive employees with longer tenures in their stores.  In contrast, ineffective SMs are more likely to have higher turnover and less productivity, which may result in them providing more non-exempt labor hours themselves.  Managerial style will also play a role in determining what activities the manager performs, and, consequently, how much time they may spend performing exempt duties.  For example, SMs who delegate and monitor would be expected to have less time spent performing non-exempt duties, as compared to SMs who are more "hands on" or less skilled at delegating tasks to others.  It is apparent that plaintiffs believe that differences in managerial quality and style have not resulted in differences in how SMs perform their jobs.  Instead, plaintiffs' theory is that common training programs have resulted in common behavior across SMs.  However, in considering whether plaintiffs' theory is true, one must also ask whether the common training has resulted in common managerial performance.   The reality is that some SMs' performance exceeded expectations, some SMs' performance met expectations, and some SMs' performance failed to meet expectations over the proposed class period.  Given this disparity in managerial performance, it is unlikely that all SMs performed their jobs in similar manners.  Consider again the example of the SMs of Store 1 and Store 2 above.  In Store 1, where the manager had a team that beat the labor model allocation, there was an excess of non-exempt labor hours.  In contrast, the manager of the team in Store 2 that worked slower than average had to deal with a short-fall of labor hours that could have been allocated to other non-exempt tasks in the store.   One reason for these different outcomes is differences in SM performance.

74.     The paragraphs above outline two competing views.  Plaintiffs' view is that a uniform set of corporate policies, practices, procedures, and training result in uniformity in how SMs perform their job, while the alternative explanation is that store and manager specific factors drive variability across SMs in terms of how they allocate their time among the various tasks they may

**DECLARATION OF ROBERT CRANDALL**

perform.  If we observe limited variability across class members in terms of individual SMs'

percentage of time spent in various areas of the store and the percentage of time spent performing

particular groups of duties, then it is likely that the policies and procedures that exist strongly

govern SMs' activities and behavior.   On the other hand, if plaintiffs' theory that policies,

practices, procedures, and training govern SMs' activities is incorrect, then one would see

variability in how SMs spend their time.   For example, suppose we sought to test the variability

in the work activities of cashiers working for a retail store chain that had a policy which required

cashiers to spend 95% of their time ringing up customers or waiting to ring up customers.  If one

wanted to test what percentage of work time cashiers spent stocking away from the cash register

there would be no meaningful variability.  Since each cashier must spend 95% of their shift at the

cash register, the most they can differ in terms of their time spent stocking would be 5%, which

translates into a maximum of 24 minutes out of an 8-hour shift.[31]  In other words, variability was

limited because the 95% cashiering policy forced both cashiers' days to be the same except for at

most 24 minutes.

75.    The example above demonstrates how strong adherence to policies could systematically

limit variability in work activities across employees in a similar role.   In other words, in this

example, a common set of policies, practices, and procedures resulted in a relatively uniform

outcome.  Now, suppose that instead of a policy which required that cashiers spend 95% of their

time ringing up or waiting to ring up customers, the policy was changed so that SMs could

allocate cashiers to other tasks when customers were not present. Variability in activities would

be expected to increase significantly due to several factors.  First, it is likely that the percentage of

work time actually spent ringing-up customers would vary based on shift-specific volume drivers,

such as sales volume and customer count. For example, suppose that in a low volume store the

cashier's actual time spent ringing-up customers was 3-hours, or 38% of an 8-hour shift.  This

---

[31] Because 95% of the shift was allocated to cashiering and waiting to cashier, the maximum
range of difference in stocking time is between 0% and 5%.  Applying 5% to an 8 hour shift
yields 0.4 hours, which corresponds to 24 minutes.

DECLARATION OF ROBERT CRANDALL

would leave approximately 5-hours per shift that could be allocated to other duties. In contrast, suppose that in a high volume store the cashier spent 5.5 hours, or 69% of his or her shift ringing-up customers. If one were to compare these two cashiers, the difference in cashiering time would be 2.5 hours per shift, or 31% of the shift. This difference, in turn, drives the variability of how much "available time" each cashier has that can be allocated to other tasks. Further complicating matters is that there are a multitude of tasks the cashier could be assigned to, such as stocking, cleaning, fronting-and-facing product, merchandising product, and re-pricing product, which could then be allocated differently based on the needs of the store that day and what duties are assigned to the other employees working on the same shift. The end result of the policy change is that cashiers go from uniform experiences to considerably more varied experiences. Thus, a policy change can result in a significant variability in work activities for non-exempt employees who are asked to perform a relatively limited set of duties.[32]

76.     The examples above contrast two work environments; one where a systematic process governs behavior versus another where policies do not strongly influence employees' behavior. If it were the case that a systematic process governs Dollar Tree SMs' behavior, then one would expect to see relatively little variation across SMs in terms of how they allocate their time to the various tasks they perform. If SMs allocate their time to various sub-categories of tasks in similar percentages, the corresponding percentage of time spent on managerial duties would be relatively uniform. However, the results on the Certification Forms and of the survey study responses both show wide variability across SMs in terms of the percentage of time spent in various areas of the store, the percentage of time spent on various groups of tasks, and the percentage of time spent on managerial duties overall. This suggests that plaintiffs' theory concerning managerial discretion and decision-making authority is incorrect.

