# EXHIBIT 10

Page 1

1                IN THE U.S. DISTRICT COURT
2              NORTHERN DISTRICT OF CALIFORNIA
3                        ---oOo---
4    _____
                                    )
5    MIGUEL A. CRUZ, and JOHN D.    )
     HANSEN, individually, and on   )
6    behalf of all others similarly )
     situated,                      )
7                                   )
                                    )
8         Plaintiffs,               )
     vs.                            )No. C 07 02050 SC
                                    )
9    DOLLAR TREE STORES, INC.,      )
                                    )
10        Defendant.                )
     _____)
11   ROBERT RUNNINGS, individually, )
     and on behalf of all others    )
12   similarly situated,            )
                                    )
13        Plaintiffs,               )
                                    )
14   vs.                            )No. C 07 04012 SC
                                    )
15   DOLLAR TREE STORES, INC.,      )
                                    )
16        Defendant.                )
     _____)
17
18        VIDEOTAPED DEPOSITION OF DAVID CROSS, at the Law
19        Offices of Littler Mendelson, P.C., 2520 Venture
20        Oaks Way, Suite 390, Sacramento, California,
21        commencing at 2:04 pa.m., April 29, 2010, before
22        Elizabeth A. Willis-Lewis, RPR, CSR No. 12155.
23
24        Job No. CS253126
25   Pages 1 - 150

Certified Transcript

Page 16

1   dedicated specifically to doing freight?

2      A.   Yes, there would have been a few that were

3   stockers -- strictly stockers.  They weren't

4   cashier-trained.

5      Q.   So they didn't even know how to do the cash

6   register?

7      A.   Not when I got there.

8      Q.   Okay.  At any time prior to May 26th, 2009, did

9   they become trained on the cash register?

10     A.   Yes.

11     Q.   Whose decision was that?

12     A.   That was mine.

13     Q.   Okay.  Did you feel that those stockers and the

14  freight manager were a good freight team?

15     A.   No.

16     Q.   Okay.  What -- why do you say they were not a

17  good freight team?

18     A.   Because the back room was bricked.

19     Q.   What does that mean, "bricked"?

20     A.   It was full -- very full.

21     Q.   Did you have to take steps to correct that when

22  you became the store manager?

23     A.   I followed the protocol that was given to me by

24  the company, you know, basically following policy, rules

25  and procedures.

1    Q.    And --

2    A.    Is that what you are wanting?

3    Q.    Yeah.  Is there a policy that says, "If the

4  stock room is full this is what you need to do"?

5    A.    No.

6    Q.    Okay.  And is it your understanding that Ralph

7  Badders did not receive the same policies or training

8  that you did?

9    A.    No, he got the same.

10   Q.    Okay.  How -- how long did it take before --

11  well, did you feel that at some point you got the stock

12  room under control so that it was acceptable according

13  to Dollar Tree standard?

14   A.    Yes.

15   Q.    And how long did that take?

16   A.    Six months.

17   Q.    Did you have to do any additional training of

18  any of the store employees to make that happen?

19   A.    Yes.

20   Q.    What type of additional training did you do?

21   A.    Wow.  Taught them how to follow the planner,

22  number 1.  Taught them what was the proper way to set up

23  an end cap because that helped get out more merchandise

24  if you do it the proper way, show them the proper

25  procedures on how to stock the floor.  We had a minimum,

1   you know, 20 cases per hour that we were making them

2   adhere to.  And so when you look at those points if they

3   are not -- if they are not being supervised or they are

4   not being trained into taking -- being productive then

5   that could cause the freight to be backed up and not put

6   out.

7       Q.   And you say you taught them.  How -- who were

8   you teaching?

9       A.   The freight manager.

10      Q.   Anyone else?

11      A.   Started with her to make sure she knew what her

12  job was, her function and what she could do for the

13  store.  So I started with her and worked with each

14  individual stocker.

15      Q.   Okay.  So how does setting up an end cap the

16  proper way help get out more merchandise?

17      A.   Well, because if somebody just puts out one

18  item only -- they can fill up an end cap, but when you

19  take and do the tie-ins that go along with it you are

20  getting out more product.  When you do the power panel

21  on the side, when you do a stack and you it a five -- we

22  call it a "five star end cap."  So when you are doing

23  five -- you are doing five items that you are

24  incorporating instead of just one item.  So, therefore,

25  you are pulling out a lot more out of that back room

1   procedures.

2        Q.   And did you have a home store at that time?

3        A.   Yes, I did.

4        Q.   Where was that?

5        A.   1215, West Sacramento.  And I actually worked

6   out of the Elk Grove store since it was right down by my

7   house.

8        Q.   So how often were you in the Elk Grove store?

9        A.   Every week.

10       Q.   For one day or --

11       A.   Yeah, usually a day or I would go by -- you

12   know, if it was close I could go by there, so I couldn't

13   give you exactly how many days a week.  With nine stores

14   I was in all of them just about every week.  I could get

15   into every single one.

16       Q.   And would you say you were in the home store

17   more often than you were in other of the nine stores?

18       A.   Yeah, probably I would say because you had to

19   go by there to get all your weekly paperwork done and

20   everything.  So, yeah.

21       Q.   And then you might have been in the Elk Grove

22   store more often than the other stores besides the home

23   store?

24       A.   Yes.

25       Q.   When you -- when you were in the store as a

1  district manager what did you do?

2       A.   Would tour the store, assess where they were

3  at, using the planner, making sure that they had

4  followed the policies and the procedures there, checking

5  the office to make sure that the cash handling

6  procedures were all being handled properly -- monitoring

7  that very closely.  Stores that did have camera

8  systems -- would view cameras to make sure that we --

9  you know, if we had anything where the paper trail was

10  showing that somebody might be doing something that was

11  going to affect the company that -- I would review the

12  camera system and make sure that, you know -- I got a

13  lot.  Unfortunately I spent a lot of time in some stores

14  and we lost several associates because of what I was

15  able to uncover.

16       Q.   Loss-prevention-type issues?

17       A.   Loss-prevention-type issues.

18       Q.   Okay.  When you were actually physically in a

19  store did you consider yourself in charge of that store?

20       A.   No.

21       Q.   Who was?

22       A.   The store manager.

23       Q.   I have the -- Exhibit 1 from the prior

24  deposition placed in front of the witness.  So this will

25  also be -- I am going to have it separately marked as

Page 137

1 Q. You wouldn't go back and adjust it if you
2 scheduled yourself to work until 5:00 and you actually
3 worked until 7:00?

4 A. No, there has nothing been told to do that
5 (sic).

6 Q. Did you keep hours -- do you have any records
7 anywhere of the hours that you actually worked?

8 A. No.

9 Q. Okay. What was your answer?

10 A. No.

11 Q. Did you ever tell your DM or your regional
12 director that you were working more hours than you had
13 scheduled yourself to work?

14 A. I don't recall. Probably talking -- in just
15 talking we probably talked about it, but --

16 Q. What was your salary between February 2009 and
17 May 26, 2009?

18 A. 60,000 --

19 Q. Okay.

20 A. -- per year.

21 Q. How much of each day did you spend walking the
22 store?

23 A. I couldn't give you a percentage.

24 Q. Okay. Would you say --

25 A. I walk it every day.

1    Q.   -- you spend a lot of your day walking the

2    store?

3    A.   I couldn't give you an exact amount of time.   I

4    do walk my store every single day throughout the day.

5    Q.   Okay.  And what's the purpose of walking the

6    store to you?