---

[32] It should be noted that we have not addressed instances where policies that govern how employees spend their time exist, but, in practice, are not adhered to across the stores, which would again result in greater variability in work activities of cashiers.

1    **SECTION IX – CONCLUSION**

2

3    77.    At this stage of the case, plaintiffs have failed to acknowledge the wide variability

4    observed in SMs' experiences. This is not surprising given that plaintiffs would also have the

5    Court believe that SMs possess little, if any, ability to dictate the terms on which their stores

6    operate. In considering this theory it is important to note that SMs have the discretion to decide

7    which tasks they perform themselves and which tasks they assign to others.  The deposition

8    testimony and certifications data indicate that SMs consistently report having decision-making

9    authority for numerous discretionary tasks including product ordering, sales promotions, staff

10   scheduling, employee hiring, disciplining, and terminations.  The survey study supports this

11   conclusion.  The discretion afforded to SMs by Dollar Tree manifests itself in observable

12   differences in the ways that SMs allocate their time.  Variability is observed across nearly every

13   manager and across every task grouping.  This is not the implied result from the account provided

14   by plaintiffs – their account establishes and expectation of relative uniformity in the ways that

15   SMs spend their time.

16

17   78.    In the presence of such variability, it becomes difficult to rely on statistical estimation as a

18   means for determining liability or damages on a class-wide basis.  Observable characteristics such

19   as store size, sales volume, and tenure will only provide a limited amount of information before

20   less-easily observable characteristics such as managerial discretion, judgment, and skill enter as

21   complicating factors.  For this reason, the need for extensive individual inquiry is likely, as it is

22   improbable that representative evidence will be useful in making generalizations about the class

23   as a whole without significant error.

24

25

26

27

28

**DECLARATION OF ROBERT CRANDALL**

1   I declare under penalty of perjury under the laws of the State of California that the foregoing is

2   true and correct and that this declaration was executed in Beverly Hills, California on May 7,

3   2010.

4

5

6   _____

7   Robert Crandall, MBA

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

46

**DECLARATION OF ROBERT CRANDALL**

Cruz, et al v. Dollar Tree Stores



EXHIBIT 1

Cruz, et al v. Dollar Tree Stores



# Summary of Managers' Weekly Responses
## to the 'Certification of Duties' Form

EXHIBIT 2

## Variation in the Percentage of 'Yes' Responses Reported on Weekly 'Certification of Duties' Forms
### - ALL MANAGERS: Chart 1 of 3 -



EXHIBIT 3A

## Variation in the Percentage of 'Yes' Responses Reported on Weekly
## 'Certification of Duties' Forms
## - ALL MANAGERS: Chart 2 of 3 -



Dollar Tree Store Managers

Percent of Certifications Answered "Yes"

EXHIBIT 3B

Cruz, et al. v. Dollar Tree Stores

# Variation in the Percentage of 'Yes' Responses Reported on Weekly
## 'Certification of Duties' Forms
### - ALL MANAGERS: Chart 3 of 3 -



**Dollar Tree Store Managers**

EXHIBIT 3C

Cruz, et al v. Dollar Tree Stores



**Variation in the Percentage of 'Yes' Responses Reported on
Weekly 'Certification of Duties' Forms
REGION 9 - BY STORE**

EXHIBIT 4A

Cruz, et al v. Dollar Tree Stores

**Variation in the Percentage of 'Yes' Responses Reported on
Weekly 'Certification of Duties' Forms
REGION 13 - BY STORE**



EXHIBIT 4B

Cruz, et al v. Dollar Tree Stores

## Variation in the Percentage of 'Yes' Responses Reported on
## Weekly 'Certification of Duties' Forms
## REGION 22 - BY STORE



NOTE: The three stores highlighted in red are those referenced in the text of the report.

EXHIBIT 4C

Cruz, et al. v. Dollar Tree Stores





Cruz, et al v. Dollar Tree Stores



'Certification of Duties' Responses for SMs That
Oversaw Two Dollar Tree Locations
- CHART 2 of 2 -

Cruz, et al v. Dollar Tree Stores

**'Certification of Duties' Responses for 11 Managers That
Oversaw Multiple Dollar Tree Locations
- Only 4 out of 11 Manager Have Consistent Responses Across All Three Stores -**



EXHIBIT 6

Cruz, et al v. Dollar Tree Stores



**Variation in the Percentage of 'Yes' Responses Reported on
Weekly 'Certification of Duties' Forms
- BY DISTRICT -**

EXHIBIT 7

Cruz, et al v. Dollar Tree Stores

## 'Certification of Duties' Responses for 30 Managers That Worked Under More Than One District Manager



NOTE: Each SM shown in the chart worked under his/her DM for atleast 10 weeks. For display purposes, a selection of the first 30 pairs is shown here.