7    A.   Looking at it as far as the eyes of a customer,

8    what they're looking at.  Is it appealing to the

9    customer?  Is it -- you have got aisles blown up.  Our

10   customers tend to take and use it -- like the toy

11   department as a playground.  So, therefore, you look at

12   it as is -- somebody making sure it gets picked up.  Are

13   you picking it up?  Sometimes you look and there is

14   nobody but you, so you are picking it all up.

15   Q.   Or you might assign it to someone else that --

16   A.   Later on in the day if somebody is coming in,

17   "This counter needs to be worked on."  So you make notes

18   on the plan as to what needs to get accomplished.

19   Q.   Going back to a prior topic, what is the

20   difference between -- if any, between the assignments

21   that you made in the COMPASS system and the assignments

22   that you made on the daily planner sheet that you used

23   to give work assignments?

24   A.   Well, you are doing a generic on the COMPASS.

25   You can't put a whole lot there.  You are just basically

Page 148

```
 1    STATE OF CALIFORNIA       ) ss:
 2    COUNTY OF PLACER          )
 3
 4         I, ELIZABETH A. WILLIS-LEWIS, CSR No. 12155, do
 5    hereby certify:
 6         That the foregoing deposition testimony was taken
 7    before me at the time and place therein set forth
 8    and at which time the witness was administered
 9    the oath;
10         That the testimony of the witness and all objections
11    made by counsel at the time of the examination were
12    recorded stenographically by me, and were thereafter
13    transcribed under my direction and supervision, and that
14    the foregoing pages contain a full, true and accurate
15    record of all proceedings and testimony to the best of
16    my skill and ability.
17         I further certify that I am neither counsel for any
18    party to said action, nor am I related to any party
19    to said action, nor am I in any way interested in the
20    outcome thereof.
21         IN WITNESS WHEREOF, I have subscribed my name this
22    ____14TH____ day of ____MAY_____ 2010.
23
24
             Elizabeth A. Willis-Lewis  JV
25         ELIZABETH A. WILLIS-LEWIS, RPR, CSR NO. 12155
```

# EXHIBIT 11

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

--oOo--

MIGUEL A. CRUZ, and JOHN
D. HANSEN, individually
and on behalf of all
others similarly
situated,



        Plaintiffs,    Case No.  C07-02050 SC

    vs.


DOLLAR TREE STORES, INC.,

        Defendant.


DEPOSITION OF MIGUEL A. CRUZ



DATE:          FRIDAY, OCTOBER 12, 2007

TIME:          9:32 A.M.

LOCATION:     Kauff, McClain & McGuire
               One Post Street, Suite 2600
               San Francisco, California



PREFERRED REPORTERS
Certified Shorthand Reporters
201 E. Watmaugh Road
Sonoma, California 95476
707-938-9227



REPORTED BY: Wendy L. Van Meerbeke, CSR #3676

1

```
 1         A.   No.                                    09:58:30

 2         Q.   Did you work somewhere aside from the  09:58:30

 3    Healdsburg store?                                09:58:33

 4         A.   Roseland.                              09:58:34

 5         Q.   Is that for 2162?                      09:58:37

 6         A.   262 -- 262 (sic).                      09:58:39

 7         Q.   What were you doing at the Roseland store? 09:58:51

 8    Were you training?                               09:58:55

 9         A.   Yes.                                   09:58:56

10         Q.   Who was training you?                  09:58:57

11         A.   Rick Tellstrom.                        09:58:58

12         Q.   For how long did you train?            09:59:08

13         A.   In Roseland, like a month.             09:59:10

14         Q.   What sorts of things were you trained on? 09:59:19

15    What were the topics of your training?           09:59:21

16         A.   Stocking shelves.                      09:59:24

17         Q.   Anything else?                         09:59:28

18         A.   That's it.  The register.              09:59:32

19         Q.   Anything else?                         09:59:37

20         A.   That's it.                             09:59:38

21         Q.   At any point in time before you started 09:59:39

22    working as a store manager, were you trained on the 09:59:42

23    Compass system for scheduling?                   09:59:46

24         A.   When I went to Arcata -- I went to Arcata 09:59:48

25    for four weeks, three weeks.                     09:59:52
```

28

| | | |
|---|---|---|
| 1 | Q.  Pardon me? | 09:59:57 |
| 2 | A.  I went to Arcata for training I estimate | 09:59:59 |
| 3 | for three or four weeks. | 10:00:03 |
| 4 | Q.  In addition to a month training in the | 10:00:04 |
| 5 | Roseland store, you also had three weeks of | 10:00:10 |
| 6 | training in Arcata? | 10:00:13 |
| 7 | A.  Yes. | 10:00:14 |
| 8 | Q.  Who provided the training in Arcata? | 10:00:14 |
| 9 | A.  Jason. | 10:00:19 |
| 10 | Q.  Jason? | 10:00:20 |
| 11 | A.  Yes. | 10:00:21 |
| 12 | Q.  When you were working at the Roseland | 10:00:21 |
| 13 | store, what was your title? | 10:00:23 |
| 14 | A.  Assistant manager. | 10:00:26 |
| 15 | Q.  You were an hourly employee; correct? | 10:00:29 |
| 16 | A.  Yes. | 10:00:31 |
| 17 | Q.  You were paid on an hourly basis; correct? | 10:00:33 |
| 18 | A.  Yes. | 10:00:36 |
| 19 | Q.  Did you receive overtime? | 10:00:36 |
| 20 | A.  Yes. | 10:00:37 |
| 21 | Q.  What kind of training did you receive at | 10:00:49 |
| 22 | Arcata? | 10:00:51 |
| 23 | A.  Same thing.  Stocking, receiving the | 10:00:51 |
| 24 | truck. | 10:00:54 |
| 25 | Q.  I thought you told me you got training on | 10:00:55 |

29

```
 1              CERTIFICATION OF DEPOSITION OFFICER

 2         I, WENDY L. VAN MEERBEKE, duly authorized to

 3    administer oaths pursuant to Section 2093(b) of the

 4    California Code of Civil Procedure, do hereby

 5    certify that the witness in the foregoing

 6    deposition was duly sworn by me to testify to the

 7    truth in the within entitled cause; that said

 8    deposition was taken at the time and place set

 9    forth; that the testimony of said witness was

10    reported by me, a Certified Shorthand Reporter and

11    a disinterested person, and was thereafter

12    transcribed by computer under my direction into

13    booklet form; that the witness was given an

14    opportunity to read and correct said deposition and

15    to subscribe to the same.

16         I further certify that I am not of counsel or

17    attorney for either or any of the parties in the

18    foregoing deposition and caption named, nor in any

19    way interested in the outcome of the cause named in

20    said caption.

21         Dated the 1st day of November, 2007.

22

23         WENDY L. VAN MEERBEKE, CSR 3676

24

25
```

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MIGUEL A. CRUZ, and JOHN D.  )
HANSEN, individually, and on  )
behalf of all others similarly )
situated,  )
 )
            Plaintiffs,  )
 )
vs.  )  Case No: C07-02050 SC
 )
 )
DOLLAR TREE STORES, INC.,  )
 )
            Defendant.  )
_____)

**COPY**

DEPOSITION OF MIGUEL CRUZ
VOLUME II

DATE:             Friday, November 2, 2007

TIME:             9:29 a.m.