EXHIBIT 8

Cruz, et al v. Dollar Tree Stores

# Variation in 'Certification of Duties' Form Responses Among Managers in Stores with High Sales Volume Per Associate



EXHIBIT 9

Cruz, et al. v. Dollar Tree Stores

**The Effect of Changes in Store-Level Attributes and Staffing Conditions on
Managers' "Certification of Duties" Form Responses**

| Measured Attribute | Method of Measurement | Change in % of 'Yes' (Exempt) Certification Form Responses | Statistically Significant |
|---|---|---|---|
| High Proportion of Full-Time Staff | Stores in the top 25th percentile based on full-time to part-time employee ratio | 8.7% | Yes |
| Heavy Customer Flow | Stores in the top 25th percentile based on sales volume per associate | -19.1% | Yes |
| Understaffed Weeks | Weeks where a store was short more than two employees | -6.4% | Yes |
| Understaffed Weeks | Weeks where a store was 10% under its average number of hours | -3.8% | Yes |
| Termination Events | Weeks where a store lost an employee | -3.6% | Yes |
| Termination Events | Weeks where a store lost a long-term (90+ days) employee | -4.4% | Yes |

EXHIBIT 10

Cruz, et al v. Dollar Tree Stores

# Survey of Dollar Tree Managers
# Frequency Distribution of Percentage of Exempt Time

**Frequency Distribution of Percent of Total Time Allocated to Exempt Tasks**
**Solid Bars = Greater Than 50% Exempt Time**



EXHIBIT 11

# Survey of Dollar Tree Managers
## The Respondent Population Showed Wide Variation in the Total Percentage Exempt Time



**Total Percent Exempt**

EXHIBIT 12

Cruz, et al v. Dollar Tree Stores

# Survey of Dollar Tree Managers
## The Respondent Population Showed Wide Variation In Percentage of Total Time Allocated to Administrative Tasks



**Total Administrative Time**

EXHIBIT 13

Cruz, et al v. Dollar Tree Stores

# Survey of Dollar Tree Managers
# The Respondent Population Showed Wide Variation In Percentage
# of Total Time Allocated to Sales Floor Tasks

**Total Sales**



EXHIBIT 14

# Survey of Dollar Tree Managers
## The Respondent Population Showed Wide Variation In Percentage of Total Time Allocated to Stock Room Tasks

**Total Stock**



EXHIBIT 15

## Survey of Dollar Tree Managers
## Analysis of Survey Results Indicates Considerable Variation in Store Managers' Time Spent Unloading Trucks and Staging Freight, Organizing and Categorizing Merchandise in the Stockroom, Conducting an Inventory of the Stockroom, and Cleaning the Stockroom

**Percentage of Total Time Allocated to Non-Exempt Stock Room Tasks**



EXHIBIT 16

Cruz, et al v. Dollar Tree Stores

**Survey of Dollar Tree Managers**
**Analysis of Survey Results Indicates Considerable Variation in Store Managers' Time
Spent Supervising Cashiers and Sales and Customer Service Efforts of Employees,
Approving Customer Checks and Customer Returns, Responding to Customer
Complaints, and Supervising Employees' Efforts to Clean and Sweep the Sales Floor**

Percentage of Total Time Allocated to Sales Floor Task Group 2



EXHIBIT 17

Cruz, et al v. Dollar Tree Stores

# Survey of Dollar Tree Managers
# 90% of the Respondents Answered Positively When Asked Whether They Had Power to Make Decision Relating to Day to Day Store Operations



EXHIBIT 18

# Survey of Dollar Tree Managers
## Analysis of Survey Responses to Question 13b
# What percentage of the total promotion activities in your store have been on your initiative versus company-wide promotions?



Q13b - Authority to Implement Merchandising Activities

EXHIBIT 19

Cruz, et al v. Dollar Tree Stores

# Survey of Dollar Tree Managers
# Analysis of Survey Responses to Question 14a
# Do You Have the Authority to Order and Receive Merchandise That You Believe Best Fits The Preferences of The Customers At Your Store?



**Q14a - Authority to Order Merchandise That Best Fits Preferences of Customers In Your Store**

EXHIBIT 20

Cruz, et al v. Dollar Tree Stores

# Survey of Dollar Tree Managers
## Analysis of Predictive Values For Exempt Time Using Regression Analysis With Annual Sales as the Independent Variable Shows Margins of Error Are Unacceptably High



EXHIBIT 21