LOCATION:       Kauff, McClain & McGuire
                 One Post Street, 26th Floor
                 San Francisco, California 94104

PREFERRED REPORTERS
Certified Shorthand Reporters
201 E. Watmaugh Road
Sonoma, California 95476
707-938-9227

Reported By: Linda Vaccarezza, RPR, CSR #10201

267

1    Q    When was the schedule due?  What day of          10:49:01a

2  the week?                                                10:49:04a

3    A    I don't remember what day.                        10:49:04a

4    Q    You took it home, then, a couple of days          10:49:09a

5  before it was due; is that right?                        10:49:11a

6    A    Yeah.                                             10:49:12a

7    MS. MCCLAIN:  May I have this marked as next           10:49:26a

8  in order, please.                                        10:49:28a

9    (Exhibit 136 was marked for identification.)           10:49:53a

10  BY MS. MCCLAIN:                                          10:49:53a

11    Q    Do you recognize this document,                  10:49:53a

12  Mr. Cruz?                                                10:49:55a

13    A    I think so.                                       10:49:55a

14    Q    Is it an index from a playbook?                   10:49:56a

15    A    Yes.                                              10:50:03a

16    Q    You had a playbook at 2262, correct?             10:50:04a

17    A    Yes.                                              10:50:07a

18    Q    That was a notebook in which you kept            10:50:07a

19  business information, correct?                           10:50:12a

20    A    If I remember, yes.                               10:50:16a

21    Q    Who suggested to you, if anyone, that a          10:50:21a

22  playbook would be a useful thing for you to have?        10:50:23a

23    A    If I remember, that's when -- that was           10:50:27a

24  going to be a managers' meeting and Felice took          10:50:31a

25  hers to do mine at the store.                            10:50:40a

332

1       Q    Ms. Clement showed you how to prepare,    10:50:43a

2   compile a playbook?    10:50:50a

3       A    Yes.    10:50:51a

4       Q    When did she do that?    10:50:52a

5       A    I don't remember when.  It was before    10:50:53a

6   the meeting.    10:50:56a

7       Q    Did Ms. Clement tell you why she was    10:51:01a

8   doing that?  Did she say someone had asked her to    10:51:03a

9   do that?    10:51:06a

10      A    I don't remember.    10:51:06a

11      Q    She just said, Miguel, let me show you    10:51:07a

12  how to do the playbook?    10:51:10a

13      A    No, I think Rick asked her.    10:51:11a

14      Q    How do you know that?  Who told you    10:51:12a

15  that?    10:51:15a

16      A    Because I think she told me.    10:51:15a

17      Q    Did you find the playbook a useful tool    10:51:20a

18  in your managing of 2262?    10:51:23a

19      A    I really don't remember.    10:51:28a

20      Q    Did you ever use it?    10:51:29a

21      A    Don't remember if I used it.    10:51:31a

22      Q    So notwithstanding the fact that    10:51:33a

23  Ms. Clement and Mr. Tellstrom went to some --    10:51:35a

24  energy on their part to show you this document,    10:51:40a

25  you're not sure you ever used it?    10:51:42a

333

```
 1   STATE OF CALIFORNIA    )

 2   COUNTY OF SONOMA        )

 3        I, LINDA VACCAREZZA, a Certified Shorthand

 4   Reporter of the State of California, duly

 5   authorized to administer oaths pursuant to

 6   Section 2025 of the California Code of Civil

 7   Procedure, do hereby certify that

 8                  MIGUEL CRUZ,

 9        The witness in the foregoing examination,

10   was by me duly sworn to testify the truth, the

11   whole truth and nothing but the truth in the

12   within-entitled cause; that said testimony of

13   said witness was reported by a disinterested

14   person, and was thereafter transcribed under my

15   direction into typewriting and is a true and

16   correct transcription of said proceedings.

17        I further certify that I am not of counsel

18   or attorney for either or any of the parties in

19   the foregoing examination and caption named, nor

20   in any way interested in the outcome of the cause

21   named in said caption.

22        Dated the 15th day of November, 2007.

23   _____

24   LINDA VACCAREZZA, RPR, CSR #10201

25
```

494

# EXHIBIT 12

1                UNITED STATES DISTRICT COURT

2    NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

3    _____

4    MIGUEL A. CRUZ and JOHN D.        )
                                       CERTIFIED
5    HANSEN, individually, and on      )
                                       TRANSCRIPT
6    behalf of all others similarly    )

7    situated,                         )

8                        Plaintiffs,   )

9         vs.                          ) No. C-07-02050 SC

10   DOLLAR TREE STORES, INC.,         )

11                       Defendant.    )

12   _____  )

13   ROBERT RUNNINGS, individually, and )

14   on behalf of all others similarly )

15   situated,                         )

16                        Plaintiffs,  )

17        vs.                          )

18   DOLLAR TREE STORES, INC.          )

19                       Defendant.    )

     _____  )

20        Deposition of MICHAEL T. DEUBERT, taken

21        at 650 California Street, 20th Floor,

22        San Francisco, California, commencing

23        at 9:09 a.m., Monday, March 22, 2010,

24        before Kenneth T. Brill, RPR, CSR No. 12797.

25   Pages 1 - 149

                                                          1

1         Q.   And how frequently did the zone vice

2    presidents visit your stores during that period, on

3    average?

4              MR. COLE:  Objection, overbroad.

5              THE WITNESS:  Less than once a year.

6    BY MR. VANDALL:

7         Q.   And how frequently on average did the district

8    managers visit your store?

9              MR. COLE:  Objection.  Compound, overbroad.

10             THE WITNESS:  Average twice a month.

11   BY MR. VANDALL:

12        Q.   Did any of the five district managers you

13   mentioned visit your store more frequently than the

14   others?

15        A.   Not that I can recall.

16        Q.   Who is in charge of the day-to-day operations

17   of the stores you manage?

18        A.   I am.

19        Q.   Does that change when your district manager

20   visits your store?

21        A.   No.

22        Q.   So you remain in charge even though the

23   district manager is there?

24        A.   Correct.

25        Q.   Is that also true when the regional director

                                                        25

1        Q.    Do you delegate any tasks to your freight

2   manager when you receive the seasonal planner?

3        A.    At some point, yes.

4        Q.    For example, when the seasonal planner comes

5   in and you see how a particular aisle or gondola is set

6   up, do you meet with your freight manager and pass that

7   task to him or her, or do you take that on yourself?

8        A.    That's part of their tasks.

9        Q.    So you delegate that function?

10       A.    Correct.

11       Q.    Do you walk your store on a daily basis?

12       A.    Yes.

13       Q.    How much time do you spend walking the store

14   on a daily basis?

15       A.    Walking the store all day, it's just pretty

16   broad, no specific time.  I'm looking as I go during the

17   whole day.

18       Q.    Do you have a set time, for example, when you

19   come in, do you do a store walk?

20       A.    No, I don't, no.

21       Q.    Before the store closes or before you leave

22   for the day, do you do the store walk?

23       A.    Yes.

24       Q.    What are you looking for when you do the store

25   walk in that instance?

47

1          MR. COLE:  Objection, overbroad.

2          THE WITNESS:  Cleanliness, how the freight was

3    put up, displays, customer service, just about

4    everything.

5    BY MR. VANDALL:

6          Q.   Do you delegate any tasks before you leave as

7    a result of that store walk, typically?

8          A.   Sometimes maybe, yes.

9          Q.   More often than not, do you do so?

10         A.   Yes.

11         Q.   And how much time does that last store walk

12   generally take you?

13         A.   No set time.  It could be -- I couldn't give

14   you a time frame.  I just might have -- interrupt

15   customers or what.

16         Q.   Fair enough.  When you are walking the store

17   constantly throughout the day, are you also looking for

18   the same things that you just described, which are

19   cleanliness, how the freight was put up, displays,

20   customer service?

21         A.   Yeah, I'm always looking at that.

22         Q.   Is there any way for you to quantify how much

23   of your day is spent engaged in those tasks?

24         A.   Not realistically looking at it, no.

25         Q.   Are you also engaged in those tasks while you

48

```
 1        A.    Yes.
 2        Q.    Okay.  How much time do you spend in a typical
 3   day engaged in tasks related to oversight of the daily
 4   store activities?
 5        A.    The whole time I'm in the store.
 6        Q.    100 percent?
 7        A.    Yeah.
 8        Q.    What does that phrase mean to you, "oversee
 9   daily store activities"?
10        A.    Oversee everything that's happening and
11   whatever -- oversee everything that's happening in your
12   store.
13        Q.    So any decision that needs to be made is your
14   responsibility?
15              MR. COLE:  Objection, calls for speculation
16   and misstates the testimony.
17              THE WITNESS:  Not exactly, no.
18   BY MR. VANDALL:
19        Q.    When problems come up at your store, just
20   general problems, who is responsible for making the
21   decisions about those roles?
22              MR. COLE:  Objection, assumes facts not in
23   evidence and calls for speculation.
24              THE WITNESS:  If I'm in the store by myself,
25   then it's my prerogative.  If the -- another manager is
```
                                                         78

1   leadership and direction to store personnel.  Do you see

2   that?

3        A.   Yes.  Uh-huh.

4        Q.   Do you agree that's a management function?

5             MR. COLE:  Objection, vague and ambiguous.

6             THE WITNESS:  It's a function of what I do.

7   BY MR. VANDALL:

8        Q.   As the store manager?

9        A.   Yes.

10       Q.   Okay.  How much time do you spend engaged in

11  that task on a typical work week, providing leadership

12  and direction to store personnel?

13            MR. COLE:  Objection.  Compound, vague and

14  ambiguous.  If you can answer it, go ahead.

15            THE WITNESS:  It's basically interaction with

16  people that you're working with.  It's an ongoing day.

17  I mean, that's part of your work.  I mean --

18  BY MR. VANDALL:

19       Q.   Is there any way for you to quantify how much

20  time you spend on that task?

21       A.   I don't -- I don't know how you would put a

22  timetable on that.  I mean --

23       Q.   Okay.  How about line item number three,

24  Protection of company assets, do you engage in that job

25  function?

80

```
 1              MR. COLE:  I'm sorry, number three or number

 2    four?

 3              MR. VANDALL:  You are correct.

 4    BY MR. VANDALL:

 5        Q.   Number four, my mistake.

 6        A.   Yes.

 7        Q.   What does that mean to you, "Protect all

 8    company assets"?

 9        A.   Make sure that we're overseeing nothing

10    happens to the four walls of the store or anything

11    inside of it.

12        Q.   And how much time in a typical work week do

13    you spend engaged in that job function?

14        A.   That's a every-day job function.

15        Q.   All day, every day?

16        A.   Well, it might be not 100 -- you know, assets,

17    cash, going to the bank, doing pulls, watching different

18    things.  I mean, I'm sure there's different timetables,

19    but it's encompassed all in what you do on a daily basis

20    so to put any specific time frame on each one, I --

21        Q.   That's fair enough.  I'm just here to ask if

22    you can or you can't.

23              MR. COLE:  Why don't you let him answer the

24    question.

25              MR. VANDALL:  I am.
```

                                                              81

1                    CERTIFICATE OF REPORTER

2

3          I, KENNETH T. BRILL, a Certified Shorthand

4    Reporter, hereby certify that the witness in the

5    foregoing deposition was by me duly sworn to tell the

6    truth, the whole truth, and nothing but the truth in the

7    within-entitled cause;

8          That said deposition was taken down in

9    shorthand by me, a disinterested person, at the time and

10   place therein stated, and that the testimony of the said

11   witness was thereafter reduced to typewriting, by

12   computer, under my direction and supervision;

13         I further certify that I am not of counsel or

14   attorney for either or any of the parties to the said

15   deposition, nor in any way interested in the event of

16   this cause, and that I am not related to any of the

17   parties hereto.

18

19         DATED:  April 5, 2010

20

21

22

23   _____
     KENNETH T. BRILL

24   CSR 12797

25

                                                          148

**EXHIBIT 13**

1

1       IN THE U.S. DISTRICT COURT

2       NORTHERN DISTRICT OF CALIFORNIA

3              ---oOo---

4    _____
                                 )       Certified
5    MIGUEL A. CRUZ, and JOHN D. )       Transcript
     HANSEN, individually, and on )
6    behalf of all others similarly )
     situated,                   )
7                                 )
                                 )
8            Plaintiffs,          )
     vs.                         )No. C 07 02050 SC
9                                 )
     DOLLAR TREE STORES, INC.,   )
10                                )
             Defendant.           )
11   _____ )
     ROBERT RUNNINGS, individually, )
     and on behalf of all others )
12   similarly situated,          )
                                 )
13           Plaintiffs,          )
                                 )
14   vs.                         )No. C 07 04012 SC
                                 )
15   DOLLAR TREE STORES, INC.,   )
                                 )
16           Defendant.           )
     _____ )

17

18       DEPOSITION OF SCOTT DIEHL, at the Law Offices of

19       Littler Mendelson, P.C., 2520 Venture Oaks Way,

20       Suite 390, Sacramento, California, commencing at

21       9:08 a.m., April 5, 2010, before Elizabeth A.

22       Willis-Lewis, RPR, CSR No. 12155.

23

24   Job No. CS250720

25   Pages 1 - 180

10

1   other store was?

2       A.   1221.

3       Q.   Okay.  How long, if you recall, were you at

4   1221 for training?

5       A.   Roughly four weeks.

6       Q.   And when you were at 1221, if you recall, were

7   you paid by the hour?

8       A.   Yes, I was.

9       Q.   And did you receive overtime for any hours you

10  worked in excess of --

11      A.   I don't know.  I don't remember.

12      Q.   Who did you report to at store 1221?

13      A.   The store manager.

14      Q.   What was that person's name?

15      A.   Chuck Searcy, S-e-a-r-c-y.

16      Q.   Okay.  What did your four weeks of training

17  consist of?

18          MS. KUEHN:  Vague and ambiguous.

19  BY MS. JOHNSON:

20      Q.   You can answer.  So if your counsel objects and

21  you understand the question and you are able to answer

22  the question then you can go ahead and answer unless she

23  instructs you not to answer, which she has done.

24      A.   From my memory, then it was reading old Dollar

25  Tree manuals.

1    Q.    Okay.  What was your most recent job title at

2  Rite Aid?

3    A.    Store manager.

4    Q.    Did you have other jobs at Rite Aid before

5  being a store manager?

6         MS. KUEHN:  Vague and ambiguous.

7         THE DEPONENT:  I worked at other retail just to

8  get experience, like Longs, but nothing as a store

9  manager.

10   BY MS. JOHNSON:

11   Q.    So when you worked at Longs were you an hourly

12  associate?

13   A.    As first hired I was.

14   Q.    And did you move up to something else?

15   A.    To a department manager and that was salary.

16   Q.    Okay.  Other than reading the Dollar Tree

17  manuals what else did you do, if anything, in your four

18  weeks of training?

19        MS. KUEHN:  Calls for speculation, vague and

20  ambiguous.

21        THE DEPONENT:  Shadowed the store manager.

22   BY MS. JOHNSON:

23   Q.    Is that something you did every day during your

24  training?

25        MS. KUEHN:  Calls for speculation.

14

1          THE DEPONENT:   That took up part of my day,

2    yes.

3       BY MS. JOHNSON:

4       Q.   And what else did you do?

5       A.   Worked on the floor.

6       Q.   In what capacity?

7          MS. KUEHN:  Vague and ambiguous.

8          THE DEPONENT:  Unloaded trucks, stock shelves,

9    cashiered, got carts.

10      BY MS. JOHNSON:

11      Q.   Did you do anything else during your four weeks

12   of training that you haven't testified about?

13      A.   No.

14      Q.   Okay.  Did you have any Human Resources

15   training at that time?

16      A.   No.

17      Q.   Okay.  Have you had -- after your four weeks of

18   training in Redding have you had any other formal

19   training through Dollar Tree?

20      A.   Yes.

21      Q.   What training have you had?

22      A.   Sexual awareness -- harassment classes.

23      Q.   How many of those have you had?

24          MS. KUEHN:  Calls for speculation.

25          THE DEPONENT:  One to two.

1    Q.   Okay.   What other things, if anything, did you

2    do to manage shrink issues at your store?

3         MS. KUEHN:   Vague and ambiguous.

4         THE DEPONENT:   I would walk up and down the

5    aisles a lot just to find any open products, maybe see

6    what that area is in the store.

7    BY MS. JOHNSON:

8    Q.   How often prior to May 26, 2009, would you say

9    you walked up and down the aisles?

10        MS. KUEHN:   Vague and ambiguous, calls for

11   speculation.

12        THE DEPONENT:   Constant.

13   BY MS. JOHNSON:

14   Q.   Was that the same at Redding and at Red Bluff?

15   A.   Yes.

16   Q.   What other things did you do to manage shrink

17   issues as a store manager?

18   A.   Also tour the warehouse constantly to see if

19   any doors -- or stuff was thrown in the bailer.

20   Q.   Okay.   And what else would you do, if anything?

21        MS. KUEHN:   Vague and ambiguous.

22        THE DEPONENT:   That is pretty much what I would

23   do.

24   BY MS. JOHNSON:

25   Q.   How often did you tour the warehouse?

105

1   specific back in those days.

2       BY MS. JOHNSON:

3       Q.   Did you ever get any e-mails from the zone vice

4   president?

5       A.   Rarely.

6       Q.   Did you ever talk to your regional director or

7   zone vice president on the phone?

8       A.   No.

9       Q.   Prior to May 26, 2009, did you find that your

10  day-to-day experience at the stores where you worked was

11  different depending on the ability of your assistant

12  managers?

13          MS. KUEHN:   Vague and ambiguous.

14          THE DEPONENT:   I felt every day was different.

15      BY MS. JOHNSON:

16      Q.   Okay.   What were the -- what were the

17  differences that you experienced each day?

18          MS. KUEHN:   Vague and ambiguous, overbroad.

19          THE DEPONENT:   Just every day brought new

20  challenges.   I can't really sum it up more than that.

21      BY MS. JOHNSON:

22      Q.   So challenges that you had to deal with?

23      A.   The store had to deal with.

24      Q.   What was an example of some of the -- of one of

25  the challenges that the store would have to deal with?

168

1    Q.    Okay.   So it is a binder that is kept in your

2    store?

3    A.    Yes.

4    Q.    And what reports are contained in the binder?

5    A.    Business summary, SPH goals, shrink goals.

6    Q.    Let me have this marked.

7         (Exhibit 6 was marked for identification.)

8    BY MS. JOHNSON:

9    Q.    This is a document that has been designated as

10   confidential.   Exhibit 6 is a one-page document.   At the

11   top it says, "Contents," and then it has a list of

12   numbered items.

13        Mr. Diehl, is this -- to your knowledge is this

14   a table of contents of a Dollar Tree play book?

15        MS. KUEHN:   This document lacks foundation,

16   calls for speculation.

17        THE DEPONENT:   This is --

18   BY MS. JOHNSON:

19   Q.    Okay.   And so how do you use the play book

20   at -- how did you use the play book at Redding prior to

21   May 26, 2009?

22        MS. KUEHN:   Assumes facts not in evidence,

23   vague and ambiguous.

24        THE DEPONENT:   I would print out these reports

25   when they wanted us to have it done by on Mondays.

169

BY MS. JOHNSON:

Q.   So each week?

A.   Yes.

Q.   What would you do with them?

A.   I would put them under their tabs in the binder.

Q.   Did you -- other than putting them under their tabs did you use the reports in any way?

A.   I did use a couple of them.

Q.   Which ones did you use?

A.   I liked number 2, the Weekly Business Summary.

Q.   How did you use the Weekly Business Summary?

MS. KUEHN:   Vague and ambiguous.

THE DEPONENT:   It just showed, like it says, everything we did, what hours we spent in comparison to other stores in my district.

BY MS. JOHNSON:

Q.   What other ones did you use?

A.   Order Score Card, number 4.

Q.   What other ones?

A.   Top 200 SKUs.

Q.   What other ones?

A.   Markdowns Here Today.

Q.   Any other ones?

A.   I gathered them all, but I didn't in depth

170

1   study every one of them.

2        Q.   How did you use the Order Score Card?

3        A.   When the computer printed it out and compared

4   it to what was brought into the store as compared to

5   what sold -- what percentage.

6        Q.   Why did you want to look at that information?

7        A.   See if my sales each week were more than the

8   truck they were delivering me (sic).

9        Q.   What would be the reason you would want to know

10  that?

11            MS. KUEHN:  Calls for speculation.

12            THE DEPONENT:  Almost -- to see if you were

13  keeping up because if you didn't keep up it would

14  accumulate in the back.

15       BY MS. JOHNSON:

16       Q.   The merchandise would accumulate in the back?

17       A.   Yes.

18       Q.   How did you use the Top 200 SKUs Report?

19            MS. KUEHN:  Vague and ambiguous.

20            THE DEPONENT:  I would just print it up to see

21  what -- out of all of our thousands each week what our

22  top 100 or 200 is.

23       BY MS. JOHNSON:

24       Q.   That would be the top 100 or 200 for your

25  particular store, correct?

178

1   STATE OF CALIFORNIA        ) ss:

2   COUNTY OF PLACER           )

3

4       I, ELIZABETH A. WILLIS-LEWIS, CSR No. 12155, do

5   hereby certify:

6       That the foregoing deposition testimony was taken

7   before me at the time and place therein set forth

8   and at which time the witness was administered

9   the oath;

10      That the testimony of the witness and all objections

11  made by counsel at the time of the examination were

12  recorded stenographically by me, and were thereafter

13  transcribed under my direction and supervision, and that

14  the foregoing pages contain a full, true and accurate

15  record of all proceedings and testimony to the best of

16  my skill and ability.

17      I further certify that I am neither counsel for any

18  party to said action, nor am I related to any party

19  to said action, nor am I in any way interested in the

20  outcome thereof.

21      IN WITNESS WHEREOF, I have subscribed my name this

22  _____21st_____ day of _____April_____ 2010.

23

24

25  _____Elizabeth Willis-Lewis DP_____
    ELIZABETH A. WILLIS-LEWIS, RPR, CSR NO. 12155

# EXHIBIT 14

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SANTA CRUZ

--oOo--

RANDY SMITH,

     Plaintiff,

vs.

DOLLAR TREE STORES, INC., a
Virginia Corporation, HAYIM
GANNON, an individual, and
DOES 1-50, inclusive,

     Defendants.

_____/

**CERTIFIED COPY**

No. CISCV 160473

**RECEIVED**

JUN 08 2010

**LITTLER MENDELSON**

Videotaped Deposition of

SHERRY DOUBLEDAY

Thursday, May 27, 2010

Reported by:
THOMAS J. LANGE, CSR No. 4689
Registered Merit Reporter
Job No.: 25239LR



**PHILLIPS LEGAL SERVICES**
SAN FRANCISCO DEPOSITION REPORTERS

(888) 333.8270
(800) 455-8030 fax
WWW.PHILLIPSDEPO.COM

| | | |
|---|---|---|
| 10:18:31 | 1 | Q.        In San Jose? |
| 10:18:32 | 2 | A.        Yes. |
| 10:18:33 | 3 | Q.        Did you manage any other stores? |
| 10:18:38 | 4 | A.        No.  I just trained in Paul Alv -- |
| 10:18:44 | 5 | Q.        Avila? |
| 10:18:44 | 6 | A.        Yeah, in his store I trained.  I don't remember |
| 10:18:46 | 7 | what the store number was. |
| 10:18:48 | 8 | Q.        Was it the San Jose store on McKee, Capitol and |
| 10:18:53 | 9 | McKee? |
| 10:18:53 | 10 | A.        No. |
| 10:18:54 | 11 | Q.        It wasn't 1254? |
| 10:18:56 | 12 | A.        No.  It was Blossom Hill. |
| 10:19:00 | 13 | Q.        Okay.  How long was your training period with |
| 10:19:07 | 14 | Mr. Avila? |
| 10:19:08 | 15 | A.        I think it was a couple months, I believe. |
| 10:19:10 | 16 | Q.        One thing I forgot to mention earlier is that |
| 10:19:14 | 17 | sometimes when I ask you a question you might be |
| 10:19:16 | 18 | searching for a specific answer.  And if you can give me |
| 10:19:20 | 19 | a specific answer, that's great.  If you can't, then I'm |
| 10:19:23 | 20 | entitled to your best estimate.  But I don't want you to |
| 10:19:26 | 21 | guess in response to my questions. |
| 10:19:27 | 22 | Do you understand the difference between those |
| 10:19:29 | 23 | concepts? |
| 10:19:30 | 24 | A.        Yes. |
| 10:19:30 | 25 | Q.        Okay.  So I'll probably frequently ask you if |

15

| | | |
|---|---|---|
| 10:19:33 | 1 | you're able to give me a best estimate.  And -- |
| 10:19:35 | 2 | A.        Okay. |
| 10:19:36 | 3 | Q.        -- specifically that will mean you don't need |
| 10:19:38 | 4 | to guess, but if you can formulate a response, you need |
| 10:19:43 | 5 | to do that.  Do you understand? |
| 10:19:44 | 6 | A.        I think so. |
| 10:19:44 | 7 | Q.        Well, why don't I go over the difference. |
| 10:19:47 | 8 | If I were to ask you how long this conference |
| 10:19:51 | 9 | room table is, you have personally observed it and you |
| 10:19:54 | 10 | might be able to give me an estimate of how many feet |
| 10:19:57 | 11 | long it is.  Do you understand? |
| 10:19:58 | 12 | A.        Uh-huh. |
| 10:19:59 | 13 | Q.        And if I were to ask you how long my dining |
| 10:20:02 | 14 | room table is at home, you wouldn't be able to do that |
| 10:20:05 | 15 | because you haven't seen it. |
| 10:20:07 | 16 | A.        Right. |
| 10:20:07 | 17 | Q.        So that would be a guess. |
| 10:20:08 | 18 | A.        Okay. |
| 10:20:08 | 19 | Q.        Do you understand the difference? |
| 10:20:09 | 20 | A.        Uh-huh. |
| 10:20:10 | 21 | Q.        Okay.  Is it correct that your |
| 10:20:16 | 22 | manager-in-training period was roughly eight weeks in |
| 10:20:19 | 23 | duration? |
| 10:20:22 | 24 | A.        Yes. |
| 10:20:23 | 25 | Q.        May have been longer, may have been shorter, |

16

| 10:43:02 | 1 | involves maintaining enough product on hand to keep the |
| 10:43:04 | 2 | store shelves full? |
| 10:43:06 | 3 | A.        Yes. |
| 10:43:06 | 4 | Q.        Do you agree that operating a Dollar Tree store |
| 10:43:10 | 5 | involves selling merchandise to the customers? |
| 10:43:12 | 6 | A.        Yes. |
| 10:43:12 | 7 | Q.        Okay.  And do you agree that keeping a store |
| 10:43:14 | 8 | clean helps to sell merchandise to the customers? |
| 10:43:17 | 9 | A.        Yes. |
| 10:43:17 | 10 | Q.        Do you agree that keeping the store shelves |
| 10:43:19 | 11 | filled with merchandise helps to sell merchandise to the |
| 10:43:22 | 12 | customers? |
| 10:43:22 | 13 | A.        Yes. |
| 10:43:23 | 14 | Q.        Do you agree that as a Dollar Tree store |
| 10:43:26 | 15 | manager at store 3185 you were responsible for |
| 10:43:30 | 16 | supervising the process of receiving merchandise to be |
| 10:43:33 | 17 | sold at the store? |
| 10:43:34 | 18 | A.        Yes. |
| 10:43:35 | 19 | Q.        Do you agree that as a Dollar Tree store |
| 10:43:37 | 20 | manager at store 3185 you were responsible for |
| 10:43:40 | 21 | supervising the process of getting the merchandise from |
| 10:43:42 | 22 | the back room to the store shelves? |
| 10:43:44 | 23 | A.        Yes. |
| 10:43:44 | 24 | Q.        And do you agree that as a Dollar Tree store |
| 10:43:47 | 25 | manager at store 3185 you were responsible for |

37

| | | |
|---|---|---|
| 10:43:51 | 1 | supervising the process of making sure your store had |
| 10:43:53 | 2 | enough merchandise on hand to keep the store shelves |
| 10:43:56 | 3 | full? |
| 10:43:56 | 4 | A.        Yes. |
| 10:43:56 | 5 | Q.        Do you agree that as a Dollar Tree store |
| 10:43:59 | 6 | manager at store 3185 you were responsible for |
| 10:44:03 | 7 | supervising the process of keeping the store clean? |
| 10:44:05 | 8 | A.        Yes. |
| 10:44:06 | 9 | Q.        As a store manager for Dollar Tree, did you |
| 10:44:23 | 10 | have any job responsibilities relating to training new |
| 10:44:26 | 11 | employees? |
| 10:44:27 | 12 | A.        Yes. |
| 10:44:28 | 13 | Q.        Can you describe what those responsibilities |
| 10:44:30 | 14 | were? |
| 10:44:31 | 15 | A.        Well, just teaching people how to do the |
| 10:44:37 | 16 | planners, following their -- what they are supposed to |
| 10:44:46 | 17 | do on their cards and stuff.  Making sure that they |
| 10:44:53 | 18 | understand rules and regulations and policies of Dollar |
| 10:44:59 | 19 | Tree. |
| 10:44:59 | 20 | Q.        Were you finished? |
| 10:45:00 | 21 | A.        Yes. |
| 10:45:01 | 22 | Q.        Okay.  Did you delegate that to any of your |
| 10:45:04 | 23 | assistant managers, what you just described? |
| 10:45:06 | 24 | A.        Yes. |
| 10:45:07 | 25 | Q.        Did you train new cashiers yourself or did you |

38

Sherry Doubleday, Volume 1                    5/27/2010

```
10:53:29   1   were complaining about hours?
10:53:30   2   A.        Probably.
10:53:31   3   Q.        Did you ever interpret their complaints about
10:53:35   4   hours to be complaints about the need to bring other
10:53:39   5   store managers to their store for inventory purposes?
10:53:45   6   A.        Say that again.
10:53:46   7   Q.        Did they ever complain to you about having to
10:53:48   8   bring store managers into their stores for inventory
10:53:52   9   purposes?
10:53:53  10   A.        I don't know.
10:53:55  11   Q.        How many times per week did Terrie Peters visit
10:54:01  12   your store?  Or times per month.  With what frequency
10:54:04  13   did she visit?
10:54:06  14   A.        Some months it was more often than others.
10:54:10  15   Sometimes I would see her just once -- once a month.
10:54:13  16   Q.        Did she ever go to your store once per week?
10:54:22  17   A.        Maybe at some point in time.
10:54:25  18   Q.        But generally it was once a month or a couple
10:54:28  19   of times a month, as far as you recall?
10:54:29  20   A.        As far as I recall.
10:54:32  21   Q.        And when she did visit your store, how long did
10:54:37  22   she typically stay?
10:54:39  23   A.        Sometimes she would be there for ten minutes.
10:54:41  24   Sometimes she would be there all day.
10:54:43  25   Q.        During the occasions that she visited your
```

46

Sherry Doubleday, Volume 1                                    5/27/2010

| 11:06:31 | 1 | and respond to that request by producing it, okay? |
| 11:06:34 | 2 | A.        Okay.  If I can find it. |
| 11:06:35 | 3 | Q.        If you have it. |
| 11:06:36 | 4 | A.        Yeah. |
| 11:06:36 | 5 | Q.        Is it fair to say that you were the highest |
| 11:06:45 | 6 | ranking manager at the store that you managed? |
| 11:06:47 | 7 | A.        I was the highest -- yes. |
| 11:06:50 | 8 | Q.        And you were ultimately responsible for whether |
| 11:06:53 | 9 | the store ran smoothly or not? |
| 11:06:55 | 10 | A.        Yes. |
| 11:06:56 | 11 | Q.        As the store manager at store 3185, did you |
| 11:07:01 | 12 | have the authority to hire hourly associates? |
| 11:07:04 | 13 | A.        Hourly associates, yes. |
| 11:07:07 | 14 | Q.        Did you hire cashiers? |
| 11:07:09 | 15 | A.        Yes. |
| 11:07:09 | 16 | Q.        Did you hire stockers? |
| 11:07:12 | 17 | A.        Yes. |
| 11:07:12 | 18 | Q.        Did you ever make a recommendation to your |
| 11:07:15 | 19 | district manager with respect to hiring an assistant |
| 11:07:18 | 20 | manager? |
| 11:07:18 | 21 | A.        No. |
| 11:07:21 | 22 | Q.        Did you ever hire an assistant manager |
| 11:07:24 | 23 | yourself? |
| 11:07:24 | 24 | A.        No. |
| 11:07:25 | 25 | Q.        Did you ever terminate a cashier? |

57

11:14:24  1   Q.        Were you aware that you could go into the

11:14:27  2   COMPASS system as a store manager and type in your

11:14:30  3   actual hours relative to the scheduled hours?

11:14:34  4   A.        No.  I had great difficulties with COMPASS.

11:14:40  5   Q.        Okay.  Can you describe the difficulties you

11:14:42  6   had?

11:14:42  7   A.        It was just Greek to me.

11:14:46  8   Q.        How did you work around that problem?

11:14:52  9   A.        I don't really recall.

11:14:58  10  Q.        One thing that you did was call Randy Smith.

11:15:02  11  You remember that?

11:15:02  12  A.        I would call Randy and ask him for advice on

11:15:05  13  that a lot.  I just can't recall what I ended up doing,

11:15:12  14  what I did.

11:15:13  15  Q.        Given that the COMPASS system was Greek to you,

11:15:16  16  as you say, did it take you longer to schedule?

11:15:19  17  A.        It took me a little bit longer, yeah.

11:15:21  18  Q.        Can you ballpark for me about how long it took

11:15:24  19  you to schedule?

11:15:25  20  A.        No, not really.  I would start on it one day

11:15:34  21  and have to go back to it a few hours later or something

11:15:37  22  because I would just get stressed with it.

11:15:40  23  Q.        It would get frustrating?

11:15:42  24  A.        It would get frustrating, yeah.  And I would

11:15:44  25  have to walk away and come back even the next day.  I

64

| | | |
|---|---|---|
| 13:26:18 | 1 | Q.       Okay.  Did you ever learn from any source that |
| 13:26:22 | 2 | other store managers were ordering with a greater |
| 13:26:25 | 3 | frequency than once per week? |
| 13:26:27 | 4 | A.       Some stores -- the bigger volume stores did |
| 13:26:31 | 5 | order differently.  A couple of days a week or |
| 13:26:35 | 6 | something. |
| 13:26:37 | 7 | Q.       Have you ever learned from any source that some |
| 13:26:39 | 8 | store managers ordered product on a daily basis? |
| 13:26:43 | 9 | A.       I don't recall. |
| 13:26:45 | 10 | Q.       You don't recall whether you ever learned that |
| 13:26:47 | 11 | from any source or whether that happened? |
| 13:26:49 | 12 | A.       Yeah.  I don't recall it ever happened.  I |
| 13:26:52 | 13 | don't know -- I don't know that I knew it. |
| 13:26:53 | 14 | Q.       Okay.  Did you use an order book when you did |
| 13:26:56 | 15 | place orders? |
| 13:26:57 | 16 | A.       Yes, it was the company's order book. |
| 13:27:00 | 17 | Q.       And you don't recall how much product you |
| 13:27:02 | 18 | ordered through the order book; is that right? |
| 13:27:05 | 19 | A.       No.  No. |
| 13:27:09 | 20 | Q.       I say that because earlier we talked about ASRs |
| 13:27:13 | 21 | versus ordering and you didn't remember the percentages. |
| 13:27:15 | 22 | A.       Yeah, I don't -- I ordered some but don't know |
| 13:27:19 | 23 | how much. |
| 13:27:19 | 24 | Q.       Do you recall how much time you spent on |
| 13:27:21 | 25 | ordering tasks? |

114

| | | |
|---|---|---|
| 13:27:24 | 1 | A.       No.   Half a day maybe. |
| 13:27:37 | 2 | Q.       Half a day once a week? |
| 13:27:39 | 3 | A.       Yeah. |
| 13:27:40 | 4 | Q.       And half a day meaning half of an eight-hour |
| 13:27:43 | 5 | day or half of a 12- to -- |
| 13:27:43 | 6 | A.       Half of a workday. |
| 13:27:45 | 7 | Q.       -- 16-hour day? |
| 13:27:46 | 8 | A.       Half of a workday. |
| 13:27:48 | 9 | Q.       Did you ever delegate the function of ordering |
| 13:27:56 | 10 | to your assistants? |
| 13:27:58 | 11 | A.       Yes, if I was on vacation or if I wasn't going |
| 13:28:02 | 12 | to be there for the deadline or something, yes. |
| 13:28:10 | 13 | Q.       Can you walk me through the process you |
| 13:28:12 | 14 | followed before placing an order? |
| 13:28:15 | 15 | A.       Oh, gosh.  We'd have to walk the store. |
| 13:28:22 | 16 |          Couldn't resist. |
| 13:28:23 | 17 |          Had to walk through the store checking the |
| 13:28:26 | 18 | aisles.  There was a -- there was a ordering thing that |
| 13:28:34 | 19 | we had to kinda -- a book that -- I forget even what it |
| 13:28:40 | 20 | was called, that we had to mark.  We saw something out, |
| 13:28:43 | 21 | we mark it on the document. |
| 13:28:44 | 22 | Q.       Sales order worksheet? |
| 13:28:47 | 23 | A.       Sales order worksheet.  That might have been |
| 13:28:50 | 24 | it. |
| 13:28:50 | 25 | Q.       Store order worksheet? |

115

13:45:24    1    Q.        Okay.  Now, line item No. 1 is "Supervision of

13:45:30    2    associates."  Do you see that?

13:45:31    3    A.        Uh-huh.

13:45:32    4    Q.        Yes?

13:45:32    5    A.        Yes.

13:45:33    6    Q.        You told me earlier that you supervised all the

13:45:36    7    associates at your store; correct?

13:45:37    8    A.        Yes.

13:45:38    9    Q.        How much of your time in a typical workweek

13:45:41    10   would you spend on supervisory tasks?

13:45:44    11   A.        No idea.

13:45:45    12   Q.        Do you agree that supervision includes things

13:45:48    13   like assigning tasks and making sure that they're done?

13:45:53    14   A.        Yes.

13:45:53    15   Q.        Do you agree that it includes monitoring

13:45:56    16   whether employees are standing around or chewing gum --

13:45:58    17   A.        Yes.

13:45:59    18   Q.        -- or working hard?

13:46:00    19   A.        Sorry.  Yes.

13:46:01    20   Q.        And you did those things all the time; isn't

13:46:03    21   that right?

13:46:03    22   A.        Most of the time.

13:46:05    23   Q.        Okay.  Now, line item No. 2 is "Oversee daily

13:46:10    24   store activities, including opening and closing of

13:46:13    25   store."  Do you see that?

                                                                    130

13:49:12  1   Q.        Is there any way to estimate how much actual

13:49:17  2   time you spend on shrink-related tasks as a store

13:49:20  3   manager in a typical workweek?

13:49:23  4   A.        No, but it's constantly on your mind.

13:49:25  5   Q.        Doesn't it vary a lot from week to week or day

13:49:30  6   to day?

13:49:30  7   A.        It might.

13:49:31  8   Q.        You just don't recall specifically?

13:49:33  9   A.        Yeah.

13:49:33  10  Q.        Is that right?

13:49:35  11  A.        Yes.

13:49:35  12  Q.        Line item No. 6 is "Responsible for adequate

13:49:40  13  staffing of the store," and then lists some additional

13:49:43  14  related tasks.  Do you see that?

13:49:45  15  A.        Yes.

13:49:46  16  Q.        Do you agree that you performed that job

13:49:48  17  function?

13:49:50  18  A.        "Recruit, interview, hire..."  Yes -- yes.

13:49:59  19  Under the rules and regulations of the books and stuff,

13:50:04  20  yes.

13:50:05  21  Q.        We talked a little bit before about hiring and

13:50:13  22  that sort of thing --

13:50:13  23  A.        Uh-huh.

13:50:14  24  Q.        -- and you didn't terminate but you did hire?

13:50:16  25  A.        Uh-huh.

134

| 13:50:16 | 1 | Q.        Yes? |
| 13:50:16 | 2 | A.        Yes. |
| 13:50:17 | 3 | Q.        Is there any way to approximate how much time |
| 13:50:19 | 4 | in a typical workweek you spent on those tasks? |
| 13:50:27 | 5 | A.        No. |
| 13:50:28 | 6 | Q.        You didn't have much turnover at your store? |
| 13:50:30 | 7 | A.        I didn't, yeah. |
| 13:50:31 | 8 | Q.        So it was not too much; is that right? |
| 13:50:34 | 9 | A.        Well, I had to do all the paperwork and stuff. |
| 13:50:37 | 10 | When I did hire somebody, I had to make phone calls into |
| 13:50:42 | 11 | whatever it was that we had to do.  And they had a ton |
| 13:50:47 | 12 | of paperwork that we had to go through. |
| 13:50:49 | 13 | Q.        So there was some time; it maybe varied from |
| 13:50:53 | 14 | week to week? |
| 13:50:53 | 15 | A.        Yeah. |
| 13:50:54 | 16 | Q.        Okay.  Next line item is "Schedule and sign |
| 13:50:57 | 17 | work to store personnel.  Evaluate, motivate, counsel, |
| 13:51:01 | 18 | develop, discipline and discharge sales associates |
| 13:51:03 | 19 | appropriately.  Maintain production reports to evaluate |
| 13:51:06 | 20 | job performance of sales associates." |
| 13:51:09 | 21 | Do you see that? |
| 13:51:09 | 22 | A.        Uh-huh. |
| 13:51:09 | 23 | Q.        Yes? |
| 13:51:10 | 24 | A.        Yes. |
| 13:51:10 | 25 | Q.        You agree that was one of your job functions? |

135

| | | |
|---|---|---|
| 13:51:13 | 1 | A.        Yes. |
| 13:51:13 | 2 | Q.        Okay.  And are you able to approximate for me |
| 13:51:16 | 3 | how much time you spent in a typical week on those |
| 13:51:20 | 4 | tasks? |
| 13:51:21 | 5 | A.        Hard to say. |
| 13:51:22 | 6 | Q.        We talked a little bit about COMPASS and the |
| 13:51:26 | 7 | time you spent on COMPASS.  Were there additional things |
| 13:51:29 | 8 | that you did outside of COMPASS within this job |
| 13:51:33 | 9 | function? |
| 13:51:34 | 10 | A.        Yeah, we had to motivate; we had to counsel |
| 13:51:42 | 11 | people sometimes, discipline people.  No way I can give |
| 13:51:47 | 12 | a -- without -- |
| 13:51:48 | 13 | Q.        Sure.  It doesn't limit itself to COMPASS, |
| 13:51:51 | 14 | though, that job function? |
| 13:51:52 | 15 | A.        Right, yeah. |
| 13:51:52 | 16 |          (Randy Smith exits.) |
| 13:51:55 | 17 | Q.        BY MR. VANDALL:  Can you give me an example of |
| 13:51:57 | 18 | how you motivate the associates you worked with? |
| 13:52:01 | 19 |          Other than buying them lunch from time to time, |
| 13:52:03 | 20 | which I would find motivating. |
| 13:52:05 | 21 | A.        I can't think of an example.  Like Halloween, |
| 13:52:17 | 22 | maybe.  We did different fun things to keep people |
| 13:52:22 | 23 | motivated and my employees kind of liked coming to work. |
| 13:52:27 | 24 | Q.        Did you do a costume day? |
| 13:52:31 | 25 | A.        Yeah, we did like costume day for Halloween and |

136

```
1                    REPORTER'S CERTIFICATE

2

3         I certify that the foregoing proceedings in the

4   within-entitled cause were reported at the time and

5   place therein named; that said proceedings were reported

6   by me, a duly Certified Shorthand Reporter of the State

7   of California, and were thereafter transcribed into

8   typewriting.

9         I further certify that I am not of counsel or

10  attorney for either or any of the parties to said cause

11  of action, nor in any way interested in the outcome of

12  the cause named in said cause of action.

13        IN WITNESS WHEREOF, I have hereunto set my hand

14  this 7th day of June, 2010.

15
                                    Digitally signed by Thomas J. Lange
                                    Date: 2010.06.07 13:47:27 -07:00
16                                  Reason: I am the author of this document
                                    Location: Sacramento, CA

17        _____
          THOMAS J. LANGE, Calif. CSR No. 4689
18        Registered Merit Reporter

19

20

21

22

23

24

25
                                                              177
```